**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

TYLER GROUP PARTNERS, LLC,

       Plaintiff,

vs.                                                                No. CIV 19-0777 JB/SMV

BERT MADERA; MONTIE CAROL
MONTGOMERY and PITCHFORK
CATTLE COMPANY, LLC,

       Defendants.

**MEMORANDUM OPINION AND ORDER**[1]

    **THIS MATTER** comes before the Court on Defendants Bert Madera and Pitchfork Cattle Company, LLC Motion for Summary Judgment on Bert Madera and Pitchfork Cattle Company, LLC Resulting from Breach of Duties, filed November 30, 2020 (Doc. 84)("MSJ").  The Court held a hearing on January 29, 2021.  See Clerk's Minutes at 1, filed January 29, 2021 (Doc. 98). The primary issues are: whether (i) N.M.S.A. § 61-29-16 bars Plaintiff Tyler Group Partners, LLC's ("Tyler Group") recovery of two-and-a-half-percent of the sale of the Pitchfork Ranch, because Fredrick Harold Tyler ("Tyler") was not a licensed broker under the Commission Act, N.M.S.A. §§ 61-29-1 to -29, at the time of the sale of the Pitchfork Ranch; and (ii) whether the Tyler's sale of surface water of the Pitchfork Ranch was the sale of real property under New Mexico law for which Tyler needed a license under the Commission Act.  The Court concludes that: (i) the Commission Act does not bar Tyler Group's recovery, because, N.M.S.A. § 61-29-16

---

      [1]This Memorandum Opinion and Order disposes of Defendants Bert Madera and Pitchfork Cattle Company, LLC Motion for Summary Judgment on Bert Madera and Pitchfork Cattle Company, LLC Resulting from Breach of Duties, filed November 30, 2020 (Doc. 84).  The Court will issue a more thorough Memorandum Opinion at a later date fully detailing its rationale for its decision.

bars recovery only where a person is acting as a broker and is seeking a broker's commission, and Tyler did not act as a broker and is not seeking to recover a commission based on actions as a broker; and (ii) Tyler did not negotiate the sale of water rights, which would be subject to the Commission Act; rather, Tyler negotiated the sale of surface water as a commodity.  Accordingly, because § 61-29-16 does not bar Tyler Group's action as a matter of law, the Court denies the MSJ.

## **FACTUAL BACKGROUND**

### **1.    The Parties.**

The Tyler Group, "a Texas limited liability company, is a foreign entity doing business in the State of New Mexico and maintains its principal place of business in Texas."  Amended Complaint for Debt and Money Due ¶ 1, at 1, filed October 2, 2019 (Doc. 8)("First Amended Complaint")(asserting these facts).  See Defendant's Ame[n]ded Memorandum in Support of Its Motion for Summary Judgment ¶¶ 1-24, at 4-7, filed November 30, 2020 (Doc. 86)("MSJ Memo")(not disputing these facts).[2]  Tyler Group's "sole member is Fredrick Harold Tyler, who, at all times relevant to this cause, has been a citizen of Texas."  First Amended Complaint ¶ 1, at 1.  See MSJ Memo ¶¶ 1-24, at 4-7 (not disputing this fact).  Tyler does not have a broker's license or an associate broker's license under the New Mexico Real Estate Brokers and Salesmen Act.  See MSJ Memo ¶¶ 22-23, at 7 (asserting this fact); Plaintiff Tyler Group Partners, LLC's Response and Memorandum in Opposition to Defendants' Motion for Summary Judgment ¶¶ 2-7, at 6-9, filed December 14, 2020 (Doc. 87)("Response")(not disputing this fact).

Defendant Bert Madera is a citizen of the State of New Mexico, and is an owner and

---

[2]Throughout the Factual Background, pursuant to the local rules, "[a]ll material facts set forth in the response will be deemed undisputed unless specifically controverted."  D.N.M. LR-Civ 56.1(b).

manager of Defendant Pitchfork Cattle Company, LLC.  See First Amended Complaint ¶ 2, at 1;

MSJ Memo ¶¶ 1-24, at 4-7 (not disputing this fact).  Montie Carol Madera is a citizen of the State

of New Mexico, and an owner and manager of Pitchfork Cattle.[3]  See First Amended Complaint ¶

3, at 1 (asserting this fact).  See MSJ Memo ¶¶ 1-24, at 4-7 (not disputing this fact).  Pitchfork

Cattle "was a New Mexico corporation based out of Lea County, New Mexico.  Pitchfork was

organized on April 3, 2017, with Bert and Montie Carol Madera as its sole members and

managers."  First Amended Complaint ¶ 4, at 2.  See MSJ Memo ¶¶ 1-24, at 4-7 (not disputing

this fact); Response ¶ 9, at 10 ("Pitchfork Cattle Company, LLC, is a New Mexico limited liability

company and the Maderas are its sole members and managers.").

> [The] Pitchfork Ranch is a nearly 24,000-acre (35,000) cattle ranch in Lea
> County, New Mexico (near Jal) owned by Bert and Montie Carol Madera.  The
> ranch has traditionally been devoted to the family's cattle operation.  The ranch,
> however, is located in the Delaware Basin (a productive portion of the Permian
> Basin in Southeast New Mexico) and the Maderas wanted to increase their income
> from opportunities related to oil and gas water-related activities, albeit not
> necessarily from oil and gas production as the Maderas owned little of the minerals.

First Amended Complaint ¶ 12, at 3.  See MSJ Memo ¶¶ 1-24, at 4-7 (not disputing this fact).

After Madera inherited the Pitchfork Ranch from his late father in 2006, Madera decided to sell

the property.  See MSJ Memo ¶ 1-3, at 4 (asserting this fact); Response ¶¶ 2-7, at 6-9 (not disputing

these facts).  Madera sought out business consultants to increase Pitchfork Ranch's profitability

and hired Tyler in 2017 "to assist with developing the water-related sales on the Pitchfork Ranch."

MSJ Memo ¶ 6, at 4.  See First Amended Complaint ¶ 14, at 4 (agreeing with these facts); Response

¶¶ 2-7, at 6-9 (not disputing these facts).  "Tyler was never hired nor tasked with selling the ranch."

MSJ Memo ¶ 8, at 5.  See Response ¶¶ 2-7, at 6-9 (not disputing this fact).

---

[3]Montie Carol Madera was voluntarily dismissed from this action under rule 41 of the
Federal Rules of Civil Procedure.  See Stipulated Notice of Dismissal with Prejudice and
Withdrawal of Montie Carol Montgomery's Request for Admissions, filed November 24, 2020
(Doc. 79).

2.      <u>**The Two Oral Contracts**</u>.

Madera and Tyler made two oral agreements, neither written down: (i) Madera would pay

the Tyler Group five percent of the gross monthly water sales that Tyler negotiated; and (ii) Madera

would pay the Tyler Group a two-and-a-half percent sales commission fee when the Pitchfork

Ranch was sold.[4]  <u>See</u> MSJ Memo ¶¶ 12-13, at 5; Response ¶¶ 14-34, at 11-19.  Tyler sought out

prospective buyers and negotiated an agreement for water sales from the Pitchfork Ranch:

> Historically, the Madera's were not able to sell fresh water in the amounts required for their surface lease holder Concho (COG). . . .  Tyler was successful and, in the fall of 2017, negotiated an agreement ("COG water agreement") with COG Operating LLC ("COG") . . . .  During the first month of the agreement, the Madera's received more than $1.3 million in water revenues.  Tyler's agreed fee was $67,500.  . . .  COG had fracks scheduled every month for the year of 2018. As a result, the Maderas could expect COG to buy approximately one million (1,000,000) barrels of water per month at two dollars ($2) per barrel, and from that Plaintiff could expect approximately one-hundred thousand dollars ($100,000) in revenues from his five percent (5%) fee.

First Amended Complaint ¶ 15, at 4-5.  <u>See</u> MSJ Memo ¶¶ 1-24, at 4-7 (not disputing these facts);

Response ¶¶ 14-19, at 11-12 (describing the water sales agreement).

"In November 2017, after only one month of water sales, the Maderas shut off the water

supply to Concho."  <u>See</u> Response ¶ 18, at 12; Defendant's Response in Support of Motion for

Summary Judgement at 1-9, filed December 21, 2020 (Doc. 89)("Reply")(not disputing this fact).

"In March 2018, counsel for the Maderas, instructed Tyler that '[a]ny decision regarding how to

handle the Concho matter" needed to be addressed through Charles Peifer, the Maderas' litigation

counsel, resulting in Tyler's removal from the consulting efforts to sell the ranch."  First Amended

---

[4]The parties dispute whether the Tyler Group seeks to recover a broker's "real estate commission fee from the sale of the" Pitchfork Ranch, MSJ Memo ¶ 21, at 7, or whether the two-and-a-half percent of Pitchfork Ranch's sale is a fee that "was part of [Tyler's] compensation for developing the Ranch's water sales business," Response ¶ 7, at 8-9.  The Court concludes that this factual distinction that the parties dispute does not change the Court's analysis.  <u>See</u> Analysis § I, <u>infra</u>.

Complaint ¶ 16, at 5-6.  See MSJ Memo ¶¶ 1-24, at 4-7 (not disputing this fact).  Then in September

2018, the Maderas sold the Pitchfork Ranch to Concho for eighty-two million dollars.  See First

Amended Complaint ¶ 17, at 6; MSJ Memo ¶¶ 1-24, at 4-7 (not disputing this fact); Response ¶ 24,

at 4 (asserting this fact).  Tyler had "no role in the negotiations, not having introduced the buyers

to the sellers, and having no first-hand knowledge of the deal's details."  MSJ Memo ¶ 21, at 7.

See Response at 23 (agreeing with this fact and citing Affidavit of Frederick H. Tyler  ¶ 7, at 3,

dated December 14, 2020, filed December 14, 2020 (Doc. 87-1)).

## PROCEDURAL BACKGROUND

In August, 2019, the Tyler Group brought this action for damages, alleging three causes of

action: (i) material breach of contract to pay the Tyler Group the two-and-a-half percent fee of the

gross sales price of the Pitchfork Ranch; (ii) fraudulent inducement; and (ii) unjust enrichment.

See Complaint for Debt and Money Due, filed August 26, 2019 (Doc. 1).  See also First Amended

Complaint ¶¶ 20-36, at 6-9.

In November, 2020, Defendants Bert Madera and Pitchfork Cattle Company, LLC

(collectively "Madera and Pitchfork Cattle") filed their MSJ and MSJ Memo, arguing that: (i) the

Tyler Group cannot show that Tyler's services increased the value of  the Pitchfork Ranch; (ii) the

Commission Act, N.M.S.A. § 61-29-1 to -29, bars the Tyler Group's recovery as a matter of law,

because (a) Tyler did not have a proper broker's license at the time of the sale of the Pitchfork

Ranch, and (b) water rights are real property in New Mexico; (iii) the Tyler Group's claims against

the Maderas in their individual capacities improperly seeks pierce the corporate veil of Pitchfork

Cattle Co., LLC; and (iv) the Tyler Group's unjust enrichment claim fails under New Mexico law.

See MSJ Memo at 1-18.

The Tyler Group responded, arguing that (i) increasing the value of the Pitchfork Ranch

was not a condition or term of either the Water Sales Fee Agreement or the Ranch Sales Fee Agreement; (ii) the Commission Act does not apply because Tyler was not acting as a broker for purposes of the Act; (iii) the claims against Madera in his individual capacity should not be dismissed; and (iv) the Tyler Group's unjust enrichment claim is appropriate. See Response at 1-26. Madera and Pitchfork Cattle replied, arguing that: (i) they "are entitled to summary judgement because New Mexico precludes real estate sales commissions without a proper license and water rights are real property subject to NMSA 1978, § 61-29-16"; and (ii) there are no disputes of material fact. Reply at 4-7.

In January 2021, the Court held a hearing on the MSJ. See Clerk's Minutes at 1, filed January 29, 2021 (Doc. 98). At the hearing, Madera and Pitchfork Cattle contended that "any agreement for the sale of real property or for the sale of real property rights is barred in New Mexico unless the party earning a commission has a license to engage in that activity." Transcript of Hearing at 8:13-18 (taken January 29, 2021)(Hightower)("Tr.").[5] Madera and Pitchfork Cattle argued that "state law is very clear that even if you provide somebody with a benefit, if you don't possess the requisite licensure from the state you can't benefit from what you provided and that holds true to these real property rights." Tr. at 13:21-25 (Hightower). Madera and Pitchfork Cattle argued:

> Mr. Hightower:   I think if the Court ultimately finds that there is no legal bar or
> state law bar to the agreements that the parties entered into.
> Then I think that the Court's question is well placed and correct
> and ultimately a jury would have to weigh the credibility of the
> testimony. It's our position that any agreement for the sale of
> real property or for the sale of real property rights is barred in
> New Mexico unless the party earning a commission has a license
> to engage in that activity.

---

[5]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

The Court:       All right.  You think that's really what this motion now is
                 distilled to is that legal issue about whether these documents
                 require a licensed real estate broker to make this sale.

Mr. Hightower:   Yes, essentially Judge.

The Court:       So basically, if that issue goes your way, you think there is
                 something here the Court can grant.  And if it doesn't go your
                 way, you're signaling that probably this thing has to go to a jury
                 trial.

Mr. Hightower:   Yes, Your Honor, to be very straightforward with you, that's
                 correct.

Tr. at 8:8-9:5 (Hightower, Court).

The Tyler Group then explained the water rights:

Mr. DeAyala:     But again, when you say the word water rights are, I assume you're
                 thinking that when they are selling water to Concho they are selling
                 water that is beneath their property.  That is not what's happening.
                 They are shipping water in from somewhere else because they can't
                 produce enough water on the ranch to sell.  This is not, even in the
                 misguided description of whether water is real estate, whatever
                 hypothetically one could argue, this isn't it.  This is third party water
                 are, piped in, put in a frac tank, because the agreement with Concho
                 was if I've got water in this frac tank I can sell it to you.  So we're
                 not than talking about real estate water rights  even if there was such
                 a thing, even if water rights constituted a real estate interest subject
                 to the  real estate act which it doesn't there is no authority to suggest
                 it does.  My argument about this is hypothetically, even if it did, this
                 isn't it,  does that make sense.

The Court:       So we're not talking about any  underground or surface water that
                 the ranch is producing it's all piped in water.

Mr. DeAyala:     Correct, Your Honor.

. . .

The Court:       Well, I'm just trying to understand what it is the Tyler group is
                 dealing with  here.  I guess when I first got into it, I thought that they
                 were selling water that was coming underground or surface water or
                 something like that.  I wouldn't think much surface water out there,
                 but under groundwater was what they were selling to the  oil
                 companies.  But that's not the case.

Mr. DeAyala:     No, Your Honor.

- 7 -

The Court:     Well, maybe I'm just not understanding, why are me shipping it to this 23,000 acres rather than another 23,000 acres?  What does the ranch give Concho that Concho couldn't get somewhere else.

Mr. DeAyala:  So Concho and the Maderas did have an agreement that if the Maderas had water, Concho had to buy it.  So Maderas were incentivized to get water, and they couldn't, they didn't have the ability to get water underground.  The aquifers weren't there and so forth.  So this third party avenue, because the price was so attractive with Concho they could go buy third party water for less, make the spread and do well.

The Court:     So the agreement with Concho is just give you water?

Mr. DeAyala:  It's almost like a take-or-pay.

The Court:     And they didn't really care where the water came from.

Mr. DeAyala:   No, it was better, it was:  If you have it, we must buy it.  Now, that contract, I don't think, is in evidence.  I didn't find it relevant to the motion.

The Court:     Well, the reason I think it's interesting is it supports your argument that this is just a commodity out there, it's not some part of property right or a bundle of the property rights that we're dealing with.  It's just water is a commodity out there, and it really doesn't matter whether it's produced there or they go buy it with Ozark bottles at the grocery store or what, all it is a commodity out there.

Mr. DeAyala:  Correct.  It's not, I think the best description I think was it's not, this water is not part of the bundle of sticks, absolutely true statement.

Tr. at 27:15-30:20 (DeAyala, Court).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"   Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th

Cir. 1991)(alteration in <u>Herrera v. Santa Fe Pub. Sch.</u>)).  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)("<u>Celotex</u>").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, <u>or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."</u>  <u>Celotex</u>, 477 U.S. at 323-25.  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment."  <u>Cardoso v. Calbone</u>, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

<u>Plustwik v. Voss of Nor. ASA</u>, No. 2:11-CV-0757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  <u>Celotex</u>, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[6]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  <u>See</u> <u>Celotex</u>, 477 U.S. at 324; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)("<u>Liberty Lobby</u>").  In <u>American Mechanical Solutions, LLC v. Northland Piping, Inc.</u>, 184 F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims.

---

[6]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in <u>Celotex</u>, this sentence is widely understood to be an accurate statement of the law.  <u>See</u> 10A Charles Allen Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

See 184 F. Supp. 3d at 1075-78.  The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided.  See 184 F. Supp. 3d at 1067, 1073, 1075, 1079.  The Court determined that, without the requisite evidence, the plaintiff failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial."  184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).  Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant may move, without any competent evidence itself, past the plaintiff's lack of competent evidence, and secure summary judgment.  See, e.g., Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that defendants defectively manufactured an oil distributor).  A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence.  See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim).  See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing

that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation and internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that

something will turn up at trial.'"  Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Liberty Lobby, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's

favor and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  (citation omitted)).  Fourth, the court cannot decide any issues of credibility.  See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that summary judgment is appropriate where video evidence quite clearly contradicted the plaintiff's version of the facts.  See 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting *Scott*, 550 U.S. at 380); *see also Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty., third and fourth alterations in York v. City of Las Cruces).  "The Tenth Circuit, in *Rhoads v. Miller*, [352 F. App'x 289 (10th Cir. 2009)] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony."  Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012).

To allege a claim for relief, rule 8 of the Federal Rules of Civil Procedure requires a pleading to contain

> (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
>
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
>
> (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8.  Parties may allege new claims in motions for summary judgment.  Evans v. McDonald's Corp., 936 F.2d at 1090-91.  When this occurs, courts treat the motion for summary judgment as a request to amend the complaint pursuant to rule 15 of the Federal Rules of Civil Procedure.  See Viernow v. Euripides Dev. Corp., 157 F.3d 790 n.9 (10th Cir. 1998).  The Tenth Circuit has stated that "[a]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover,

provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits." Evans v. McDonald's Corp., 936 F.2d at 1090-91 (quotation marks omitted). While the purpose of "fact pleading" is to give defendants fair notice of claims against them "without requiring the plaintiff to have every legal theory or fact developed in detail before the complaint is filed and the parties have opportunity for discovery," plaintiffs may not "wait until the last minute to ascertain and refine the theories on which they intend to build their case." Evans v. McDonald's Corp., 936 F.2d at 1091.

## LAW REGARDING DIVERSITY JURISDICTION AND ERIE

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[7] If the Court finds only an

---

[7]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.). Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme

opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will

consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by

the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court

decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that

where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal

district court sitting in this district, is to predict what the Supreme Court of New Mexico would do

if the case were presented to it"  (citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir.

2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt

to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance

from decisions rendered by lower courts in the relevant state"))).[8]  The Court may also rely on

---

court precedent usually binds state trial courts.  The factors to which a federal court should look
before making an Erie prediction that a state supreme court will overrule its prior precedent vary
depending upon the case, but some consistent ones include: (i) the age of the state supreme court
decision from which the federal court is considering departing -- the younger the state case is, the
less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts
-- especially the state supreme court -- have placed on the state decision from which the federal
court is considering departing; (iii) apparent shifts away from the doctrine that the state decision
articulates, especially if the state supreme court has explicitly called an older case's holding into
question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting
justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or
its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, a
state supreme court case that a federal court Erie predicts will be overruled is likely to be very old,
neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common
law which does not get much attention or have much application -- and clearly wrong.

    [8]The Supreme Court has addressed what the federal courts may use when there is not a
decision on point from the state's highest court:

        The highest state court is the final authority on state law, but it is still the duty of
        the federal courts, where the state law supplies the rule of decision, to ascertain and
        apply that law even though it has not been expounded by the highest court of the
        State.  An intermediate state court in declaring and applying the state law is acting
        as an organ of the State and its determination, in the absence of more convincing
        evidence of what the state law is, should be followed by a federal court in deciding
        a state question.  We have declared that principle in *West v. American Telephone*

Tenth Circuit decisions interpreting New Mexico law.  See Anderson Living Trust v. WPX Energy

Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[9]  Ultimately, "the Court's task is to predict what the

---

> and Telegraph Co., 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.
>
> . . . We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.
>
> . . . .
>
> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions."  (emphasis and title case omitted)).

[9]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state-law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This

consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight. On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation. Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law. This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law --at least provides consistency at the federal level, so long federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth

- 18 -

---

Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the federal Constitution possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases that were available to the Tenth Circuit and that the Tenth Circuit considered, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is *x*. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's Federal Practice § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation and internal quotation marks omitted))). This formulation may not be the most precise one if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that

circuit court interprets it, see Abbott Labs. v. Granite State Ins., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.). From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court." The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").

state supreme court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666.  Accord Mosley

v. Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d

1174, 1188-89 (D.N.M. 2008)(Browning, J.).

---

A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue," Wankier v. Crown Equip. Corp., 353 F.3d at 866 -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of Allen [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it.  In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided Biosera[, Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'"  (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

## ANALYSIS

The Tyler Group seeks recovery for two oral agreements: (i) a "fee of 2.5% of the gross sales price of the ranch," First Amended Complaint ¶ 25, at 7; see MSJ Memo ¶ 13, at 5 (stating this as an undisputed fact); and (ii) "five percent (5%) of the total gross monthly water sales revenue as a result of a successful" water negotiations, First Amended Complaint ¶ 21, at 6; see MSJ Memo ¶ 12, at 5 (stating this as an undisputed fact).  Madera and Pitchfork Cattle argue that, under N.M.S.A. § 61-29-16, Tyler Group cannot recover either the two-and-a-half percent fee on the sale of the Pitchfork Ranch or the five percent commission on any water sales, because both are considered commissions of real property, and "[u]nder New Mexico law, Tyler must be a licensed broker to earn a sales commission on a real estate transaction."  MSJ Memo at 10.   The Tyler Group, in response, agrees that, under the Commission Act, it is "unlawful for a person to act 'in the capacity of . . . a broker within this state without a license issued by the Commission,'" but contends that that Tyler was a not "'broker'" for Commission Act purposes, and argues that the Commission Act does not apply to either the sale of Pitchfork Ranch or the water sales, because: (i) Tyler "was not hired to provide, nor did he provide, real estate brokerage services as defined in the Act,"  Response at 22-23 (quoting N.M.S.A. § 61-29-1); and (ii) Tyler "was not selling subsurface water rights but rather surface water," and that "surface water Plaintiff sold is" not "'real estate' under New Mexico law triggering application of the Act."  Response at 23 (no citation for quotation).  The Court concludes that: (i) the Commission Act does not apply where, as here, a person is not acting as a broker; and (ii) Tyler did not negotiate the sale of water rights, which would be subject to the Commission Act, because Tyler negotiated the sale of water as a commodity.

I.    **THE COMMISSION ACT BARS RECOVERY ONLY WHERE A PERSON IS ACTING AS A BROKER SEEKING A BROKER'S COMMISSION; BECAUSE TYLER WAS NOT ACTING AS A BROKER, THE COMMISSION ACT DOES NOT APPLY.**

New Mexico courts have explained that the "purpose of the Act is 'to regulate and, thus, protect the public against abuses which can occur within the real estate business.'" PC Carter Co. v. Miller, 2011-NMCA-052 ¶ 12, 253 P.3d 950, 953 (quoting Amato v. Rathbun Realty, Inc., 1982-NMCA-095 ¶ 6, 647 P.2d 433, 434). The Commission Act provides: "It is unlawful for a person to engage in the business or act in the capacity of real estate associate broker or qualifying broker within New Mexico without a license issued by the commission." N.M.S.A. § 61-29-1. Additionally,

> [n]o action for the collection of a commission or compensation earned by any person as a qualifying broker or an associate broker required to be licensed under the provisions of [the Commission Act] shall be maintained in the courts of the state unless such person was a duly licensed qualifying broker or associate broker at the time the alleged cause of action arose.

N.M.S.A. § 61-29-16. The Supreme Court of New Mexico has explained:

> There can be no doubt that what Section 61-29-16 means is that "a judgment for recovery of a real estate commission without a finding that plaintiff held either a broker's or salesman's license, when the cause of action arose, is erroneous." Star Realty Company v. Sellers, 1963-NMSC-140, ¶ 5, 387 P.2d 319, 320. Nor can an unlicensed real estate broker or salesperson recover a commission in an action in quantum meruit. Bank of New Mexico v. Freedom Homes, Inc., 1980-NMCA-064, 612 P.2d 1343.

Watts v. Andrews, 1982-NMSC-080, ¶ 6, 649 P.2d 472, 474 ("We hold that a person who simply brings two parties together in a real estate transaction must be licensed to sue for recovery of a commission."). See Bosque Farms Home Ctr., Inc. v. Tabet Lumber Co., 1988-NMSC-027, ¶ 6, 753 P.2d 894, 895 ("[I]n order to satisfy the requirements of Section 61-29-16 . . . the party seeking relief must allege that he was licensed at the time the work or service was performed."). Under the Commission Act,

"qualifying broker" means a licensed real estate broker who has qualified a proprietorship, corporation, partnership or association to do business as a real estate brokerage in the state of New Mexico, who discharges the responsibilities specific to a qualifying broker as defined by the commission and who for compensation or other consideration from another:

    (a)    lists, sells or offers to sell real estate; buys or offers to buy real estate; or negotiates the purchase, sale or exchange of real estate or options on real estate;

    (b)    is engaged in managing property for others;

    (c)    leases, rents or auctions or offers to lease, rent or auction real estate;

    (d)    advertises or makes any representation as being engaged in the business of buying, selling, exchanging, renting, leasing, auctioning or dealing with options on real estate for others as a whole or partial vocation; or

    (e)    engages in the business of charging an advance fee or contracting for collection of a fee in connection with a contract under which the qualifying broker undertakes primarily to promote the sale of real estate through its listing in a publication issued primarily for that purpose or for the purpose of referral of information concerning real estate to other qualifying brokers or associate brokers . . . .

N.M.S.A. § 61-29-2(A)(15).  "A single act of a person in performing or attempting to perform an activity described in [§§ 61-29-2(A)(15)(a)-(e)] makes the person a qualifying broker."  N.M.S.A. § 61-29-2.  Section 61-29-2(C) provides:

The provisions of [the Commission Act] do not apply to:

    (1)    a person who as owner performs any of the activities included in this section with reference to property owned by the person, except when the sale or offering for sale of the property constitutes a subdivision containing one hundred or more parcels;

    (2)    the employees of the owner or the employees of a qualifying broker acting on behalf of the owner, with respect to the property owned, if the acts are performed in the regular course of or incident to the management of the property and the investments;

    (3)    isolated or sporadic transactions not exceeding two transactions annually in

- 24 -

which a person acts as attorney-in-fact under a duly executed power of attorney delivered by an owner authorizing the person to finally consummate and to perform under any contract the sale, leasing or exchange of real estate on behalf of the owner; and the owner or attorney-in-fact has not used a power of attorney for the purpose of evading the provisions of Chapter 61, Article 29 NMSA 1978;

(4)    transactions in which a person acts as attorney-in-fact under a duly executed power of attorney delivered by an owner related to the attorney-in-fact within the fourth degree of consanguinity or closer, authorizing the person to finally consummate and to perform under any contract for the sale, leasing or exchange of real estate on behalf of the owner;

(5)    the services rendered by an attorney at law in the performance of the attorney's duties as an attorney at law;

(6)    a person acting in the capacity of a receiver, trustee in bankruptcy, administrator or executor, a person selling real estate pursuant to an order of any court or a trustee acting under a trust agreement, deed of trust or will or the regular salaried employee of a trustee;

(7)    the activities of a salaried employee of a governmental agency acting within the scope of employment;

(8)    persons who deal exclusively in mineral leases or the sale or purchase of mineral rights or royalties in any case in which the fee to the land or the surface rights are in no way involved in the transaction; or

(9)    an auctioneer; . . . .

N.M.S.A. § 61-29-2(C).

Madera and Pitchfork Cattle are correct that under the Commission Act, if a person wants to bring an "action for the collection of a commission or compensation" of a real estate transaction, that person must be "a duly licensed qualifying broker or associate broker at the time the alleged cause of action arose." N.M.S.A. § 61-29-16.  See N.M.S.A. § 61-29-1.  The Supreme Court of New Mexico has held that "[t]here can be no doubt that what Section 61-29-16 means is that 'a judgment for recovery of a real estate commission without a finding that plaintiff held either a broker's or salesman's license, when the cause of action arose, is erroneous.'"  Watts v. Andrews, 1982-NMSC-080, ¶ 6, 649 P.2d 472, 474  (quoting Star Realty Co. v. Sellers, 1963-NMSC-140, ¶

5, 387 P.2d 319, 320).  If, however, the commission is not derived from the sale of real property, or if the person was "not acting as a real estate broker," then the Commission Act does not apply. Vihstadt v. Real Estate Comm'n of State of N.M., 1988-NMSC-003, ¶ 12, 748 P.2d 14, 16 ("Vihstadt").  The Supreme Court of New Mexico explains that where a person "[is] not acting as a real estate broker during the sale of the real estate contract," the New Mexico Real Estate Commission "lack[s] jurisdiction" and the Commission Act does not apply.  Vihstadt, 1988-NMSC-003, ¶ 12, 748 P.2d at 16.  In Vihstadt, the plaintiff, Vihstadt, a licensed broker, bought a property by a real estate contract, but never made the cash down payment, and then, through a third party, sold the real estate contract.  See Vihstadt, 1988-NMSC-003, ¶¶ 3-4, 748 P.2d at 15. After Vihstadt defaulted on the real estate contract and on the underlying mortgage, the bank foreclosed on the property, the buyer lost his investment, and then, after the buyer filed a complaint, the New Mexico Real Estate Commission revoked Vihstadt's broker's license.  See Vihstadt, 1988-NMSC-003, ¶¶ 5-6, 748 P.2d 14, 15.  Vihstadt appealed the revocation of his license, and the Supreme Court of New Mexico concluded that New Mexico Real Estate Commission "lack[s] jurisdiction" under the Act, because (i) "Vihstadt did not engage in any activities of selling, or offering to sell, or negotiating the purchase or sale or exchange of real estate or a real estate contract"; (ii) "[h]e was not employed as a 'broker'"; (iii) the buyer did not meet or deal with Vihstadt when he purchased the real estate contract; and (iv) a real estate contract is not a real estate transaction.  Vihstadt, 1988-NMSC-003, ¶¶ 11-14, 748 P.2d 14, 16-17.  Cf. Poorbaugh v. New Mexico Real Estate Comm'n, 1978-NMSC-033, ¶ 5, 578 P.2d 323, 324 (holding that, if the plaintiff represented himself as a broker to buyer or seller, the New Mexico Real Estate Commission has jurisdiction to revoke his license).  The Supreme Court of New Mexico also noted that the third party who sold the real estate contract to the buyer also was not

engaged in the business of a real estate broker, because she had acted as a "note broker, a seller of commercial paper," because the real estate contract is an item of personalty and not realty, and therefore it is not a real estate transaction.  Vihstadt, 1988-NMSC-003, ¶¶ 11-14, 748 P.2d 14, 16-17.  See Marks v. City of Tucumcari, 1979-NMSC-045, ¶ 12, 595 P.2d 1199, 1201-02 ("We are committed to the rule . . . that the interest retained by a vendor under an executory contract of sale is personalty and not real estate."); Gregg v. Gardner, 1963-NMSC-223, ¶ 21, 388 P.2d 68, 75 (holding that, where a decedent had sold real estate and retained an interest in a real estate contract, the decedent's interest should be treated as personalty for purposes of construing a devise of real property).  See also Elliott v. New Mexico Real Estate Comm'n, 1985-NMSC-078, ¶ 15, 705 P.2d 679, 682 (Walters, J., dissenting)(same); Garcia v. New Mexico Real Estate Comm'n, 1989-NMCA-034, ¶ 17, 775 P.2d 1308, 1312 ("Because the sale of a real estate contract is not a real estate transaction, a real estate license is not required for that transaction.").

The Court concludes that the Commission Act does not bar the Tyler Group from bringing its breach-of-contract claim for failure to pay two-and-a-half percent of the Pitchfork Ranch sales price by the.  The Court concludes that, although the contract to pay two-and-a-half percent of the Pitchfork Ranch sales price involves the sale of real property, § 61-29-16 does not apply, because Tyler Group has not "act[ed] as a real estate broker."  Vihstadt, 1988-NMSC-003, ¶ 12, 748 P.2d 14, 16.   The parties agree: (i) that Tyler had "no role in the negotiations, not having introduced the buyers to the sellers, and having no first-hand knowledge of the deal's details," MSJ Memo ¶ 21, at 7; see Response at 23 (citing Affidavit of Frederick H. Tyler  ¶ 7, at 3, dated December 14, 2020, filed December 14, 2020 (Doc. 87-1)); (ii) that Tyler was not hired to find a buyer for the Pitchfork Ranch or otherwise act as real estate broker, see MSJ Memo ¶ 6, at 4 (stating as an undisputed fact that "Mr. Madera employed Plaintiff Tyler in 2017 to assist with developing the

water-related sales on the Pitchfork Ranch"); see Response at 23 (agreeing with this allegation);

Transcript of Bert Madera Deposition at 95:14-15, taken June 24, 2020, filed December 14, 2020

(Doc. 87-3)(page 19 of the portable document format ("pdf")); or (iii) that Tyler was not "tasked

with selling the ranch," MSJ Memo ¶ 8, at 5 (stating this allegation as an undisputed fact); see

Response at 23 (agreeing).  Although Madera and Pitchfork Cattle agree that Tyler was not acting

as a broker, they argue that § 61-29-16 bars anyone seeking a commission for a real estate

transaction.  See Reply at 4-6.  The parties dispute whether the Tyler Group seeks to recover a

broker's "real estate commission fee from the sale of the" Pitchfork Ranch, MSJ Memo ¶ 21, at 7,

or whether the two-and-a-half percent of Pitchfork Ranch's sale is a fee that "was part of [Tyler's]

compensation for developing the Ranch's water sales business," Response ¶ 7, at 8-9.  The Court

concludes that this factual distinction that the parties dispute does not change the Court's analysis

that § 61-29-16 does not bar Tyler Group's action.  Even if Madera and Pitchfork Cattle are correct

that Tyler was orally promised a "real estate commission" as opposed to fee for services rendered

related to water sales, MSJ Memo ¶ 23, at 7, § 61-29-16 only bars actions brought to recover "a

commission or compensation earned by any person as a qualifying broker or an associate broker

required to be licensed under the provisions" of the Act.  N.M.S.A. § 61-29-16.  The parties agree

the Tyler is not "a qualifying broker or an associate broker" under the Commission Act, and that

Tyler took no steps related to the sale of the Pitchfork Ranch that would require him to be licensed

as a broker.  N.M.S.A. § 61-29-16.  See MSJ Memo at 4-7; Response at 6-19.  Because Tyler did

not act as a broker, he cannot seek a broker's commission.  In other words, if Tyler had taken steps

enumerated in § 61-29-2(15), such as "list[ing], sell[ing] or offer[ing] to sell real estate; buy[ing]

or offer[ing] to buy real estate; or negotiat[ing] the purchase, sale or exchange of real estate or

options on real estate," § 61-29-2(15)(a), or even bringing the parties together as a middleman, see

Watts v. Andrews, 1982-NMSC-080, ¶ 6, 649 P.2d at 474 ("We hold that a person who simply brings two parties together in a real estate transaction must be licensed to sue for recovery of a commission."), then under § 61-29-16, Tyler would have needed a license under the Commission Act.  Here, as in as in Vihstadt, Tyler "did not engage in any activities of selling, or offering to sell, or negotiating the purchase or sale or exchange of real estate or a real estate contract.  He was not employed as a 'broker.'"  Vihstadt, 1988-NMSC-003, ¶¶ 11-14, 748 P.2d 14, 16-17.  See N.M.S.A. § 61-29-2; Watts v. Andrews, 1982-NMSC-080, ¶ 12, 649 P.2d at 475 ("When the Legislature defined a 'broker' as one who 'sells or offers for sale', they, no doubt, intended to encompass within its definition one who simply procures a purchaser; the term 'sell' being synonymous with procuring a purchaser.")(quoting N.M.S.A. § 61-29-2(A)).   Accordingly, because Tyler did not act as broker to sell the Pitchfork Ranch, § 61-29-16 does not bar Tyler Group's recovery.

## II.     TYLER NEGOTIATED THE SALE OF WATER AS A COMMODITY, NOT THE SALE OF A RIGHT TO WATER, WHICH IS SUBJECT TO THE COMMISSION ACT.

Madera and Pitchfork Cattle contend Tyler is barred from recovering related to the water sale revenue -- the five percent of the total gross monthly water sales revenue -- because Tyler negotiated the water sales and "water rights are real property within the scope of NMSA 1978 § 61-29-16."  Reply at 6.  The parties agree that Tyler sought prospective buyers for water sales from Pitchfork Ranch, negotiated the sale of water, and was paid for his services in acquiring water sale contracts.  See MSJ Memo ¶¶13-18, at 5-6 (asserting these facts); Response ¶¶ 14-17, at 11-12 (agreeing).  The Tyler Group, however, argues that Tyler "was not selling subsurface water rights but rather surface water," and contends that that surface water is not "'real estate' under New Mexico law triggering application of the Act."  Response ¶ 40, at 23 (no citation for quotation and citing Walker v. United States, 2007-NMSC-038, 162 P.3d 882).  The Court concludes that

Tyler did not negotiate the sale of water rights, which would be subject to the Commission Act; rather Tyler negotiated the sale of water as a commodity.  Accordingly, the Commission Act does not bar the Tyler Group's recovery.

Although, "'[a] water right is property and in fact it is held to be real property by most authorities,'" Posey v. Dove, 1953-NMSC-019, ¶ 49, 257 P.2d 541, 547 (quoting be New Mexico Prod. Co. v. New Mexico Power Co., 1937-NMSC-048, ¶ 20, 77 P.2d 634, 641), the laws governing the use and sale of water in New Mexico are complex.  In Walker v. United States, the Supreme Court of New Mexico was asked to certify a question related to the State of New Mexico's recognition of plaintiffs' limited forage right implicit in their vested water rights.  See 2007-NMSC-038, 162 P.3d at 888-890.  In the process of answering the question in the negative, the Supreme Court of New Mexico outlined the following helpful and illustrative history of the principles and historical development of New Mexico Water Law:

**Foundational Principles and Historical Development of New Mexico Water Law:**

The prior appropriation doctrine governs water law in New Mexico. See N.M. Const. art. XVI, § 2 ("Priority of appropriation shall give the better right."); Montgomery v. Lomos Altos, Inc., 2007-NMSC-002, ¶ 5 n. 3, 141 N.M. 21, 150 P.3d 971 (citing NMSA 1978, § 72-1-2 (1907)).  Under prior appropriation, "the right to use water is considered a property right which is separate and distinct from ownership of the land."  KRM, Inc. v. Caviness, 1996-NMCA-103, ¶ 6, 925 P.2d 9; see Charles T. DuMars & A. Dan Tarlock, Symposium Introduction: New Challenges to State Water Allocation Sovereignty, 29 Nat. Resources J. 331, 332 (1989)(noting that under prior appropriation a "water right [is] a quasi-exclusive property right (not tied to the locus of use ) . . .")(emphasis added).  Thus, a water right is not an automatic stick in the bundle of rights a landowner receives upon purchasing even a fee interest in land.

Under the doctrine of prior appropriation, water rights are both established and exercised by beneficial use, which forms "the basis, the measure and the limit of the right to use of the water."  N.M. Const. art. XVI, § 3.  A water right is separate and distinct from a right to adjacent land because it is derived not from the rights in the land, but "from appropriation for beneficial use.  Olson v. H & B Props., Inc., 118 N.M. 495, 498, 882 P.2d 536, 539 (1994).  As a result of the separate and distinct nature of a water right, that right must be exercised or lost; one cannot sit

on water rights to the exclusion of any other claimant without putting them to beneficial use. See Ira G. Clark, Water in New Mexico: A History of Its Management and Use 39 (1987)("Since the criterion was application of water to beneficial use, this was not a property right which could be acquired in perpetuity; it had to be exercised to be kept alive.").

The sole exception to the general rule that water rights are separate and distinct from the land is water used for irrigation.  See KRM, 1996-NMCA-103, ¶ 8, 925 P.2d 9 (holding that Section 72-1-2 and NMSA 1978, § 72-5-22 (1953) "evince an intent to create a limited statutory exception to the general rule that water rights and land ownership are distinct property rights").  Irrigation water rights are appurtenant to the land, meaning that any conveyance of the land will carry the water right with it unless the water right is expressly reserved by the grantor.  See NMSA 1978, § 72-1-2 (1953) (providing that "all waters appropriated for irrigation purposes . . . shall be appurtenant to specified lands owned by the person, firm or corporation having the right to use the water"); § 72-5-22 (providing that "the transfer of title of land in any manner whatsoever shall carry with it all rights to the use of water appurtenant thereto for irrigation purposes, unless previously alienated in the manner provided by law" (emphasis added)); Turner v. Bassett, 2005-NMSC-009, ¶ 10, 111 P.3d 701 (noting that under Sections 72-1-2 and 72-5-22, "water that is applied to irrigation becomes appurtenant to the land on which it is used").

The prior appropriation tradition, as it exists in New Mexico today, can be traced to the convergence of practices followed in northern Mexico prior to the cession in 1848 with practices developed in connection with Anglo western settlement. See United States v. Rio Grande Dam & Irrigation Co., 9 N.M. 292, 306, 51 P. 674, 678 (1898) (stating that "[t]he law of prior appropriation existed under the Mexican republic at the time of the acquisition of New Mexico"), rev'd on other grounds by 174 U.S. 690 (1899); Clark, supra, at 41-42 (noting that the "water institutions of New Mexico represent a fusion" of early Spanish law and custom with "the pure form of the doctrine of prior appropriation [which] stems from the California gold rush").  The prior appropriation doctrine's independence of water from the land, and the requirement that a water right be exercised continuously, distinguish water rights under the prior appropriation doctrine from water rights under the riparian doctrine. See Clark, supra, at 39. The riparian doctrine governs water rights in most eastern states, and grants landowners the right to make reasonable use of water that flows through or otherwise abuts their land. Ownership of a water right under the riparian doctrine is in "no way affected by failure to exercise the right."  Id. at 37.

Early Western settlers, such as those in the gold mining camps of California and the early irrigation settlements in Colorado, found the riparian doctrine unworkable in the arid West because they often had to divert water from its source in order to use it beneficially because the land associated with the use of the water did not itself contain a water source. See A. Dan Tarlock, The Future of Prior Appropriation in the New West, 41 Nat. Resources J. 769, 770 (2001); Clark, supra, at 37-40.  Under the traditional riparian doctrine, the new Western settlers would

have had to show that their reasonable use did not interfere with those downstream. See Clark, supra, at 37 (noting that under the riparian doctrine, the reasonable use of a water right must not significantly interfere with downstream riparian appropriators).  This riparian doctrine made sense in the eastern states where larger sources of water exist, and, therefore, not as many people had to tap into a single source resulting in less effect on downstream users.  See Norman K. Johnson & Charles T. Dumars, A Survey of the Evolution of Western Water Law in Response to Changing Economic and Public Interest Demands, 29 Nat. Resources J. 347, 348-49 (1989).  In the western states where populations were limited to fewer and smaller water sources, most uses somehow affected downstream users.  See id.

As indicated by its historical evolution in the West, a primary feature of the prior appropriation doctrine and its concomitant beneficial use requirement was the need for water to be mobile or divertible to other areas of use and not tied to the surrounding land. See 2 Joseph W. Dellapenna, Waters and Water Rights 11.02(a), (d) (Robert E. Beck, ed., 1991 ed., 2001 Repl. Vol.)(noting the key attributes of prior appropriation address the need in arid regions to divert and transport water in order to place it to beneficial use).  Because water is a scarce commodity in the West, mobility and transferability are necessary to meet changing social goals.  This often means moving water from one location to another and also from one use to another.   See Kaiser Steel Corp. v. W.S. Ranch Co., 419, 467 P.2d 986, 991 (1970)(discussing how even private parties may exercise powers of condemnation to construct facilities to transport water and put it to beneficial use such as mining); Clark, supra, at 39 (stating that prior appropriation "had released the arid western region from restricting its scant water resources to the limits of riparian lands, making possible the diversion of those waters to areas where they could be applied more effectively").

Water rights are therefore not tied to a particular location or even a particular source.  See NMSA 1978 § 72-5-23 (1985) (change of place of use); NMSA 1978 § 72-5-24 (1985) (change of purpose); NMSA 1978 § 72-12-7 (1985) (change of location of well for groundwater). As such, water rights are not considered ownership in any particular water source, but rather a right to use a certain amount of water to which one has a claim via beneficial use. See Joseph L. Sax, Rights that "Inhere in the Title Itself": The Impact of the Lucas Case on Western Water Law, 26 Loy. L.A. L. Rev. 943, 944 ("Water has been described as merely usufructuary; as belonging to the public; as subject to public servitudes; as incapable of full ownership; as subject to constraints that it be used nonwastefully, reasonably, beneficially, etc." (citation omitted)).  Thus, under prior appropriation, as a separate protected property right, a vested water right can be "sold, leased, or transferred."  KRM, 1996-NMCA-103, ¶ 5, 925 P.2d 9.

Walker v. United States, 2007-NMSC-038, ¶¶ 20-28, 162 P.3d 882, 888-90.  The Supreme Court

of New Mexico has also held that

water rights are separate from the surrounding land and may be owned separately

from the land, regardless of necessity.  These principles apply with equal force to both surface water rights and ground water rights. . . .  Thus, a person owning a parcel of land situated over an underground aquifer does not necessarily own the right to use that water.  Ground water, like surface water, must be appropriated and applied to beneficial use before a vested water right will result.

Hydro Res. Corp. v. Gray, 2007-NMSC-061, ¶¶ 20-21, 173 P.3d 749, 755-56 (footnotes omitted)(citing N.M.S.A. § 72-12-1 (declaring that all underground water "belong[s] to the public and is subject to appropriation for beneficial use")).[10]  The Court concludes, as Madera and Pitchfork Cattle argue, that if Tyler negotiated or sold water rights, the Commission Act would bar the Tyler Group's recovery, because water rights are real property subject to the Act and Tyler does not hold a broker's license.  See Posey v. Dove, 1953-NMSC-019, ¶ 49, 257 P.2d at 547; N.M.S.A. § 61-29-16.  See also N.M.S.A. § 61-29-2(C) (not listing the sale of water rights as an exception); N.M.H.B. No. 648, 54th Legislative Sess. -- First Sess. 2019 (proposing that the sale of "water rights" be added to the exceptions under N.M.S.A. § 61-29-2(C)(8)).  The Commission Act, however, only applies to selling water rights -- "a right to use a certain amount of water to which one has a claim via beneficial use," Walker v. United States, 2007-NMSC-038, ¶ 28, 162 P.3d at 890; see N.M.S.A. § 72-1-2 ("Beneficial use shall be the basis, the measure and the limit of the right to the use of water . . . .") -- the Act does do apply when a person does not sell, lease, or transfer a right to water, such as the sale of water as a commodity, see N.M.S.A. § 61-29-16. The New Mexico legislature has provided a process for the sale of water rights:

In the event of any changes of ownership of a water right, whether by sale, gift or any other type of conveyance, affecting the title to a water right that has been permitted or licensed by the state engineer, has been declared with the state engineer or has been adjudicated and is evidenced by a subfile order, partial final

---

[10]In Hydro Res. Corp. v. Gray, the Supreme Court of New Mexico recognized that "ground water and surface water are hydrologically connected such that, '[w]here the groundwater table intersects with the ground surface, groundwater discharges to the surface and becomes surface water in the form of wetlands, lakes, streams, or springs.'"  Hydro Res. Corp. v. Gray, 2007-NMSC-061, ¶ 21 n.6, 173 P.3d  at 756 n.6 (quoting Herrington v. State ex rel. Office of the State Engineer, 2006-NMSC-014, ¶ 18, 133 P.3d 258).

decree, final decree or any other court order, the new owner of the water right shall file a change of ownership form with the state engineer.

N.M.S.A. § 72-1-2.1.  <u>See</u> N.M.S.A. § 72-5-22 ("Any permit or license to appropriate water may be assigned, but no such assignment shall be binding, except upon the parties thereto, unless filed for record in the office of the state engineer.")  Neither party suggests that this process took place. <u>See</u> MSJ Memo at 1-7; Response at 1-19.  The Court concludes that Tyler did not sell water rights: Madera and Pitchfork Cattle do not contend that Tyler sold, leased, or transferred the right to use water, Madera and Pitchfork Cattle only contend that Tyler sold water in a "water sale deal," MSJ Memo ¶ 14, at 6, whereby "the Maderas could expect COG to buy approximately one million (1,000,000) barrels of water per month at two dollars ($2) per barrel," First Amended Complaint ¶ 15, at 4; <u>see</u> MSJ Memo ¶ 16, at 6 (not disputing this fact).  Selling barrels of water at a fixed rate is not equivalent to selling or otherwise transferring a water right owned by Pitchfork Ranch. <u>See</u> N.M.S.A. § 72-1-2 ("Beneficial use shall be the basis, the measure and the limit of the right to the use of water . . . ."); N.M.S.A. § 72-5-1 (establishing rules for surface water use); N.M.S.A. § 72-5-22 (establishing the process for the transfer of water rights).  <u>See</u> also <u>Walker v. United States</u>, 2007-NMSC-038, ¶¶ 20-28, 162 P.3d at 888-90.  Because Tayler negotiated the sale of water as a commodity, not the right to use water, § 61-29-16 does not bar Tyler's recovery.

**IT IS ORDERED** that the Defendants Bert Madera and Pitchfork Cattle Company, LLC Motion for Summary Judgment on Bert Madera and Pitchfork Cattle Company, LLC Resulting from Breach of Duties, filed November 30, 2020 (Doc. 84), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Emilio DeAyala
Buck Keenan, LLP
Houston, Texas

-- and --

Joseph M. Zebas
Zebas Law Firm, LLC
Hobbs, New Mexico

      *Attorneys for the Plaintiff*

Clayton S. Hightower
Sanders, Bruin, Coll & Worley, P.A.
Roswell, New Mexico

      *Attorney for the Defendants Bert Madera and Pitchfork Cattle Company, LLC*