## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TYLER GROUP PARTNERS, LLC,

       Plaintiff,

vs.                                                                                   No. CIV 19-0777 JB/SMV

BERT MADERA; MONTIE CAROL
MONTGOMERY and PITCHFORK RANCH
CATTLE COMPANY, LLC,

       Defendants.

### MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

**THIS MATTER** comes before the Court on: (i) Defendant Bert Madera's Motion In Limine to Bar Reference of Settlement Negotiations, Attorney Client-Communication and Dismissal of Parties, filed November 30, 2020 (Doc. 80)("Motion"); and (ii) a two-day bench trial on damages, see Clerk's Minutes, filed May 3, 2021 (Doc. 135)("Trial Minutes"). The Court held a hearing on the Motion on January 29, 2021. See Clerk's Minutes at 1, filed January 29, 2021 (Doc. 98). The Court held a two-day bench trial on May 3, 2021, and May 4, 2021. See Transcript of Bench Trial (held May 3, 2021), filed May 24, 2021 (Doc. 132)("May 3 Tr."); Transcript of Bench Trial (held May 4, 2021), filed May 24, 2021 (Doc. 133)("May 4 Tr."). The primary issues are: (i) whether the Court should exclude evidence of an email Defendant Bert Madera accidently sent to Frederick Harold Tyler, the sole member of Plaintiff Tyler Group Partners, LLC, discussing an offer to Tyler for the sale of the Pitchfork Ranch, because the email (a) is part of a settlement negotiations, which are inadmissible under rule 408 of the Federal Rules of Evidence; (b) is privileged attorney-client communication; and (c) is prejudicial under rule 403 of the Federal Rules of Evidence; and (ii) whether Tyler Group is entitled to damages under an oral water sales

agreement with Defendant Bert Madera and Pitchfork Ranch Cattle Company, LLC ("Pitchfork Cattle"), because Madera acted in bad faith when he shut off water access; and (iii) whether Tyler Group formed a contract with Madera and Pitchfork Cattle, for 2.5% of Pitchfork Ranch's sale price. First, the Court concludes that the email is admissible, because (a) it is not settlement communications under rule 408; (b) Madera waived confidential attorney-client privilege, because he did not make the email in confidence; and (c) there is no prejudice under rule 403, because there is no risk of jury confusion. Second, the Court does not award Tyler Group damages under the water sales agreement, because Madera and Pitchfork Cattle paid Tyler Group for the one water sale Tyler negotiated, and Madera did not act in bad faith. Third, the Court concludes that Madera and Tyler had a contract for 2.5% of Pitchfork Ranch's sale to compensate Tyler for the work he did to improve Pitchfork Ranch's water sales and therefore to attract potential buyers, because the record reflects that Madera made an offer on February 12, 2018; (ii) Tyler accepted through performance; (iii) there was consideration; and (iv) the parties objectively manifested mutual assent. The Court concludes, therefore, that Madera breached the contract, because Madera and Pitchfork Cattle did not pay Tyler Group anything when Madera sold Pitchfork Ranch for $81,600,000.00. Consequently, the Court awards Tyler Group $2,040,000.00 in damages, which is 2.5% of the $81,600,000.00 sales price of Pitchfork Ranch.

## FINDINGS OF FACT

Following the two-day bench trial, Tyler Group and Madera submitted proposed findings of fact. See Plaintiff's Proposed Findings of Fact and Conclusions of Law at 1-14, filed June 8, 2021 (Doc. 137)("Tyler Group FOFs"); Defendants Bert Madera and Pitchfork Ranch Cattle Company, LLC Proposed Findings of Fact and Conclusions of Law at 1-9, filed October 30, 2020 (Doc. 139)("Madera FOFs"). The Court has considered carefully Tyler Group's and Madera's sets of facts, and accepts some of those facts, rejects some, and finds some facts that no party

brought to its attention.  See Tyler Group FOFs at 1-14; Madera FOFs at 1-9.[1]  The Court sets forth its findings below.[2]

**1.    The Parties.**

1.    The Tyler Group is a Texas limited liability company doing business in the State of New Mexico.  See May 3 Tr. at 107:7-11 (DeAyala, Tyler); Tyler Group FOFs at 2 (no paragraph numbering); Madera FOFs ¶ 2, at 1.

2.    Fredrick Harold Tyler is Tyler Group's sole member and owner.  See May 3 Tr. at 107:7-11 (DeAyala, Tyler); Tyler Group FOFs at 2 (no paragraph numbering); Madera FOFs ¶ 2, at 1.

3.    Tyler does not have a qualifying broker's license or associate broker's license under the New Mexico Real Estate Brokers and Salesman Act ("NMREBSA").  See Pretrial Order Madera FOFs ¶ 33, at 5.

4.    Pitchfork Ranch is a cattle ranch in Lea County, New Mexico.  See May 3 Tr. at 107:7-11 (DeAyala, Madera); Tyler Group FOFs at 1 (no paragraph numbering); Madera FOFs ¶ 4, at 1.

5.    Bert Madera is a citizen of New Mexico and, at all times relevant to this case, has been an owner and manager of Pitchfork Cattle.  See May 3 Tr. at 34:21-35:3 (DeAyala, Madera);

---

[1]Although the parties express many of the background facts differently, they do not dispute many of those facts. The Court has, throughout its findings, synthesized the parties' proposed findings where they are fully compatible.  In many cases, the Court adopts one party's finding and declines to adopt the other's finding for stylistic reasons: for example, where one party's proposed findings more completely discuss a fact than another party, the Court generally has adopted the more thorough discussion.  Where the Court determines that the proposed facts differ, the Court analyzes the applicable evidence and makes a finding.

[2]Where the Court adopts one party's finding and declines to adopt an opposing party's finding for a substantive reason -- that is, because the evidence better supports one finding than another -- the Court explains the reason for that conclusion in the footnotes.

Tyler Group FOFs at 2 (no paragraph numbering); Madera FOFs ¶ 3, at 2.

6.      At one time, Pitchfork Ranch comprised more than 70,000 acres.  See May 3 Tr. at 30:25-31:1 (DeAyala, Madera); Tyler Group FOFs at 1 (no paragraph numbering).

7.      Pitchfork Ranch has been in the Madera family for five generations.  See May 3 Tr. at 30:22-24 (DeAyala, Madera); Tyler Group FOFs at 1 (no paragraph numbering); Madera FOFs ¶¶ 6-7, at 2.

8.      In 2006, Madera inherited Pitchfork Ranch from his late father.  See May 3 Tr. at 31:2-4 (DeAyala, Madera); Madera FOFs ¶ 6, at 2.

9.      Madera and Madera's former wife, Montie Carol Madera (now known as Montie Carol Montgomery), decided to sell Pitchfork, with the "goal of" selling it for "100-million plus." May 3 Tr. at 114:10-16 (Madera).  See Tyler Group FOFs at 3 (no paragraph numbering); Madera FOFs ¶ 8, at 2.

10.     On April 3, 2017, Madera and Montgomery signed an operating agreement as members and mangers of Pitchfork Cattle.  See Operating Agreement of Pitchfork Ranch Cattle Ranch, LLC at 1-9 (effective April 3, 2017)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 3)("Pitchfork Ranch Operating Agreement"); May 3 Tr. at 43:22-23 (Madera)("Montie Carol was a manager, and I was a manager."); May 3 Tr. at 59:7-16 (DeAyala, Madera); Tyler Group FOFs at 2 (no paragraph numbering).

11.     Montgomery owned half of Pitchfork Cattle.   See May 3 Tr. at 59:13 (Madera)("[S]he owned half of it."); id. at 43:19-44:7 (DeAyala, Madera).

12.     Montgomery "took care of all the administrative work" for Pitchfork Cattle: she "did the accounts payable, accounts receivable, the books.  [She] took care of recordkeeping.  [She and Madera] would look at contracts together and talk about those . . . ."  May 3 Tr. at 249

(Montgomery).

13.     Concho Resources was Pitchfork Ranch's largest oil and gas leaseholder.  See May 3 Tr. at 59:22-24 (Madera).

14.     On August 29, 2018, when Madera sold Pitchfork Ranch, Pitchfork Ranch was about 23,000 acres.  See May 3 Tr. at 31:7-11 (DeAyala, Madera); Tyler Group FOFs at 1 (no paragraph numbering); Madera FOFs ¶¶ 6-7, at 2.

**2.     The SUCA.**

15.     In June 2016, Madera entered into a Surface Use and Compensation Agreement ("SUCA") with COG Operating LLC, an affiliate of Concho Resources.  See Surface Use and Compensation Agreement at 1-13 (effective June 27, 2016; signed Jul 14, 2016)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 1)("SUCA"); May 3 Tr. at 36:22-40:8 (DeAyala, Madera); Tyler Group FOFs at 2 (no paragraph numbering).

16.     Under the SUCA, COG Operating LLC paid Madera fees in exchange for various land use activities on Pitchfork Ranch, such as fees for "fresh water use" in Concho Resources' fracking operations on Pitchfork.  SUCA at 4.  See May 3 Tr. at 84:10-85:15 (DeAyala, Madera)(describing the SUCA); Tyler Group FOFs at 2 (no paragraph numbering);

17.     Under the SUCA, COG Operating LLC, the "Operator[,] shall purchase water from" Madera," the "Surface Owner,"

> for as long as it is available and of sufficient quality.  Operator may supplement from other sources only when Surface Owner's water is no longer available or of sufficient quality.  Operator agrees to purchase fresh water from Surface Owner's water for $2.00 per barrel.  This price includes use of land to deliver water to operator's project.  In the case where water is brought onto Surface Owner's land that is considered "off lease water", and additional char of twenty-five cents (.25) per barrel will be charged to Operator.

SUCA at 4.

18.     Concho Resources, Pitchfork Ranch's largest oil and gas leaseholder, was expected

to need a million barrels of more of water per well fracked.  See May 3 Tr. at 59:22-24 (Madera); id. at 81:22-82:1 (Madera); Tyler Group FOFs at 2 (no paragraph numbering); Declaration of James Michael Mooney at 1 (Executed April 22, 2021)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 50)("Mooney Decl.")("During the 20 months I was employed with Concho, several pads were constructed and multiple wells drilled on each pad. . . .  Each well pad consumed, in many instances, as much as or more than 1 million barrels of frac water.").

19.     Pitchfork Ranch, however, could not produce enough water for Concho Resources' operations.  See May 3 Tr. at 35:17-36:6 (Madera)("[W]e could not produce, on the ranch, ranch water to frac a well, but we had a pipeline coming into the ranch from off-lease water."); id. at 35:20-23 (DeAyala, Madera)(DeAyala: "[Pitchfork Ranch] couldn't produce enough water to water pecan trees."  Madera: "You're right."); Tyler Group FOFs at 2 (no paragraph numbering).

20.     The SUCA stayed in place until Madera sold the Pitchfork Ranch to Concho Resources.  See May 3 Tr. at 128:10-12 (DeAyala, Tyler).

**4.     The Initial Offers to Buy Pitchfork Ranch.**

21.     Beginning in 2012 or 2013, Madera received numerous offers to purchase Pitchfork Ranch.  See May 3 Tr. at 250:12-21 (Montgomery); Madera FOFs ¶ 9, at 2.

22.     The Maderas did not conduct a formal appraisal of Pitchfork Ranch.  See Madera FOFs ¶ 21, at 3.

23.     Concho Resources, before Tyler Group became involved, offered Madera $30 million to purchase Pitchfork Ranch.  See May 3 Tr. at 8:11-13 (DeAyala); id. at 114:6-16 (Madera); Madera FOFs ¶ 10, at 2.

24.     Madera dismissed Concho Resources' $30 million offer.  See May 3 Tr. at 8:11-13 (DeAyala); May 3 Tr. at 114:6-16 (Madera); Madera FOFs ¶ 10, at 2.

25.     Chevron,[3] another potential buyer before Tyler Group became involved, offered Madera $34 million to purchase Pitchfork Ranch.  See May 3 Tr. at 250:24-251:1 (Montgomery); Madera FOFs ¶ 11, at 2.

26.     Sourcing Rock, another potential buyer before Tyler Group became involved, offered Madera $54 million to purchase Pitchfork Ranch.  See May 3 Tr. at 251:2 (Montgomery); Madera FOFs ¶ 12, at 2.

27.     Another potential buyer before Tyler Group became involved offered Madera $50-60 million for the southern half of Pitchfork Ranch.  See May 3 Tr. at 90:12-25 (Madera); id. at 91:1-2 (Madera); id. at 200:3-13 (Coker); id. at 241:1-22 (Coker); id. at 242:2-9 (Coker); Madera FOFs ¶ 13, at 2.

28.     Bison,[4] another potential buyer before Tyler Group became involved, offered Madera $70-75 million for Pitchfork Ranch.  See May 3 Tr. at 91:17-92:9 (Madera); id. at 203:11-19 (Coker); id. at 251:10-17 (Montgomery); Madera FOFs ¶ 15, at 2.

29.     Jason Roberts, another potential buyer before Tyler Group became involved, offered Madera $90 million for Pitchfork Ranch.  See May 3 Tr. at 251:3-4 (Montgomery); Madera FOFs ¶ 15, at 3.

30.     Matador,[5] another potential buyer before Tyler Group became involved, offered Madera $90 million for Pitchfork Ranch.  See May 3 Tr. at 251:4-7 (Montgomery); Madera FOFs ¶ 16, at 3.

**5.     <u>Madera Hires Consultants to Increase Pitchfork Ranch's Profitability and to Attract Buyers</u>.**

---

[3]The parties did not give a full name.

[4]The parties did not give a full name.

[5]The parties did not give a full name.

31.     Madera sought business consultants to increase Pitchfork Ranch's profitability and attract buyers.  See May 3 Tr. at 35:4-6 (Madera); id. at 199:1-5 (Coker); Madera FOFs ¶ 17, at 2; Tyler Group FOFs at 3 (no paragraph numbering).

32.     In October 2016, the Madera hired Brian Coker to be his general counsel.  See Engagement Letter and Fee Agreement at 1 (Dated October 31, 2016)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 2)("Ozark Royalty-Madera Agreement"); May 3 Tr. at 88:15-21 (Hightower, Madera)(describing Coker as Madera's general counsel).

33.     Coker's company, Ozark Royalty Co., LLC ("Ozark Royalty"), "[p]rimarily operates in Texas, in New Mexico, but also Wyoming and Colorado as well.  [Ozark Royalty] purchase[s] and sell[s] oil and gas leases, mineral rights, NPRIs,[6] but part of [its] business is related to mineral management and in assisting some companies in high-net-worth individuals with managing their mineral assets and certain land rights."  May 3 Tr. at 197:16-23 (Coker).

34.     Madera hired Coker and Ozark Royalty to "represent" him on:

1.      The sale or lease of your undivided interest . . . in and to the mineral estate consisting of approximately 9,000 acres, more or less, located in Culberson, Texas;

2.      Representing your interests in negotiating water and water use agreements, particularly regarding the use of certain waste water now being injection

---

[6]Although the parties did not define NPRI, the Court understands that NPRI stands for a Non-Participating Royalty Interest, which

> is an interest in oil and gas production which is created from the mineral estate. Like the plain "royalty interest" it is expense-free, bearing no operational costs of production.  The term "non-participating" indicates that the interest owner does not share in the bonus, rentals from a lease, nor the right (or obligation) to make decisions regarding execution of those leases (ie no executive rights). The owner of a NPRI has fewer rights than does the 'regular' royalty owner, who participates in at least one, if not all, of the aforementioned activities.

What is a Non-Participating Royalty Interest?, Mineral Wise, https://mineralwise.com/non-participating-royalty-interest-npri/ (last visited August 24, 2021).

one or more formations beneath 35,000 acres, more or less, in Lea County, New Mexico;

3.      Reviewing, amending and vetting all Oil, Gas and Mineral Leases, Surface Use and Damage Agreement, Rights of Way Agreements;

4.      Reviewing and approving an and all Licenses, Liquidated Damages Clauses . . . and preparing the same for our signature; and

5.      To zealously represent your interests regarding your oil, gas, other minerals, water and in any other way that you direct.

. . . .

Thank you for selecting me and the team at Ozark to assist you.  I am certain that we can do more than protect and advance your right, I believe we can grow your asset base.  Our company goal is to ultimately manage your land resources, for your benefit and for the benefit of your heirs.

Ozark Royalty-Madera Agreement at 1-2; May 3 Tr. at 57:8-58:17 (Madera); id. at 239:12-240:25 (Coker); Tyler Group FOFs at 3 (no paragraph numbering).

35.     Under the Ozark Royalty-Madera Agreement, Coker and Ozark Royalty were to receive five percent commission for the sale of Pitchfork Ranch.  See Ozark Royalty-Madera Agreement at 1 (providing for a "five-percent commission (5%) on all Ozark Royalty negotiated sales . . ."); May 3 Tr. at 222:19-25 (Coker); Tyler Group FOFs at 3 (no paragraph numbering).

36.     Coker and Ozark Royalty's "primary task was to enhance the value of the ranch and to help market and sell the Pitchfork Ranch's assets, so . . . the number-one goal, was to divest the ranch of its assets."  May 3 Tr. at 199:2-5 (Coker).

37.     Coker and Ozark Royalty

revised a number of agreements that the Pitchfork Ranch entered into. We also modified fees that the ranch received for rights-of-way licenses, helped Pitchfork to negotiate a number of sales . . . of parcels and pieces of the ranch, . . . small tracts of acreage. We also solicited development from . . . oil and gas refineries and producers and tried to attract development and mineral assets on the ranch.

May Tr. at 199:10-19 (Coker).

38.     In January 2017, Coker introduced Tyler to Madera.  See May 3 Tr. at 35:4-6 (Madera); id. at 110:19-111:24 (Tyler); id. at 258:9-20 (Montgomery); Tyler Group FOFs at 3 (no paragraph numbering); Madera FOFs ¶ 18, at 3.

39.     Madera hired Tyler in January 2017 as a business development consultant.  See May 3 Tr. at 83:25-84:3 (DeAyala, Madera)(DeAyala: "[C]onsistant with what you hired him to do, to be your busines development consultant, right?"  Madera: "Yes, sir."); id. at 111:21-114:16 (Tyler); Bert Madera Proposal to Concho Resources Re: Pitchfork Ranch Water Supply Proposal at 1-2 (dated November 17, 2017)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 13)(email from Madera to Concho Resources stating that Concho Resources could contact "Fred Tyler, Business Development Consultant" to discuss the water agreement between Madera and Concho Resources); Image of the Back of Fred Tyler's Business Card at 1 (not dated)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 47)("Back of Tyler's Business Card"); Image of the Front of Fred Tyler's Busines Card at 1 (not dated)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 47.1)("Front of Tyler's Business Card").[7]

40.     Madera hired the Tyler Group "to add value primarily by promoting and developing water sales" and "[t]o help bring water onto the ranch and to help bring this water business up to

---

[7]The front and back of Tyler's Business Card:



Front of Tyler's Business Card at 1; Back of Tyler's Business Card at 1.

its fullest capacity." May 3 Tr. at 72:4-11 (DeAyala, Madera); id. at 87:1-3 (Madera).

41.     Tyler started working in January 2017.  See May 3 Tr. at 112:21-24 (DeAyala, Tyler).

42.     Tyler has expertise and experience in oilfield surface operations and water sales, which Coker does not have.  See May 3 Tr. at 108:2-24 (Tyler); id. at 206:20-24 (Coker)("Mr. Tyler . . . had a water experience, water management and development experience, and I introduced him to the Pitchfork."); id. at 223:10-23 (Coker); Tyler Group FOFs at 3 (no paragraph numbering).

43.     Tyler had worked in the oilfield services businesses for eleven years after graduating college and before starting Tyler Group.  See May 3 Tr. at 108:2-24 (Tyler); Tyler Group FOFs at 3 (no paragraph numbering).

44.     Madera and Tyler intended their working relationship to be long term.  See May 3 Tr. at 45:16-20 (Madera); id. at 223:10-23 (Coker); Tyler Group FOFs at 3 (no paragraph numbering).

45.     Madera and Tyler did not execute a written agreement; Tyler "submitted agreements" to the Maderas, but they were not "executed and signed . . . they were lingering." May 3 Tr. at 148:4-7 (Hightower, Tyler).

46.     When Tyler started working for Madera in January 2017, his goal was to "build a water business . . . from water sales from frac, but also the big infrastructure project for water recycling disposal."  May 3 Tr. at 125:18-24 (Tyler).  See Tyler Group FOFs at 3 (no paragraph numbering); Madera FOFs ¶ 18, at 3 ("Mr. Madera employed Plaintiff Tyler in 2017 to assist with developing the water-related sales on the Pitchfork Ranch.").

47.     Tyler's "function was just to do business-development-type services and create a

balance sheet, create water sales, create these business lines and business streams for the ranch as revenue streams and then also look at other businesses that we . . . could do."  May 3 Tr. at 116:11-16 (Tyler).

48.    Madera did not hire Tyler to sell Pitchfork Ranch or act as a real estate professional. See May 3 Tr. at 71:5-11 (DeAyala, Madera); id. at 114:-6-16 (DeAyala, Tyler); Madera FOFs ¶ 19, at 3.

49.    Madera did not hire Tyler to find a buyer for Pitchfork Ranch.  See May 3 Tr. at 71:5-15 (DeAyala, Madera); id. at 114:6-16 (DeAyala, Tyler); id. at 116:1-9 (DeAyala, Tyler); Madera FOFs ¶ 19, at 3.

50.    When Tyler started working for Madera, Tyler was not trying to sell Pitchfork Ranch.  See May 3 Tr. at 125:12-18 (DeAyala, Tyler)(DeAyala: "When you signed on in early 2017 . . . was it your goal to have the . . . ranch sold?" Tyler "No.  That was the . . . goal of the Maderas."); Madera FOFs ¶ 20, at 3 ("Plaintiff Tyler was explicitly told of Mr. Madera's ultimate goal of selling the ranch at the outset of their busines relationship.").

51.    Tyler understood that the Maderas wanted to sell Pitchfork Ranch for over $100,000,000.00, because they thought it was worth that amount, and that they asked him how improve Pitchfork Ranch's value to sell it for $100,000,000.00.  See May 3 Tr. at 111:5-9 (Tyler)("They thought the ranch was worth about 100 million plus. They wanted to get to that number.  They asked me how to get to that number.").

52.    Madera and Tyler's relationship was "supposed to be a long-term income stream where [Madera] would win big, and Tyler would win small."  May 3 Tr. at 72:4-11 (DeAyala, Madera).

53.    While working for Madera, Tyler would talk to Madera on the telephone two or

three times a week, and would talk to Montgomery one or two time a months.  See May 3 Tr. at 121:18-24 (Tyler); Tyler Group FOFs at 6 (no paragraph numbering).

54.     Tyler Group had two other ranches as clients located in Texas.  See May 3 Tr. at 146:14-147:3 (Hightower, Tyler).

55.     With those two clients, Tyler Group used a written retainer with commission fee structure, where the client pays a monthly fee of $7,500.00 and a five percent commission on any business Tyler brought to the client.  See May 3 Tr. at 146:21-148:3 (Hightower, Tyler).

56.     Madera hired Chiron Financial LLC ("Chiron Financial") to help market and sell Pitchfork Ranch.  See May 3 Tr. at 211:3-212:6 (Hightower, Coker)(discussing Chiron Financial's role); id. at 227:22-228:2 (Hightower)("At some point in time Ozark and Chiron enter into an agreement with Pitchfork and the Maderas to assist with the sale of the ranch, and that happens in October 2017, right?" Coker: "That sounds right, yes."); id. at 31:25-32:8 (DeAyala, Madera); id. at 47:1-50:13 (DeAyala, Madera); id. at 87:16-18 (Hightower, Madera)(Hightower: "[Y]ou hired Chiron Investments  and other entities. Why did you hire them?"  Madera: "To increase the . . . value of the ranch."); Engagement Agreement at 1 (dated and signed October 2, 2017)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 7)("Chiron Financial Agreement").

57.     On October 2, 2017, Chiron Financial, Ozark Royalty, and Pitchfork Cattle, entered into an agreement, whereby Chiron Financial and Ozark Royalty would "provid[e] investment banking services" to Pitchfork Cattle, "focusing primarily on the sale of some or all of" Pitchfork Cattle's "assets or equity (a 'Sale') fo[r] a single buyer or investor, or in one or more Sales to one of multiple buyers or investors."  Chiron Financial Agreement at 1.

58.     Under the Chiron Financial Agreement, for the sale of Pitchfork Ranch, Chiron Financial and Ozark Royalty would receive a sales fee "equal to a) 5%" of the Pitchfork Ranch

purchase price "up to $85,000,000, plus b) 10.0%" of the Pitchfork Ranch purchase price "in excess of $85,000,000 up to $120,000,000, in any, plus c) 15.0%" of the Pitchfork Ranch purchase price "in excess of $120,000,000, if any . . . ."  Chiron Financial Agreement at 2.

59.     Under the Chiron Financial Agreement, Chiron Financial and Ozark Royalty would split the Pitchfork Ranch sales fee equally.  See Chiron Financial Agreement at 2.

**6.      Tyler's Work for Pitchfork Cattle.**

60.     The Maderas did not hire Tyler to perform -- nor did he perform -- real estate brokerage services for the Maderas.  See Pretrial Order ¶ 1, at 8 (listing stipulated facts).

61.     The Maderas did not hire Tyler to, nor did they task him with, selling Pitchfork Ranch.  See Pretrial Order ¶ 2, at 8 (listing stipulated facts).

62.      Tyler had no role in marketing, introducing prospective buyers to the Maderas, negotiating terms of sale or otherwise assisting with the sale of the Ranch.  See Pretrial Order ¶ 2, at 8 (listing stipulated facts).

63.     On December 30, 2017, Tyler negotiated a Memorandum of Understanding ("MOU") between Solaris Midstream DB-NM LLC ("Solaris Midstream") and Pitchfork Cattle. Memorandum of Understanding at 1 (dated December 30, 2017)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 23).  See Tyler Group FOFs at 5-6 (no paragraph numbering)("Tyler negotiated a MOU between Solaris Midstream and Defendants for water infrastructure . . . .").

64.     Under the MOU, Solaris Midstream agrees "to finance, develop and operate water infrastructure systems on the Pitchfork Ranch": "(i) temporary and permanent pipelines and gathering systems, (ii) saltwater disposal wells ("SWDs") drilled and completed into Delaware sands formations . . . , (iii) processing and recycling facilities . . . , and (iv) Storage ponds, above ground storage and related equipment and facilities . . . ."  MOU at 1.

65.     The MOU did not result in the "exchange . . . [of] mon[ey] . . . ." May 3 Tr. at 157:5-10 (Tyler).

66.     Tyler created a summary of Pitchfork Ranch's assets, including its revenue sources from surface damage, mineral interests, pipeline easements, water sales, water trespass, disposal and recycling, caliche quarrying, to be shared with interested parties.  See Report on Pitchfork Ranch at 1-20 (not dated)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 44); Summary for Pitchfork Cattle Company LLC (not dated)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 45); Pitchfork Ranch by Fred Tyler & Brian Coker (not dated)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 46); Tyler Group FOFs at 5-6 (no paragraph numbering)("Tyler . . . created numerous business materials which Tyler used to pitch various business opportunities . . . .").  See also May 3 Tr. at 136:7-137:6 (DeAyala, Tyler)(discussing Tyler's work to produce material discussing Pitchfork Ranch's business prospects).

67.     Tyler designed a logo for a business card for Pitchfork Cattle.  See May 3 Tr. at 136:7-137:6 (DeAyala, Tyler); id. at 83:2-84:9 (DeAyala, Madera)(discussing Tyler's business cards); Front of Tyler's Business Card at 1; Back of Tyler's Business Card at 1.  See also Tyler Group FOFs at 6 (no paragraph numbering).[8]

68.     Tyler provided information about the Pitchfork Ranch to Chiron Financial to assist Chiron Financial with marketing the ranch.  See May 3 Tr. at 137:17-138:19 (DeAyala, Tyler); 23,237 Ace Lea County Ranch for Sale: Prime Location in the Core of the New Mexico Delaware Basin (not dated)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 8)("Chiron Financial

---

[8]Madera testified that he never saw the business card, see May 3 Tr. at 84:3-9 (Madera)("[T]his is the first time to ever see that card . . . , because I would not have allowed him to put my box number on his business card in Ruidoso, New Mexico. He didn't live in Ruidoso. He's never been to Ruidoso."), but does not dispute that Tyler designed the logo, see May 3 Tr. at 83:12-21 (DeAyala, Madera).

Marketing Materials"); Tyler Group FOFs at 6 (no paragraph numbering).

69.     Tyler came up with an idea to "not only . . . sell water but look at this infrastructure project to recycle and sell water . . . ." May 3 Tr. at 131:21-23 (Tyler).

70.     Tyler talked with a company, H2O Midstream, which visited the Pitchfork Ranch, and spoke with Madera and Montgomery, "to hammer out a deal," but the parties did not reach an agreement for sale of water or water recycling, because H2O Midstream "wanted to buy assets." May 3 Tr. at 132:1-10 (Tyler).

71.     Tyler sent out about fifteen "proposals" for selling recycled water "to different oil and gas companies in the area." May 3 Tr. at 138:23-139:6 (Tyler). See May 3 Tr. at 139:7-140:25 (DeAyala, Tyler).

72.     Tyler "developed some . . . extensive plans for water development, recycling water and producing water for" Pitchfork Cattle. May 3 Tr. at 207:6-9 (Coker).

73.     Tyler never sent Madera any invoices for the work he performed. See May 3 Tr. at 95:16-22 (Hightower, Madera).

74.     Tyler did not calculate his costs and expenses for working for the Maderas. See May 3 Tr. 148:8-11 (Hightower, Tyler)(Hightower: "So approximately how much, if you can recall, were you out on costs and expenses when it comes to working for the Maderas?" Tyler: "You know, I haven't put that together.").

75.     Tyler did not put his costs and expenses for the Maderas on any income tax form. See May 3 Tr. at 148:12-15 (Hightower, Tyler).

76.     Madera, Montgomery, and Pitchfork Cattle did not pay Tyler from January, 2017 through November, 2017 or from January, 2018 through August, 2018. See May 3 Tr. at 98:5-100:25 (DeAyala, Madera).

7.        **The Oral Contract for Five Percent of All Water Sales**.

77.        Before Tyler began working for Madera, Pitchfork Cattle sold water to Concho Resources.  See Tr at 87:4-6 (Hightower; Madera).

78.        In 2016, when Madera hired Coker, Pitchfork Ranch "had two producing water wells on it . . . that Mr. Madera owned and operated himself . . . .  There was also a third party called Rockhouse that operated a number of water wells on the Pitchfork Ranch as well."  May 3 Tr. at 205:20-25 (Coker).

79.        Madera wanted to improve the water sales and hired Tyler to do so.  See Tr at 87:13-15 (Hightower; Madera).

80.        Madera and Tyler had an oral contract where Tyler would receive five-percent of all water sales that Tyler negotiated.  See May 3 Tr. at 40:12-24 (DeAyala, Madera); id. 92:21-93:25 (DeAyala, Madera); id. at 101:2-8 (DeAyala, Madera)(DeAyala: "[Y]our deal was to pay him five percent of water sales."  Madera: "I agree there."); id. at 262:14-19 (DeAyala, Montgomery); Tyler Group FOFs at 4 (no paragraph numbering); Madera FOFs ¶¶ 23-24, at 3-4 ("Mr. Madera does not dispute the legitimacy of this first oral contract . . . . The first oral agreement is alleged to be compensation in the form of a 5% commission on any water sales that Plaintiff Tyler negotiated.").

81.        The water sales agreement between Madera and Tyler is not a written agreement. See May 3 Tr. at 60:10-13 (DeAyala, Madera)(admitting the water sales agreement was "probably" reached over the telephone); Tyler Group FOFs at 4 (no paragraph numbering); Madera FOFs ¶¶ 22-24, at 3-4.

82.        Developing Pitchfork Cattle's water business was meant to provide a "long term income stream."  May 3 Tr. at 126:14-17 (DeAyala, Tyler); Tyler Group's FOFs at 3 (no paragraph

numbering).

83.     The Maderas wanted to drill a well, so Tyler looked into drilling a well on Pitchfork Ranch to access the Capitan Reef aquafer,[9] but decided, after hiring a hydrologist to make a report, that "the cost of drilling" the well "would have been outrageous, so that wouldn't have been the best course of action to build a balance sheet for the ranch of water sales."  May 3 Tr. at 113:7-11 (Tyler).  See May 3 Tr. at 113:3-114:5 (DeAyala, Tyler).

84.     Tyler estimated that drilling a well to reach the Capitan Aquifer would cost Pitchfork Cattle between $750,000.00 and $3,000,000.00.  See May 3 Tr. at 113:17-19 (Tyler).

85.     Tyler explained to Madera that, under the SUCA, Concho Resources had to buy water from Madera at two dollars a barrel regardless whether the water came from Pitchfork

---

[9]At trial, Tyler described the Capitan Reef:

> The . . . Capitan is an aquifer that extends from Alpine, comes into New Mexico, kind of curves around to Carlsbad.  It's an interesting aquifer.  At the tip of Alpine, the cows drink better water than the city of Fort Stockton.  As it comes up, the [total dissolved solids] levels will start to get more briny, and by the time it hits where Lea County . . . it's a nonuseful water.  Then it swings back around to Carlsbad, and it's actually a good water again.  But it's . . . not a fresh-water aquifer as it's defined.  It's an abundant water source that has thousands of acreage feet of water that comes out of the mountains.  It's a water that's going to be utilized in the future.

May 3 Tr. at 4-18 (Tyler).  The National Parks Service explains that the Capitan Reef aquifer:

> is made mostly of dolomite and limestone stratigraphic units with a thickness as much as 719 m in a 16 to 23-km wide strip.  Immediately west of and at the base of the Guadalupe Mountains, Quaternary alluvium [a loose clay, silt, sand, or gravel sediment deposited from the Quaternary Period] forms a layer on top of the reef complex. The Capitan Reef Complex aquifer is primarily recharged through precipitation. Water extracted from this aquifer east of the park has been used for oil reservoir flooding.

Groundwater Monitoring at Guadalupe Mountains National Park, National Parks Service, https://www.nps.gov/articles/gumo-groundwater-monitoring.htm (last visited August 20, 2021).

Ranch, therefore Madera did not have to drill wells on Pitchfork Ranch to supply Concho Resources with water under the SUCA. See May 3 Tr. at 128:23-129:8 (Tyler).[10]

86.     Tyler explained to Madera that the SUCA provides Madera with a "great opportunity . . . for water sales," because Madera could buy water offsite and Concho Resources was obligated to buy it.  May 3 Tr. at 128:23-129:8 (Tyler).

87.     In late November, 2017, Tyler solely negotiated a water sale of $1,350,000.00 between Pitchfork Cattle and Concho Resources, which was Pitchfork Cattle's single "largest" water sale "by far."  May 3 Tr. at 40:2-8 (DeAyala, Madera).  See May 3 Tr. at 39:20-40:8 (DeAyala, Madera); id. at 130:1-131:13 (DeAyala, Tyler); id. at 225:6-8 (Coker)(Tyler "was solely responsible for resolving that issue."); Email from Mark Holly to Fred Tyler at 1-2 (dated November 30, 2017 through December 1, 2017)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 15)("2017 Water Sale Email"); Check From COG Operating LLC to Rupert Fred Bert Madera (dated December 7, 2017)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 17)("Water Sales Check")(paying $1,350,000.00 from COG Operating LLC to Madera).

---

[10]Tyler testified:

> Because from what the Maderas had told me when we first started, that they didn't -- they thought they had to drill water wells or had to have water that came from their ranch in sufficient quantities to sell for the frac and couldn't do it, they were really relying on the trespass fees.

> I said, well, if I look at [the SUCA], when water is available, and it's of the quantity, they have to buy it from you for $2.  It does not say it has to emanate from your ranch.  It doesn't have to come from below the ranch.  Doesn't have to come from the ranch.  When water's available, Concho has to buy it for $2.

> So that, to me, proved that there was a great opportunity here for water sales when they thought they couldn't sell the water because it came from offlease.

May 3 Tr. at 128:23-129:8 (Tyler).

88.     Madera bought water at $1.65 per barrel from Accelerated Water and sold that water to Concho at $2.00 per barrel under the SUCA. See May 3 Tr. at 179:20-181:20 (Hightower, Tyler).[11]

---

[11]At trial, Tyler testified that Accelerated Water generated the water that Madera sold to Concho under the SUCA:

| | |
|---|---|
| Hightower: | Where was the water generated from? |
| Tyler: | The water was generated from Accelerated Water, so there was about $1.65 or so cost on that water . . . . |
| Hightower: | So who had -- so did Bert have to eat the cost for that Accelerated Water payment to fill up the frac ponds? |
| Tyler: | Actually, he was getting the money. He was getting paid by Concho for the water that he was -- Accelerated was paying us. Literally just taking off with a couple-hundred thousand dollars. He was literally not out of pocket at all. |
| Hightower: | And that's because of a surface-use agreement that you did not negotiate, fair to say? |
| Tyler: | It was because of that clause for water that they were never able to exercise until such time as Fred Tyler came into the picture and it said when water was available at sufficient quantities, Concho had to use it. That's the most important part of this whole thing I think we need to keep concentrating on. |
| | You keep concentrating on the fact that there was 1.3 in water sales. You need to look at the bigger picture. Before, nobody exercised that clause in the surface-use agreement. Yes, the surface-use agreement was from 2016, but nobody was able to exercise the fact that Concho had to pay for water when it was available regardless of if it came from the ranch or not. It wasn't exercised till I was still there. |
| Hightower: | And after $1.3 million was paid by Concho to Mr. Madera, nobody exercised that clause again? |
| Tyler: | At that point, it didn't matter. Concho knew they were stuck. They knew if Mr. Madera put water in the pit, they had to pay for it at $2. |

89.    On December 18, 2018, Madera paid Tyler $67,500.00 for negotiating the water sale between Concho Resources and Pitchfork Cattle, which is five percent of $1,350,000.00.  See May 3 Tr. at 40:12-51:15 (DeAyala, Madera)(DeAyala: "That [$67,500.00] was the fee [Tyler] was paid sometime in December of '18 as his five percent fee on that $1.35 million water transaction?"  Madera: "Yes, sir."); id. at 130:1-131:13 (DeAyala, Tyler); Summary of Pitchfork Cattle Company, LLC Transactions at Merrill Lynch Bank of America Corporation at 1 (dated December 30, 2017)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 18)(listing that a check for $67,500.00 was written on December 18, 2018, and that the check was cleared on January 2, 2019); Mooney Decl. at 1 (no paragraph numbering)("[P]rior to hiring Tyler, Pitchfork was able to bring in third party water and receive a trespass fee, Pitchfork had been unable to source for itself and sell a sufficient  volume of water needed to frac a well."); id. at 1 ("In October-November 2017, Pitchfork, for the first time, sourced and sold a  sufficient volume of water

---

| Hightower: | Mr. Madera tried to turn off the water; is that right? |
| Tyler: | He threatened, yes. |
| Hightower: | Who paid Accelerated Water for the water that was put into the frac ponds? |
| Tyler: | Well, Bert waited until he got his money from Concho, then he paid Accelerated, who paid me. |
| Hightower: | Accelerated was paying you? |
| Tyler: | No.  No.  Bert would get -- Bert would wait until he got paid by Concho. He would pay Accelerated and pay me. |
| Hightower: | I understand that.  Bert's the, quote unquote, middleman. The water's traveling across his property, correct? |
| Tyler: | Correct. |

May 3 Tr. at 179:20-181:20 (Hightower, Tyler).

for Concho Resources to frac a well."); May 3 Tr. at 225:11-15 (Coker)(testifying that Tyler "specifically went to Midland or Monahans,[12] as I recall, and sat down and worked with six adverse parties at Concho and resolved the sale of water associated with a frac job there on Pitchfork in December of '17 . . . .").

       90.     On November 30, 2017, Tyler, Montgomery, and Mike Mooney, Pitchfork Cattle's ranch manager overseeing oilfield operations, exchanged a series of texts congratulating Tyler for the water sale:



Text Message Exchange Between Fred Tyler, Monte Carol Madera, and Mike Mooney (dated November 30, 2017)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 51).

       91.     On November 30, 2017, Montgomery sent Tyler a message regarding the November 2017 water deal:

---

[12]Coker is referring to Monahans, Texas.  See Monahans, Texas, https://en.wikipedia.org/wiki/Monahans,_Texas (last visited September 18, 2021).

Dear Pitchfork Team,

      Bert and I want to express our appreciation for the hard work and diligence in putting our water deal together.  We know we still have work to do but we wanted to recognize your effort with the enclosed.  We know checks should be incoming soon and commission checks will be issued but this a small advance to say "Thanks"!!

Letter at 1 (Dated November 30, 2017)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 14)("Appreciation Letter").  See Tyler Group FOFs at 5 (no paragraph numbering).[13]

      92.     Montgomery enclosed a check to Tyler for $10,000.00 with the Appreciation Letter.  See Tyler Group FOFs at 5 (no paragraph numbering); May 3 Tr. at 101:11-15 (Madera)("Montie Carol gave him $10,000 out of my bank account . . . ."); May 3 Tr. at 224:13-15 (Coker)(characterizing the $10,000.00 "as a Christmas bonus paid by Montie Carol . . . .").

      93.     The $67,500.00 was the only time Madera paid Tyler for water sales.  See May 3 Tr. at 41:16-18 (Madera)("[T]his is the only water that Fred Tyler ever got paid for."); Tyler Group FOFs at 5 (no paragraph numbering); Madera FOFs ¶ 34, at 3-4 ("Madera . . . does assert that he has paid Plaintiff Tyler all he is entitled to under the agreement.  This is because Mr. Madera did not sell any further water to Concho after December 2017.").

      94.     The November, 2017, water sale was the only water sale that Tyler negotiated for Pitchfork Cattle.  See May 3 Tr. at 40:25-41:18 (DeAyala, Madera)(testifying that the $10,000 was paid without Madera's knowledge; Tyler Group FOFs at 5-6 (no paragraph numbering);[14]

---

      [13]Madera testified that, although the Appreciation Letter contains Madera's name at the bottom, Montgomery sent the letter and the enclosed check without his knowledge; Madera does not, however, dispute either the Appreciation Letter or the enclosed check.  See May 3 Tr. at 101:11-15 (Madera)("Montie Carol gave him $10,000 out of my bank account on the other hand and never even asked my permission or never said thank you or kiss my butt.").

      [14]Tyler Group contends that "Tyler did significant work toward the agreed goal of increasing revenue streams and water sales for the Ranch," discusses other work Tyler performed for Pitchfork Ranch and the Maderas, but does not list any other water sales:

Madera FOFs ¶ 34, at 3-4 ("Madera . . . does assert that he has paid Plaintiff Tyler all he is entitled

to under the agreement.  This is because Mr. Madera did not sell any further water to Concho after

December 2017.").

95.    Around November, 2017, Tyler and Coker expected that Concho Resources would

drill new wells on Pitchfork Ranch through 2018.  See Tyler Group FOFs at 6 (no paragraph

numbering);  May  3  Tr.  at  143:11-24  (DeAyala,  Tyler);  id.  at  234:12-23  (DeAyala,

Coker)(agreeing that it "was commonly known that Concho Resources was going to actively drill

and frac wells on the ranch for the year to come . . . .").[15]

96.    Madera and Tyler expected that each of Concho Resources' planned wells would

---

In addition to the water sale to Concho, Tyler negotiated a MOU between
Solaris Midstream and Defendants for water infrastructure (Ex. 23) and created
numerous business materials which Tyler used to pitch various business
opportunities including, but not limited to, water sales to companies including H2O
Midstream, Devon, EOG Resources, Mewbourne Oil and Gas, NGP Capital,
Matador Resources, Santo Petroleum, Kaiser Francis, Antelope Water
Management, Oppenheimer, DH Horton, and Marathon.  Tyler also created a logo
for the Ranch that he and Defendants used on their business cards and in their email
signatures.  Tyler was in constant communication with Defendants during this time,
speaking by phone with Madera two or three times per week and Montgomery once
or twice per month.  Throughout Tyler's tenure as Defendants' Business
Development Consultant, Defendants were complimentary of Tyler's work and had
no criticism.  Tyler also provided financial and oil field services market data and
business model information about the Ranch to Chiron that Chiron incorporated in
its investment marketing document.

Tyler Group FOFs at 5-6.  The Court concludes that Tyler did not negotiate any other water sales,
because Tyler Group does not contend that it did get more water sales, nor does the record reflect
that it secured other water sales.

[15]Tyler Group contends that, "[a]s of November 2017, Concho had planned to drill new
wells on the Ranch consistently through 2018," Tyler Group FOFs at 6 (no paragraph numbering),
the record, however, does not reflect what Concho resources planned; it only shows what Tyler
and Coker expected Concho Resources to do, see Tyler Group FOFs at 6 (no paragraph
numbering)(citing the record); May 3 Tr. at 143:11-24 (DeAyala, Tyler); id. at 234:12-23
(DeAyala, Coker).

require one million barrels of water.  See May 3 Tr. at 81:22-82:23 (DeAyala, Madera)(agreeing that it was "common and expected . . . that when Concho were doing their long fracs, their long laterals, that they were using, per lateral, a million barrels or more of water"); id. at 143:11-24 (DeAyala, Tyler); Mooney Decl. at 2 (no paragraph numbering)(stating that Concho Resources drilled multiple wells on Pitchfork Ranch from October, 2018, to August, 2018, and that "[e]ach well pad consumed, in many instances, as much as or more than 1 million barrels of frac water").

97.     Based on Tyler's estimation that each of Concho Resources' planned wells would require one million barrels of water, Tyler projected that he "could expect to be paid at least $100,000 per month from Defendants going forward from its 5% water sales fee agreement," because each barrel of water cost $2.00 under the SUCA.  Tyler Group FOFs, at 6 (no paragraph numbering).  See May 3 Tr. at 143:11-24 (DeAyala, Tyler).

98.     Madera felt as though he had a contractual obligation to Tyler to continue to own Pitchfork Ranch and sell water.  See May 3 Tr. at 92:10-13 (Hightower, Madera)(Hightower: "Did you feel as though you had a contractual obligation with Mr. Tyler here to continue to own the ranch and sell water?"  Madera: "Yes.").

99.     Concho Resources did not have an agreement with Pitchfork Cattle to drill a certain number wells per year.  See May 3 Tr. at 88:1-14 (Hightower, Madera).

100.    While Tyler worked for Madera, no wells were drilled on Pitchfork Ranch.  See May 3 Tr. at 95:3-10 (Hightower, Madera).

101.    On January 12, 2018, after only one month of sales, Madera shut off the water supply to Concho Resources and prevented Concho Resources from accessing Pitchfork Ranch. See Pretrial Order ¶ 5, at 9 (listing as a stipulated fact: "After only one month of commercial water sales to Concho, the Maderas shut off the water supply to Concho."); Tyler Group FOFs at 7 (no

paragraph numbering); Madera FOFs ¶ 24, at 3-4 ("Madera did not sell any further water to Concho after December 2017."); May 3 Tr. at 50:19-51:7 (DeAyala, Madera); id. at 237:5-16 (DeAyala, Coker); Voicemail (not dated)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 27)(Madera's voicemail to Concho Resources threatening to shut off the water to Concho Resources if Concho Resources did not pay a disputed amount of money owed); Complaint for Temporary Restraining Order and Preliminary and Permanent Injunction ¶ 11, at 2, filed January 12, 2018, Fifth Judicial District, Lea County, New Mexico (admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 28)("Concho Resources TRO")(alleging that on "January 12, 2018, [Pitchfork Cattle] called COG and threat[en]ed to lock COG out of the land, denying it access to the frac pond and water, and physically turned off the pumps at the frac pond, thereby preventing the delivery of the water to COG's nearby Project").

102.    Pitchfork Cattle's relationship with Concho Resources continued to deteriorate, and Concho Resources stopped drilling operations on Pitchfork Ranch from January, 2018 through August, 2018. See Tyler Group FOFs at 7 (no paragraph numbering); Madera FOFs ¶ 24, at 3-4; May 3 Tr. at 50:19-51:7 (DeAyala, Madera); id. at 237:5-16 (DeAyala, Coker); id. at 207:15-22 (Hightower, Coker).

**8.    The Oral Contract for 2.5% of the Sale Price of Pitchfork Ranch.**

103.    In January 2017, Coker told Tyler about the Chiron Financial Agreement, under which Coker would receive a fee for the sale of the Pitchfork Ranch, but Tyler did not see the agreement. See May 3 Tr. at 115:1-10 (DeAyala, Tyler)(DeAyala: "You don't recall seeing the agreement, right?"  Tyler: "No."  DeAyala: "He just told you about it?"  Tyler: "Correct.").

104.    Tyler and Coker agreed that they would "split" Coker's fee from the sale of the ranch. May 3 Tr. at 115:11-13 (DeAyala, Tyler).

105.    Tyler understood that, if Madera sold the Pitchfork Ranch, he would lose out on his monthly commission for water sales, which was one of the reasons that Tyler wanted a fee of the Pitchfork Ranch's sale price.  See May 3 Tr. at 125:25-126:20 (DeAyala, Tyler); Tyler Group's FOFs at 3 (no paragraph numbering).

106.    Tyler, Coker, and Madera discussed Coker and Tyler's arrangement to split the fee for the sale of the Pitchfork Ranch on the telephone.  See May 3 Tr. at 115:17-20 (DeAyala, Tyler); id. at 163:18-21 (Hightower, Tyler).

107.    Madera fired Coker in January 2018.  See May 3 Tr. at 80:24-81:1 (DeAyala, Madera)(DeAyala: "[Y]ou fired [Coker] in January '18?"  Madera: "Yes, I sure did.");  id. at 43:4-12 (DeAyala, Madera); id. at 45:4-7 (DeAyala, Madera)("[I]n January [Madera] let Mr. Tyler know that [he had] fired Coker, and [he] no longer had any dealings with" Coker); id. at 60:20-22 (DeAyala, Madera); id. at 226:23-227:7 (DeAyala, Coker)(recalling that Coker was "terminated, fired, according to the word that Mr. Madera uses, after that TRO hearing" in January 2018); Tyler Group FOFs at 7 (no paragraph numbering).

108.    Madera terminated the Ozark Royalty-Madera Agreement.  See May 3 Tr. at 43:4-12 (DeAyala, Madera); id. at 45:4-7 (DeAyala, Madera)(agreeing that "in January [Madera] let Mr. Tyler know that [he had] fired Coker, and [he] no longer had any dealings with" Coker); id. at 60:20-22 (DeAyala, Madera); id. at 226:23-227:7 (DeAyala, Coker)(recalling that Coker was "terminated, fired, according to the word that Mr. Madera uses, after that TRO hearing" in January 2018); Tyler Group FOFs at 7 (no paragraph numbering).

109.    In January 2018, when Tyler heard that Madera had fired Coker and Ozark Royalty, Tyler thought that he was now "exposed," and he therefore called Madera.  May 3 Tr. at 116:17-117:1 (DeAyala, Tyler); id. at 164:3-8 (Tyler); Tyler Group FOFs at 7 (no paragraph numbering).

110.    During that conversation, Madera told Tyler that Tyler "deserved a fee" and that

Madera "would take care of it."  May 3 Tr. at 116:3-6 (Tyler); Tyler Group FOFs at 7 (no paragraph

numbering).

111.    During that conversation, Madera acknowledged the existence of the now year-old

agreement that Tyler had with Ozark Royalty that he was to receive a fee upon the ranch sale.  <u>See</u>

May 3 Tr. at 117:13-25 (DeAyala, Tyler); <u>id.</u> at 164:3-8 (Tyler).

112.    On February 6, 2018, Michael T. Newel, Madera's and Pitchfork Ranch's lawyer,

sent Tyler a letter stating:

Re: Pitchfork Cattle Co. LLC

Dear Mr. Tyler:

This firm represent[s] Rubert "Bert" Madera and Pitchfork Cattle Co. LLC.
In response to the proposed development agreement with the Tyler Group, Mr.
Madera has authorized this firm to offer you a one time finders fee payment of one
percent for any ranch purchaser you bring to Mr. Madera who is willing to pay in
excess of $100,000,000 for the ranch.

Should you wish to discuss this matter do not hesitate to call.

Sincerely,

Newell Law Firm

Letter from Michael T. Newell to Fred Tyler (dated February 6, 2018)(admitted at Trial on May

3, 2021, as Tyler Group's Exhibit 33)("Newell Letter").  <u>See</u> May 3 Tr. at 116:4-11 (Tyler); Tyler

Group FOFs at 7 (no paragraph numbering).

113.    On February 8, 2018, Tyler emailed Madera, Newell, Newell's legal secretary,

Morgan Banks, and "sjones"[16]:

Bert/Morgan,

---

[16]Neither party identified to whose email sjones refers.

Unfortunately, this is not inline with previous talks between Bert and the Tyler Group.  My finders fees are normally 5% gross of funds raised or deals closed and in this case I would accept nothing less than 3% gross of ANY accepted sale price I bring forth.

Please remember, it was the Tyler Group who was able to retrieve monies owed to Bert and I was able to bring Solaris to the table to deal; correspondence, dates, times, meetings, visits, to the field more to prove this. Because of these successes, the sale price for the ranch has significantly increased, this was documented in writing.  My fee is more than reasonable and compliant with industry standards.

I would suggest to adjust your offer accordingly, there are buyers in the pipeline that need to begin due diligence and letters of offer to Bert.  Until such time as a signed agreement between the parties has been completed, no such talks will be initiated.

Thank you,

Fred Tyler

Email from Fred Tyler to Bert Madera, Morgan Banks, Michael Newell, and "sjones" at 1 (dated February 8, 2018)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 34)("Feb. 8, 2018 Email Chain").  See May 3 Tr. at 61:5-63:13 (DeAyala, Madera); id. at 118:7-119:10 (DeAyala, Tyler); Tyler Group FOFs at 7-8 (no paragraph numbering); Madera FOFs ¶ 27, at 4.[17]

---

[17]That same day, Tyler forwarded his February 8 Email to "Robert."  Feb. 2018 Email Chain at 1.  See Tyler Group FOFs at 7-8 (no paragraph numbering); Madera FOFs ¶ 27, at 4.  The parties do not identify to whose email name "Robert" refers; Madera, during the trial, suggested that Robert referred to himself, see May 3 Tr. at 67:12016 (Madera), but the Feb. 8, 2018 Email refers to Madera's email name as "Bert."  The Feb. 8, 2018 email confused Madera, see May 3 Tr. at 67:12016 (Madera), because Robert is listed as an email name: "to Robert" in larger font than in the email's actual text and Tyler does not use the name in the body of emails:

114.    On February 8, 2018, when Madera read Tyler's February 8 Email asking for "nothing less than three percent gross," Madera "[i]n [his] mind, . . . then cancelled Mr. Tyler and Tyler Group from the sale, from any of this . . . because he turned it down, my offer." May 3 Tr. at 64:9-12 (Madera).

115.    On February 8, 2018, after Tyler sent the February 8 Email, Tyler called Madera and left a voicemail.  See May 3 Tr. at 119:11-120:24 (DeAyala, Madera); Tyler Group FOFs at 7 (no paragraph numbering); Madera FOFs ¶ 27, at 4.

116.    On February 8, 2018,[18] after Tyler left the voicemail, Madera called Tyler back while Tyler was at a Starbucks in San Angelo, Texas, and Tyler answered while he was in the Starbucks parking lot.  See May 3 Tr. at 119:11-120:16 (DeAyala, Tyler)(describing the sequence of events); Tyler Group FOFs at 7-8 (no paragraph numbering).

117.    When Madera called Tyler back on February 8, 2018, they discussed Tyler's compensation if the Pitchfork Ranch sold, and they agreed that

> two-and-a-half percent was pretty consistent, . . . but [they] couldn't put a value on the ranch, because [Tyler] ha[d] no control over that.  [They] agreed [Tyler was] not selling the ranch.  [They agreed that they couldn't] put a value on the ranch,

---

| Fredrick Tyler <fredrick@tylergroups.com> | Fe b 8 |
| to Robert | |
| FYI | |
| Bert Madera <bertmaderajnm@yahoo.com> | Feb 12 |
| to me | |

Feb. 8, 2018 Email at 1.  The Court, therefore, concludes that "Robert" does not refer to Madera.

[18]The Court finds that this telephone call occurred on February 8, 2018 based on Tyler's testimony: "Q: So February 8th, you write this email.  What happens after February 8th after you write that email? A: So I wrote the email, and then I called Bert, and then I must have left a voice message[.]"  Tr. 119:12-17.

and [they] would agree to two-and-a-half percent of the sale of the ranch as [Tyler's] compensation . . . .

May 3 Tr. at 120:17-25 (Tyler).  See May 3 Tr. at 66:17-23 (Madera)(stating that "I would not dispute that Tyler and he had a conversation between February 8 and 12, about Tyler's fee).[19]

118.    On February 12, 2018, Madera sent Tyler an email addressed to Morgan Banks: "Morgan: Let's offer Tyler Group 2.5% finders fee on the sale of Pitchfork.  Can Michael call me this afternoon to discuss fee to be paid Tyler Group for work done the S[o]laris Project?"  Feb. 12, 2018 Email at 2.  See May 3 Tr. at 64:24-65:11 (Madera); Tyler Group FOFs at 7-8 (no paragraph numbering); Madera FOFs ¶ 27, at 4.[20]

---

[19]Madera does not dispute this conversation occurred, but does not recall the conversation either:

> DeAyala:    So if after this February 8 email that's on page one of Exhibit 4, after that email, if Mr. Tyler were to testify that you and he had a phone conversation between that February 8 email and your February 12 email, would you have any reason to disagree with that?
>
> Madera:    No, I would not.
>
> . . . .
>
> DeAyala:    So with respect to the conversation you had with Mr. Tyler . . . after his February 8th email, it appears that you don't have a recollection of that conversation, but during that conversation, that's where the two-and-a-half percent fee on the sale of the ranch was discussed and agreed to between you and Mr. Tyler, correct?
>
> Madera:    No, sir.
>
> DeAyala:    You don't recall?
>
> Madera:    No, sir. . . . .

May 3 Tr. at 66:17-69:2 (DeAyala, Madera).

[20]At trial, Madera suggested the 2.5% in the February 12, 2018 Email is conditional on Pitchfork Ranch selling for over $100,000,000.00 -- "Over $100 million is the wording in that.

119.    Madera sent Tyler the February 12, 2018 Email by "accident."  May 3 Tr. at 64:24-65:1 (Madera)(explaining that Madera meant to write Banks, but "for some reason or other, Fred Tyler got ahold of this email," and that Madera sent it to Tyler "not on purpose" and that "it was an accident").

120.    At that time, Madera did not email or otherwise tell Tyler that he did not mean to send Tyler the February 12, 2018 Email.  See May 3 Tr. at 64:24-65:11 (Madera)(agreeing that he did not "do anything prior to 2020 to say, oops, I didn't mean to send it, give it back, anything like that . . ."); id. at 65:1-20 (Madera)(agreeing that Madera did not send a "follow-up email That said, oh, you weren't supposed to receive that, Fred . . ." ).[21]

121.    Madera's February 12, 2018 Email addressed to Banks is consistent with Tyler and Madera's telephone conversation from February 8, 2018.  See May 3 Tr. at 122:7-14 (DeAyala, Tyler);  id. at 124:14-16 (DeAyala, Tyler)(DeAyala: "Did this email memorialize that conversation?"  Tyler: "It did.").

122.    Later, in July, 2018, Tyler made a timeline of events related to Pitchfork Ranch for Coker, which states: "February 12, 2018 -- Bert offers Fred Tyler 2.5% on sale if he brings a buyer."  Tyler's Timeline of Events at 1 (not dated)(admitted at Trial on May 3, 2021, as Madera's Exhibit B).  See May 3 Tr. at 151:8-25 (Hightower, Tyler); Madera FOFs ¶ 29, at 4.

123.    Based on Madera's February 12, 2018 Email, and their telephone conversation, Tyler understood that Madera would pay him a 2.5% sales fee if he "attract[ed] the buyer and the

---

Over 100 million."  May 3 Tr. at 90:10-11 (Madera); the email, contrary to Madera's assertion contains no mention of a price associated with the sale, see Feb. 2018 Email Chain at 1-2.

[21]Madera did not argue the email was sent by accident until 2020, when he filed the Motion. See Motion at 1.  The Court denies the Motion and provides its reasons for doing so in its Analysis, infra.

buyer was always Concho." May 3 Tr. 3 at 153:6-8 (Hightower, Tyler).

124.    Tyler never called Madera, sent Madera an email, or sent Madera a letter rejecting,

accepting, or counter offering Madera's offer in the February 12, 2018 Email.  See May 3 Tr. at

68:10-20 (DeAyala, Madera).[22]

125.    On February 13, Tyler emailed Madera in the same chain as the Feb. 2018 Email

Chain:

> Bert,
>
>      I am losing the ability to be face-to-face with the buyers as they are here at
> the produced water conference.  They will be gone on Friday, early in the morning.
> Currently, they are scouting the marker in the Delaware for land opportunities
> between Reeves and Lea counties.
>
> Any updates?

Feb. 13, 2018 Email at 2.  See Tyler Group FOFs at 7-8 (no paragraph numbering); Madera FOFs

¶ 27, at 4.

126.    On February 15, 2018, Tyler emailed Madera "to see if there were any updates[.]"

---

[22]Madera testified at the trial that he did not receive any communication from Tyler about
the offer in the February 12, 2018, Email:

| DeAyala: | And you'll agree with me that after this email was sent by you that there is no writing, no email, letter, smoke signal, or anything else from Mr. Tyler disagreeing with it? |
|---|---|
| Madera: | Nor is there any email or letter or phone conversation where he accepted it. |
| DeAyala: | Afterwards? |
| Madera: | During or after, either way. |
| DeAyala: | Okay.  Let's move on. |
| Madera: | He didn't accept it . . . . |

May 3 Tr. at 68:10-20 (DeAyala, Madera).

Feb. 15, 2018 Email at 2.  <u>See</u> Tyler Group FOFs at 7-8 (no paragraph numbering); Madera FOFs ¶ 27, at 4.

127.    On February 28, 2018, Tyler emailed Morgan asking: "Can we scheduled a call to discuss Concho?"  Feb. 28, 2018 Email at 2.  <u>See</u> Tyler Group FOFs at 7-8 (no paragraph numbering); Madera FOFs ¶ 27, at 4.

128.    Based on their negotiations, Madera and Tyler had an agreement where Madera would pay Tyler 2.5% of Pitchfork Ranch's gross sales price.  <u>See</u> May 3 Tr. at 66:17-23 (Madera); <u>id.</u> at 116:17-122:14 (DeAyala, Tyler); <u>id.</u> at 120:17-25 (Tyler); <u>id.</u> at 123:15-126:20 (DeAyala, Tyler); <u>id.</u> at 153:6-8 (Hightower, Tyler); Feb. 2018 Email Chain at 1-2; Tyler Group's FOFs at 7 (no paragraph numbering).[23]

129.    Following their negotiations, Tyler continued to work for Madera until July 2018. <u>See</u> May 3 Tr. at 74:22-75:18 (DeAyala, Madera).

130.    Although Tyler and Madera use the phrase "finder's fee" throughout their negotiations, Tyler was not "hired nor tasked with . . . introducing prospective buyers to the Maderas."  Pretrial Order ¶ 2, at 8 (listing stipulated facts).

131.    Madera and Tyler use the phrase "finder's fee" to refer to Tyler's efforts to improve Pitchfork Ranch's water operations and therefore make Pitchfork Ranch more attractive for protentional buyers.  <u>See</u> May 3 Tr. at 116:11-16 (Tyler)("My function was just to do business-development-type services and create a balance sheet, create water sales, create these business lines and business streams for the Ranch as revenue streams and then also look at other businesses that we could . . . do."); <u>id.</u> at 151:18-152:2 (Hightower, Tyler)("I was attracting the buyer . . . .");

---

[23]In its Analysis, <u>infra</u>, the Court discusses further why the parties entered into a contract for 2.5% of Pitchfork Ranch's gross sales price.

id. at 153:4-19 (Hightower, Tyler); May 4 Tr. at 15:20-17:15 (Court, DeAyala).[24]

_____

[24]During closings, Madera argued that Tyler Group was required find a buyer, see May 4 Tr. at 35:7-39:17 (Court, Hightower); however, Madera stipulated that Tyler did not have to do so, see Pretrial Order ¶ 2, at 8 (listing stipulated facts), and the trial testimony reflects that Madera and Tyler did not use the term finder's fee to describe Tyler Group's efforts to make Pitchfork Ranch more attractive for potential buyers:

Hightower:   [W]hy did you write if you find a buyer on your own timeline?

Tyler:   Because the two-and-a-half percent is based on attracting the buyer, and the buyer was always Concho.

Hightower:   So it's your contention that you brought Concho to the Maderas?

Tyler:   No, that's not it. The --

Hightower:   That you attracted them?

Tyler:   The -- yes -- yes, that is correct, because the attraction to Concho was that it was a $30 million ranch to them prior to Fred Tyler coming on board. By the time this ranch sold by Fred Tyler, the same buyer, Concho, is now buying it for what was 100 million was the idea, that ended up being 80 million.  That's it.

May 3 Tr. at 153:4-19 (Hightower, Tyler).  During closing arguments, the Court asked Tyler Group to explain what "finder's fee" meant, and Tyler Group explained that it is a "term of art" that has to be taken into context:

That's kind of a slang term . . . .  Look at the testimony of the parties.  Look at the actions of the parties.  The testimony is: I really never hired him to do that. I never expected him to do that.  Okay.  Finder's fees is just a term that was used, number one.  Number two is the reality is, in a sense, not in a real estate professional sense, but in a sense it was his conduct that made the sale to Concho more likely, and at a higher price.  So in a very loosely worded thing, it was his work, not as a realtor or real estate professional, but his work that brought Concho, and that made them the likely buyer, as defendants understood all along.  And in the context of the conversation, in the phone conversation, again, you heard testimony from everybody: Concho was a likely buyer. They were the target.  So we're looking at something that is static.  We're looking at a fee on an identified buyer.  And it ended up being that buyer.

So the finding part is not intended to mean what they now want it to mean.  And the evidence is clear about that, because of the testimony of defendants.  He wasn't hired to do those things.  But, in effect, if you understand that terminology

132.    Tyler and Madera's agreement that Madera would pay Tyler 2.5% of the Pitchfork Ranch's gross sales price did not depend on the amount for which Madera sold the Pitchfork Ranch.  See Feb. 13, 2018 Email at 2; Tyler's Timeline of Events at 1; May 3 Tr. at 64:24-65:11 (Madera); id. at 122:7-14 (DeAyala, Tyler); id. at 124:14-16 (DeAyala, Tyler); id. at 151:8-25 (Hightower, Tyler); id. at 153:6-8 (Hightower, Tyler); id. at 68:10-20 (DeAyala, Madera); Tyler Group FOFs at 7-8 (no paragraph numbering); Madera FOFs ¶¶ 27, 29, at 4.[25]

**8.    Madera Fires Tyler and Sells Pitchfork Ranch.**

133.    On March 6, 2018, Newell emailed Tyler, telling Tyler not to communicate with Concho Resources, and that any Concho Resources related matters should be directed to Newell, Charles Peifer, or the Maderas.  See Email from Newell to Tyler at 1 (dated March 6, 2018)(admitted at Trial as Madera's Exhibit R); May 3 Tr. at 164:9-25 (Hightower, Tyler).

---

based on the conduct of the parties, Concho became the buyer at a higher price in large part because of the conduct of Tyler.  Does that make it someone found?  Does that make it a buyer that was brought forth because of efforts of Tyler?  Absolutely.  But again, I don't think that the parties intended finder's to mean a real estate function, a real estate professional function.  It's just a term of art used for when you receive a percentage fee on the sale of real estate.

May 4 Tr. at 16:1-17:15 (DeAyala).  The Court agrees with Tyler Group's interpretation of the term finder's fee, because it reflects accurately the stipulated facts in the Pretrial Order and reflects the trial testimony.

[25]Madera argues that, if there is an agreement between the parties, it includes the term that Madera will pay Tyler Group only if the Pitchfork Ranch sells for more than $100,000,000.00.  See May 4 Tr. at 39:11-14 (Hightower).  Although the $100,000,000.00 term is part of Madera's offer on February 6, 2018, see Newell Letter at 1, that term dropped out when Tyler Group counter offered, see Feb. 2018 Email Chain at 1 ("I would accept nothing less than 3% gross of ANY accepted sale price I bring forth."), and Madera made his final offer on February 12, 2018, without a reference to a sales price, see Email Chain at 2 ("Let's offer Tyler Group 2.5% finder's fee on the sale of Pitchfork.").  See also NMRA CIV UJI 13-808 ("If [the offeree] responded to an offer by conditioning acceptance on new terms that added, varied or changed any term of the offer, the response was a rejection of the original offer and operated as a new offer that could be accepted or rejected by [the offeror].").

134.    In July 2018, Madera "terminated [Tyler's] employment."  May 3 Tr. at 74:22-75:18 (DeAyala, Madera).[26]

135.    Madera fired Tyler so that he would not have to pay Tyler anything.  See May 3 Tr. at 74:22-75:18 (DeAyala, Madera).[27]

---

[26]Madera testified that he "terminated" Tyler "'[b]y telling him he was not involved anymore in any way because he did not produce the sale of the ranch, and he didn't.'"  May 3 Tr. at 74:22-75:18 (DeAyala, Madera)(quoting deposition testimony of Bert Madera).  Tyler testified, however, that "I was never fired," and that "I worked for Bert up until the ranch had closed."  May 3 Tr. at 168:8-11 (Tyler).  Tyler, later, in his proposed FOFs alleges that Madera fired him.  See Tyler Group FOFs at 8 (no paragraph numbering).  The Court concludes that Madera fired Tyler, because Madera testified that he fired Tyler and Tyler admits to it in his FOFs, which outweighs Tyler's testimony at trial.

[27]At trial, Madera testified:

DeAyala:   Okay.  Let's go to your deposition . . . [w]here you say: . . .

[A:]    "I terminated his employment.

[Q:]    How did you do that?

[A:]    By telling him he was not involved anymore in any way because he did not produce the sale of the ranch, and he didn't.

[Q:]    When did you fire him?

[A:]    I don't remember.

[Q:]    Did you do it in an email? Text? Phone call?

[A:]    No, sir.  Phone call probably.

[Q:]    What year?

[A:]    Oh, I have no idea. Oh, in '18. It was sometime in '18, because it was -- and it was July -- June, July of '18, because in August of '18 was when we had the sale of the ranch.

[Q:]    So you made sure to fire him before you'd ever have to pay him anything?

[A:]    Oh, yeah, definitely."

136.    In August 2018, Coker told Tyler that Madera was selling the Pitchfork Ranch, and Coker stated that he did not think Madera would pay him a fee.  See May 3 Tr. at 142:4-13 (DeAyala, Tyler).

137.    On August 11, 2018, after Tyler heard from Coker that Madera was selling the Pitchfork Ranch, Tyler talked to Madera and "reminded him that we had an agreement together for two-and-a-half percent" of the Pitchfork Ranch's sale price.  May 3 Tr. at 141:6-10 (Tyler). See May 3 Tr. at 141:11-15 (Tyler); id. at 141:23-5 DeAyala, Tyler).

138.    During that conversation, Madera told Tyler "that the ranch wasn't selling."  May 3 Tr. at 141:9-10 (Tyler).  See May 3 Tr. at 77:1-10 (Madera)(stating that it was probably true that he didn't tell Tyler the ranch was being sold on August 11, 2018).

139.    On August 29, 2018, Madera sold Pitchfork Ranch to Quail Ranch LLC, a subsidiary of Concho Resources, for $81,600,000.00.  See Letter Agreement at 1 (dated August 29, 2018)(admitted at Trial on May 3, 2021 as Tyler Group's exhibit 39)(listing the terms of the sale between Quail Ranch LLC, the purchaser, and the Maderas and Pitchfork Cattle, the sellers); Pretrial Order ¶ 6 at 8; May 3 Tr. at 31:12-16 (DeAyala, Madera); Tyler Group FOFs at 9 (no paragraph numbering); Madera FOFs ¶ 31, at 5.

140.    Madera had asked Concho Resources to pay $100,000,000.00 for Pitchfork Ranch, and Concho Resources had agreed to pay $100,000,000.00, but Concho Resources paid less because of Montgomery's and Madera's divorce.  See May 3 Tr. at 47:1-18 (DeAyala,

---

Does that refresh your memory?

Madera:    Yes, sir.

DeAyala:   Is that testimony true?

Madera:    Yes, sir.

May 3 Tr. at 74:4-75:16 (DeAyala, Tyler)(quoting Deposition Testimony of Bert Madera).

Madera)(agreeing that Concho Resources "agreed to pay it, and they ultimately paid less because of Montie Carol Montgomery and [Madera's] divorce . . ."); id. at 47:1-18 (DeAyala, Madera)(agreeing that "[i]f it wasn't for the divorce or Montie Carol Montgomery, [Madera] would have [the] ranch sold at $100 million . . ."); id. at 93:19-94:1 (Madera); Tyler Group FOFs at 9 (no paragraph numbering).

141.    After Tyler heard that Madera sold the Pitchfork Ranch, Tyler talked to Coker, and Coker told Tyler that he had not been paid by Madera.  See May 3 Tr. at 142:14-24 (DeAyala, Tyler).

142.    Madera did not call Tyler after he sold Pitchfork Ranch.  See May 3 Tr. at 22-24 (DeAyala, Tyler); Tyler Group FOFs at 9 (no paragraph numbering).

143.    At closing, the Maderas paid Chiron Financial $1,000,000.00, and paid Coker and Ozark Royalty $650,000.00.  See Settlement Statement at 1 (Dated August 29, 2018)(admitted at Trial on May 3, 2021 as Tyler Group's exhibit 40); Tyler Group FOFs at 9 (no paragraph numbering).

144.    Tyler did not know that the Maderas paid Chiron Financial, Coker, and Ozark Royalty after the sale of Pitchfork Ranch.  See May 3 Tr. at 232:14-16 (Coker); Tyler Group FOFs at 9 (no paragraph numbering).

145.    Neither Chiron Financial, Coker, nor Ozark Royalty shared any of their sale fees with Tyler.  See May 3 Tr. at 232:14-16 (Coker); Tyler Group FOFs at 9 (no paragraph numbering).

146.    The Maderas did not pay Tyler a fee when they sold Pitchfork Ranch.  See Pretrial order ¶ 7 at 8 (listing as a stipulated fact: "The Maderas did not pay Tyler any fee resulting from the sale of the Ranch."); Tyler Group FOFs at 9 (no paragraph numbering); May 3 Tr. at 141:3-143:9 (Coker).

147.    If Madera had sold Pitchfork Ranch for over $100,000,000.00, Madera would have paid Tyler 2.5% of the sale's fee.  See May 3 Tr. at 75:19-76:11 (DeAyala, Madera).

## PROCEDURAL HISTORY

On August 26, 2019, Tyler Group filed a Complaint For Debt and Money Due (Doc. 1), and then on October 2, 2019, Tyler Group filed an Amended Complaint for Debt and Money Due (Doc. 10)("First Amended Complaint").  In the First Amended Complaint, Tyler Group brings three claims: (i) breach of contract for (a) "Tyler's expected income" for 5% of water sales that Madera cancelled; and (b) "never pa[ying] Tyler the agreed upon fee of two and a half percent (2.5%) of the gross sales price" of Pitchfork Ranch; (ii) fraudulent inducement, because the "Defendants intentionally, knowingly, and/or recklessly made the false representations.  Plaintiff justifiably relied on the representations to its detriment"; and (iii) unjust enrichment because of Tyler Group's efforts with water sales and the sale of Pitchfork Ranch.  See First Amended Complaint ¶¶ 20-36, at 6-8.  Tyler Group, based on these three claims, requests "(a) actual damages; (b) reasonable and necessary attorneys' fees and costs of court; (c) pre- and post-judgment interest;" and "(d) punitive and exemplary damages . . . ."  First Amended Complaint at 9.

### 1.    The MOO.

On February 16, 2021, the Court entered its Memorandum Opinion and Order, Tyler Grp. Partners, LLC v. Madera, No. CIV 19-0777 JB/SMV, 2021 WL 601843, at *1 (D.N.M. Feb. 16, 2021)(Browning, J.), filed February 16, 2021 (Doc. 107)("MOO").  In the MOO, the Court denies Defendants Bert Madera and Pitchfork Cattle Company, LLC Motion for Summary Judgment on Bert Madera and Pitchfork Cattle Company, LLC Resulting from Breach of Duties, filed November 30, 2020 (Doc. 84)("MSJ"), and

> concludes that: (i) the Commission Act[, N.M.S.A. §§ 61-29-1 to -29,] does not bar
> Tyler Group's recovery, because, N.M.S.A. § 61-29-16 bars recovery only where a
> person is acting as a broker and is seeking a broker's commission, and Tyler did
> not act as a broker and is not seeking to recover a commission based on actions as
> a broker; and (ii) Tyler did not negotiate the sale of water rights, which would be
> subject to the Commission Act; rather, Tyler negotiated the sale of surface water as
> a commodity. Accordingly, because § 61-29-16 does not bar Tyler Group's action
> as a matter of law

MOO, 2021 WL 601843, at *1.

### 2. The Motion.

In November, 2020, Madera and Pitchfork Cattle filed the Motion and the Defendants Bert

Madera and Pitchfork Cattle Company, LLC Memorandum in Support of Its Motion In Limine to

Preclude the Plaintiff's Use of Certain Testimony and Electronic Communication, filed November

30, 2020 (Doc. 81)("Motion Memo").  Madera and Pitchfork Cattle argue that Court should

exclude "certain e-mail correspondence" that Tyler Group seeks to admit "that are covered as

settlement communications and/or covered under the attorney-client privilege."  Motion Memo at

1.  Madera and Pitchfork Cattle contend that under rule 408 of the Federal Rules of Evidence,

evidence of settlement negotiations is not admissible, and that

> Mr. Madera instructed his attorney at the time to make an offer to the Tyler Group
> regarding payment.  Mr. Madera stated, "Morgan: Let's offer Tyler Group 2.5%
> finders fee on the sale of Pitchfork."  The Tyler Group in[ad]verte[t]ly received the
> communication and rejected the offer.  Specifically the email from Fred Tyler
> stated, "I would accept nothing less than 3% gross of ANY accepted sale price I
> bring forth."  This email chain constitutes a settlement negotiation under the rules
> and should be excluded from the jury.

Motion Memo at 3 (quoting Email Correspondence at 1-2).

Next, Madera and Pitchfork Cattle argue that the admission of the Email Correspondence

creates the risk of jury confusion and prejudice under rule 403.  See Motion Memo at 3 (citing

Southwest Nurseries, LLC v. Florists Mut. Ins., Inc., 266 F. Supp. 2d 1253, 1259 (D. Colo.

2003)(Shaffer, M.J.)("Even where evidence is not barred under Rule 408, the trial court must still

perform a balancing analysis under Rule 403 of the Federal Rules of Evidence, weighing the probative value of the proffered evidence against its potential for unfair prejudice to the objecting party."). Madera and Pitchfork Cattle contend:

> There is a significant risk that the jury will confuse the purpose for which Tyler Group Partners, LLC purports to offer the negotiations at trail and will construe the negotiations as some sort of concession by Bert Madera and Pitchfork Cattle Company, LLC that monies are due to the Tyler Group, a result which would be unfairly prejudice to Bert Madera and Pitchfork Cattle Company, LLC. Accordingly, Rule 403 bars admission of the negotiations.

Motion Memo at 3 (citing Equal Employment Opportunity Commission v. Gear Petroleum, Inc., 948 F.2d 1542, 1546 (10th Cir. 1991); Southwest Nurseries, LLC v. Florists Mut. Ins., Inc., 266 F. Supp. 2d at 1258-59; and 2 Weinstein's Federal Evidence §408.08 ("The almost unavailable impact of the disclosure of [settlement evidence] is that the jury will consider the offer or agreement as evidence of a concession of liability.")).

Last, Madera and Pitchfork Cattle argue the Email Correspondence is not admissible, because it is privileged attorney-client material that was inadvertently disclosed. See Motion Memo at 4. Madera and Pitchfork Cattle contend that there are four factors that Courts consider to determine whether a document has lost its privilege through inadvertent disclosure:

> "(i) precautions taken to prevent inadvertent disclosure in view of extent of document production; (ii) number of inadvertent disclosures; (iii) extent of disclosures, and delay in rectifying disclosure; and (iv) whether overriding interests of justice would be served by relieving party of consequences of error."

Motion Memo at 4-5 (quoting Bud Antle, Inc. v. Grow-Tech, Inc., 131 F.R.D. 179, 183-84 (N.D. Cal. 1990)(Woelflen, C.M.J.)).[28] Madera and Pitchfork Cattle contend that no factor is dispositive

---

[28]Although B. Madera and Pitchfork Cattle give four factors, it is unclear from their brief where these factors come from. The case they appear to cite, Bud Antle, Inc. v. Grow-Tech, Inc., 131 F.R.D. 179, 183-84 (N.D. Cal. 1990)(Woelflen, C.M.J.), does not mention these factors; rather the language, in part, is cited in cases such as Gray v. Bicknell, 86 F.3d 1472, 1474 (8th Cir. 1996), Advanced Med., Inc. v. Arden Med. Sys., Inc., No. CIV.A. 87-3059, 1988 WL 76128, at *2 (E.D. Pa. July 18, 1988)(Naythons, M.J.)(collecting cases), and Hydraflow, Inc. v. Enidine Inc., 145

and that they, as the parties asserting the privilege, have the burden of proof.  See Motion Memo at 5.  Madera and Pitchfork Cattle argue that "it is clear that Mr. Madera's email to Morgan was meant to be a confidential attorney / client communication," because "[a]t the time Morgan Banks was and still is a legal secretary for Michael Newell of the Newell Law Firm, LLC which represented" Madera and Pitchfork Cattle.  Motion Memo at 5.

###   3.   The Response.

Tyler Group responds, first arguing that Madera and Pitchfork Cattle's two arguments "are mutually exclusive," because the Email Correspondence cannot be a settlement negotiation and privileged attorney-client communications at the same time.  Plaintiff Tyler Group Partners, LLC's Response and Memorandum in Opposition io Defendants' Motion In Limine at 4, filed December 14, 2020 (Doc. 88)("Response").  Next, Tyler Group argues that, because no claim existed at the time the emails were sent, the Email Correspondence cannot be a compromise negotiation, under rule 408.  Response at 4-5.  Tyler Group contends that "[i]n order for a communication of an offer, acceptance or negotiation (collectively 'compromise negotiations') to become inadmissible under

---

F.R.D. 626, 637 (W.D.N.Y. 1993)("Hydraflow"), cases which cite five factors not four:

> [T]here is the middle test, sometimes called the Hydraflow test . . . . Hydraflow, 145 F.R.D. at 637.  Under the Hydraflow test, the court undertakes a five-step analysis of the unintentionally disclosed document to determine the proper range of privilege to extend.  These considerations are (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of document production, (2) the number of inadvertent disclosures, (3) the extent of the disclosures, (4) the promptness of measures taken to rectify the disclosure, and (5) whether the overriding interest of justice would be served by relieving the party of its error.  Id.; see also Alldread v. City of Grenada, 988 F.2d 1425, 1433 (5th Cir. 1993).  If, after completing this analysis, the court determines that waiver occurred, then those documents are no longer privileged.  At the court's discretion, the privilege may also be determined to have been waived for related, but-as-yet undisclosed, documents

Gray v. Bicknell, 86 F.3d 1472, 1483-84 (8th Cir. 1996).

FRE 408, there must first be a legal dispute that is being resolved."  Response at 5 (no citation for

quotation).  Tyler Group contends that a compromise negation under rule 408 does not include

"simple business negotiations."  Response at 5.  Tyler Group maintains that "there must be some

existing legal dispute that's being resolved, not just standard back-and-forth negotiations over a

matter of business.  Even if parties are negotiating over conflicting terms, Rule 408 won't apply

unless there's a true existing legal dispute between the parties."  Response at 5 (citing <u>Deere &</u>

<u>Co. v. International Harvester Co.</u>, 710 F.2d 1551, 1556-57 (Fed. Cir. 1983)(" Rule 408, on its

face, is limited to actual disputes over existing claims . . . ."); <u>Big O Tire Dealers, Inc. v. Goodyear</u>

<u>Tire & Rubber Co.</u>, 561 F.2d 1365, 1336-37 (10th Cir. 1977)(concluding that "business

communications" are not "compromise negotiations")).

> Tyler Group contends:
>
> Defendants have the burden of establishing the applicability of FRE 408.
> Defendants must establish: (1) a claim or legal dispute existed when the alleged
> compromise negotiation was made; and (2) that the alleged compromise
> negotiations contained in [the Email Correspondence] was to compromise or
> attempt to compromise the claim.

Response at 6.  Tyler Group argues that Madera and Pitchfork Cattle have not proven either,

because no claim or legal dispute existed in February 2018.  <u>See</u> Response at 6. Tyler Group

contends:

> There is no evidence that prior to the February 2018 email communication, Plaintiff
> "claimed" it was owed a fee from Defendants if the ranch sold or that Defendants
> believed a claim existed.  Ex. 4, Tyler Aff. ¶ 16.  In fact, the document sought to be
> excluded memorializes, in part, the oral agreement reached between Plaintiff and
> Defendants.  No breach of contract claim existed -- or legally could exist - until that
> agreement was reached.  Therefore, Ex. 1 could not have been an attempt to
> compromise a claim.  Plaintiff's claim against Defendants for failure to pay
> Plaintiff's fee did not exist or accrue until at the earliest more than six months later
> on August 29, 2018, when the ranch sale closed and Plaintiff's fee was not paid.

Response at 6.

Turning to the rule 403 argument, Tyler Group argues that the probative value of the Email

Correspondence outweighs any unfair prejudice, because "[w]ritings memorializing communications or terms of oral agreements are regularly admissible under various theories including estoppel," are writings "are probative especially from the opposing party to an agreement." Response at 7. Tyler Group that the Email Correspondence demonstrates that the parties hard an "oral agreement that Defendants would pay Plaintiff 2.5% of the gross proceeds from the sale of the ranch," and if the Court were to exclude the Email Correspondence, it would be prejudicial to Tyler Group. Response at 7.

Next, Tyler Group argues that the Email Correspondence is not privileged attorney-client communication, because Madera intended to disclose the email to Tyler. See Response at 7. Tyler Group cites Tyler's Affidavit for the proposition that the

> email communication resulted from a recent telephone conversation between Mr. Madera and Mr. Tyler where they agreed that Plaintiff would be paid 2.5% of the proceeds from any sale of the ranch.
>
> Mr. Madera included Mr. Tyler to show him that Defendants were moving forward with the newly reached agreement. Mr. Tyler's inclusion was not by accident or mistake. It was intentional. Mr. Madera and Mr. Tyler spoke again after the email was sent. The email was discussed during the subsequent conversation with the understanding from Mr. Madera that Mr. Tyler was supposed have been part of that communication. At no time during that subsequent conversation did Mr. Madera communicate a sentiment that Mr. Tyler was not supposed to have received the email. Also, at no prior to Defendants filing the motion has there been any communication from anyone, including Defendants counsel copied on the email, Mr. Madera or Defendants' counsel in this case, that Mr. Tyler was not a proper recipient of the email.

Response at 7-8 (citing Affidavit of Frederick H. Tyler ¶ 16, at 4, dated December 14, 2020, filed December 14, 2020 (Doc. 87-1)("Tyler Aff.")).

Next, Tyler Group argues that even if the email disclosure was inadvertent, Madera and Pitchfork Cattle waived the privilege, because Madera and Pitchfork Cattle have done nothing to "rectify the disclosure." Response at 8. Tyler Group then provides its timeline of events:

- February 12, 2018 -- Mr. Madera sends email to Morgan Banks, Legal Secretary for Michael Newell (Newell Law Firm, LLC.) and Mr. Tyler. Neither Mr. Madera, Mr. Newell, Ms. Banks nor any other person at the Newell Law Firm attempt to rectify the alleged disclosure despite being recipients of the email.

- Mid to Late February 2018 -- Mr. Madera and Mr. Tyler discuss the email and its contents and Mr. Madera makes no mention of mistake or inadvertent disclosure. Ex. 4, Tyler Aff. ¶ 16.

- February 18, 2020 -- Plaintiff produces bates stamped pages Tyler000001-375 which includes the email in question. Plaintiff does not receive notice of inadvertent disclosure from any of the Defendants until the filing of Defendants' motion. Ex. 3, Plaintiff's First 26.1 Disclosure Statement (February 18, 2020).

- June 19, 2020 -- Plaintiff deposes Montie Carol Montgomery and marks the email in question as deposition Exhibit 25. Defendants participated in the deposition, received a copy of the Depo Exhibit 25 but made no objection or notification of inadvertent disclosure either during the deposition or after the 174-page transcript was received. Ex. 5, Montgomery Dep. 5:22, 133:15-134:25.

- June 24, 2010 -- Plaintiff deposes Bert Madera and questions Mr. Madera about the email (Deposition Exhibit 25). Defendants participated in the deposition, received a copy of the Depo Exhibit 25 but made no objection or notification of inadvertent disclosure either during the deposition or after the 144-page transcript was received. Ex. 2, Madera Dep. 103:23-108:23.

- September 17, 2020 -- Plaintiff submitted a settlement letter to Defendants as required by this court's settlement conference procedures discussing in detail and attaching for reference the email (Deposition Exhibit 25). Defendants made no objection or notification of inadvertent disclosure after receipt of the settlement letter.

Response at 9-10. Tyler Group argues that this series of events "clearly establishes that Mr. Tyler was an intended recipient of the email." Response at 10.

**4.    The Reply.**

Madera and Pitchfork Cattle reply. _See_ Defendant's Reply To Plaintiff's Response And

Memorandum In Opposition To Defendants' Motion In Limine, filed December 21, 2020 (Doc. 90)("Reply").   Madera and Pitchfork Cattle argue that presenting two mutually exclusive arguments does not mean that neither is true, and that "[a]lternative arguments are not uncommon the legal profession."  Reply at 4.  Next, Madera and Pitchfork Cattle argue that,

> in its De los Santos[v. City of Roswell, No. CV 12-375 WPL/GBW, 2013 WL 12330144, at *8 (D.N.M. May 21, 2013)(Wormuth, M.J.)] decision, this Court[29] adopted a multi-factor balancing approach for determining whether documents have lost their privilege through inadvertent disclosure. This court specifically stated that the following factors should be relied on when making this determination: (1) The reasonableness of the precautions taken to prevent disclosure; (2) the amount of time taken to remedy the error; (3) the scope of discovery; (4) the extent of disclosure; and (5) fairness.
>
> The Plaintiff's Response has altogether ignored the balancing test established by this Court in De Los Santos.

Reply at 5.  Madera and Pitchfork argue that Cattle Tyler Group cites only out of circuit cases, therefore they will "ignore the Plaintiff's attempted use of these non-binding cases.  Defendants only seek to address the Plaintiff's misuse of those few binding cases its latest briefing cited." Reply at 5.  In addition, Madera and Pitchfork Cattle contend that Tyler Group's citation to Hartman v. El Paso Natural Gas Co., 1988-NMSC-080, ¶ 35, 107 N.M. 679, 687, 763 P.2d 1144, 1152 is inaccurate, because the Supreme Court of New Mexico held only that inadvertent disclosure is only one factor to consider when determining whether a party has waived attorney-client privilege.  See Reply at 5-6.  Similarly, Madera and Pitchfork Cattle contend that Tyler Group's citation to New Mexico Court of Appeals cases are not applicable, because neither "addresses no facts detailing or analyzing an inadvertent disclosure."  Reply at 6 (citing Gingrich

---

[29]The Court did not author De Los Santos v. City of Roswell, 2013 WL 12330144, at *8; that decision was authored by the honorable Gregory B. Wormuth, United Stated Magistrate Judge for United States District Court for the District of New Mexico. While Magistrate Judge Wormuth's prior review of a similar issue will be persuasive , the opinion of another federal district court, even from the same district, is not binding on the Court.

v. Sandia Corp., 2007-NMCA-101, 142 N.M. 359, 165 P.3d 1135, and Pub. Serv. Co. of New

Mexico v. Lyons, 2000-NMCA-077, 129 N.M. 487, 10 P.3d 166).  Madera and Pitchfork Cattle

argue that, here, the Email Correspondence

> was clearly a case of inadvertent disclosure, as the Defendant did not mean for the
> Plaintiff to be copied onto the email at the time it was sent.  Accordingly, the New
> Mexico Supreme Court holdings in Pub. Serv. Co. of New Mexico v. Lyons[, 2007-
> NMCA-101, 142 N.M. 359, 165 P.3d 1135] and Gingrich v. Sandia Corp.[, 2000-
> NMCA-077, 129 N.M. 487, 10 P.3d 166] are not illustrative for how this Court
> should proceed, because neither case addresses an inadvertent disclosure.  Instead,
> this Court should apply the multi-factor balancing test that it embraced in De Los
> Santos v. City of Roswel[, 2013 WL 12330144, at *8].

Reply at 6.

### 5.    **The Hearing.**

The Court held a hearing on the Motion.  See Draft Transcript of Hearing (taken January

29, 2021)("Motion Tr.").[30]  The Court stated that it needed to understand the timing of Email

Correspondence, and that

> it struck me as the back and forth that people have before they get into a lawsuit.
> So it wasn't the kind of material that is excluded by Rule 408.  I don't have  a real
> grasp on the attorney client issue here, because it seems to have gone to so many
> people that it's not something that would be privileged.  But in any case, it struck
> me as the back and forth that you have when you're putting business deals together
> and those sort of things and not the kind of thing that lawyers are trying to
> compromise.  I had a case up in Tulsa that the judges up there got recused and I had
> a similar situation where we had a lawyer letter from Akin gump and you know it
> just seemed to me that it was largely the back and forth that goes on before we
> really get to the point of having claims that need to be compromised.

Motion Tr. at 36:2-18 (Court).

Madera and Pitchfork Cattle stated that the Email Correspondence "was an email that my

client sent" to a legal secretary, and that "[m]y client is in his young '70s, and apparently hit reply

---

[30]The Court's citations to any draft transcripts of hearings refer to the court reporter's
original, unedited version.  Any final transcript may contain slightly different page and/or line
numbers.

all on an email that was intended to go to his attorney at the time." Motion Tr. at 36:25-37:2 (Hightower). In the alternative, Madera and Pitchfork Cattle argued that "you have a very simple in my mind law school situation where you have an offer of that number, and then you have a rejection of that offer. So we would say that that's a settlement communication that went between the two parties. Obviously, it was rejected based on the response." Motion Tr. at 37:14-19 (Hightower). The Court then stated:

> Sometimes when there is an inadvertent disclosure of attorney-client information, then the law sometimes protects the sender or the lawyer for an inadvertent disclosure. But it generally imposes some obligation on the parties that are trying to keep the privilege to recoup, and try to rectify their problem immediately by trying the get the copies back or alerting people attorney-client or anything like that. I didn't see any sort of mitigation efforts from this. It seemed to me that it just stayed out there, it just became part-and-parcel of the business discussions and arrangement. And then when we got into litigation then there was an attempt to go back and assert attorney-client privilege. You can tell me my reaction is wrong or you can correct it.

Motion Tr. at 37:22-28:12 (Court). Madera and Pitchfork Cattle argued that they did not try to rectify the situation because the offer was rejected: "There was really no point at that point to try to cover it up to try to expose the mistakes because the response came very quickly and said Nope, I can't accept that." Motion Tr. at 38:16-19 (Hightower).

Tyler Group responded and argued that the communication is not protected because Madera was not seeking legal advice, nor was he given legal advice. See Tr. at 29:11-17 (DeAyala). Tyler Group then walked through the relevant timeline:

> In 2018 in February the lawyers are copied on it. So the lawyers see the waiver. The person who owns the privilege expressly does the waving, and there is no claw-back concern, give that back it was unintentional, we didn't mean it. You weren't supposed to read that or anything like that. Nothing like that happened. Mr. Madera and Mr. Tyler talk about the email afterwards on the phone. And that's in mid February of 2018.

> Fast forward this case gets filed. Now we're in February the 18 of 2020, and plaintiffs produce in our Rule 26 disclosures [of] 200 pages, not a ton of documents, something like that. And this email is produced. Crickets, nothing, no

objections, no concern, nothing.  June of 2020 Montie Carol's deposition takes place.  This is Exhibit 25. And she's asked about it you know in detail in her deposition, which has a protective order in place to keep certain things confidential. Crickets, no problem, no objections, no let's keep it confidential, nothing like that. Bert Madera's deposition takes place a week later, June of 2020 are, Exhibit 25, the same email is discussed in that deposition as well.  No concerns no problems no objections no anything. September 17, 2020, with the settlement conference in this Court we were supposed to exchange settlement letters with each other and we did that, and this exhibit was part of the attachments to our settlement letter.  No objections no nothing no anything, and then this motion in limine gets filed.

So I haven't seen facts supporting waiver stronger than these facts.  But I don't even think we actually have to even get there, because it was an express waiver.  It was intentional, it wasn't inadvertent.  It was not by accident it was in summons to a phone call that Mr. Madera and Mr. Tyler had where they agreed to a two and a half percent fee.  So that's the issue on why it's not privileged, and why if it was inadvertently waived which we contend it was not it's still waived.  And that's also under the analysis of the <u>De Los Santos v. City of Roswell</u> balancing test approach.  Even under that approach, this is clearly waived.  And in the 408 argument is there is no evidence provided.  It's their burden provided to suggest that there is a dispute or claim pending.  There is no claim.  These folks are negotiating an agreement under defendant's analysis every contact negotiation is protected under 408.  There could not have been a claim until the property was so. Only then would a fee been owed, so there is no dispute, there is no claim, and there is no evidence that there was a dispute or claim at the time. I don't think this document should be inadmissible under 408 or as an attorney client communication for the reasons stated.

Motion Tr. at 39:19-42:25 (DeAyala).

Madera and Pitchfork Cattle stated only, in reply, that there was an offer and rejection,

which is a "straightforward issue for the Court."  Motion Tr. at 42:9-13 (Hightower).  The Court

then indicated that it would likely deny the motion, but that it would give the issue further though:

I need to give this some further thought but I'm inclined to deny it.  It looks to me like we don't really have a 408 situation whether this was made, and if it was intended as attorney-client it seems to me that it was used then and that happens. People may intend something to be attorney-client and it gets out there and they just slug their shoulders and keep moving, they'd rather not go to the trouble recovering it, rather than trying to assert that its privileged and look very sensitive about it.  So I'm inclined to think that this is going to be used at trial and is properly used at trial.

Motion Tr. at 42:14-43:1 (Court).

- 50 -

2.      **The Bench Trial**.

1.   The Court held a two-day bench trial on May 3, 2021, and May 4, 2021.  See Trial

Minutes at 1; May 3 Tr.; May 4 Tr.  On the first day, the parties called witnesses and presented

evidence.  See Trial Minutes at 1-10.  After the close of Tyler Group's case-in-chief, Madera

moved to dismiss as a matter of law, and argued that Tyler Group had not met

> the burden of proof in this particular matter. The surface-use agreement was in
> place before Mr. Tyler ever stepped foot on the Pitchfork. That agreement
> contained a clause that ultimately was found to be very detrimental to Concho's
> ongoing operations on the Pitchfork.
>
> . . . .
>
> It's our position, my client's position that there was no, quote unquote, value
> added. . . .  With regards to the sale of the Pitchfork itself, Your Honor, the Court's
> read the exhibits. The Court's read Mr. Tyler's own timeline. And with regards to
> that, it's still our position that based on the evidence that was presented, there's no
> value added. If you're looking for a finder's fee, it's just like a rose by any other
> name. It's a commission. That's unfortunately not allowed in New Mexico for the
> sale of real property.

May 3 Tr. at 190:16-191:17 (Hightower).  After Tyler Group responded, the Court denied the oral

motion.  See May 3 Tr. at 192:17-25 (Court).

2.   On the second day of trial, the parties gave closing arguments.  See Trial Minutes

at 10-11.  Tyler Group argued:

> The preponderance of the evidence established in this case that the Tyler
> Group and the defendant entered into two agreements.  One, which was a stipulated
> fact, was an agreement whereby Tyler would receive 5 percent of all water sales
> from the ranch. The second was an agreement whereby Tyler would receive 2.5
> percent of the sales price upon the sale of the ranch.
>
> . . . .
>
> [L]et's  talk about the water sales agreement for a minute -- all witnesses
> testified that Concho intended and communicated that they were going to drill wells
> consistently from November 2017 for at least a year, and monthly. And that was
> their intent.
>
> . . . .

So with respect to defendants' agreement to pay Tyler 2.5 percent of any ranch sale, the testimony of the parties; that is of Mr. Tyler and of Mr. Madera, the defendants, and their written words established that they formed an oral agreement that was memorialized by the email, . . . February 12, 2018. And that email says defendants would pay Tyler 2.5 percent on the sale of the ranch. . . . .

So Mr. Tyler's testimony is . . . that he could not be responsible for the sales price of the ranch. He was not in control of that. He was not hired to be a broker, realtor to go find third party buyers, those sorts of things. That wasn't his job, he wasn't hired to do. His payment wasn't dependent upon that. That was in the Maderas' control. What he said was: If the ranch sells, I am to be paid two-and-a-half percent. Mr. Madera said, I agree. . . . [in February 12, 2018] email: This is our deal. There is no writing . . . disputing that agreement, there is no writing contradicting that agreement. There is no other words testified to orally between the parties disputing, amending, compromising, making unclear that agreement.

May 4 Tr. at 2:18-15:19 (DeAyala).

3.    The Court then asked Tyler Group to explain what "finder's fee" means, and Tyler

Group explained that it is a "term of art" that had to be taken into context:

That's kind of a slang term . . . .  Look at the testimony of the parties.  Look at the actions of the parties.  The testimony is: I really never hired him to do that. I never expected him to do that.  Okay. Finder's fees is just a term that was used, number one. Number two is the reality is, in a sense, not in a real estate professional sense, but in a sense it was his conduct that made the sale to Concho more likely, and at a higher price. So in a very loosely worded thing, it was his work, not as a realtor or real estate professional, but his work that brought Concho, and that made them the likely buyer, as defendants understood all along.  And in the context of the conversation, in the phone conversation, again, you heard testimony from everybody: Concho was a likely buyer. They were the target. So we're looking at something that is static. We're looking at a fee on an identified buyer.  And it ended up being that buyer.

So the finding part is not intended to mean what they now want it to mean. And the evidence is clear about that, because of the testimony of defendants.  He wasn't hired to do those things. But, in effect, if you understand that terminology based on the conduct of the parties, Concho became the buyer at a higher price in large part because of the conduct of Tyler.  Does that make it someone found? Does that make it a buyer that was brought forth because of efforts of Tyler? Absolutely. But again, I don't  think that the parties intended finder's to mean a real estate function, a real estate professional function. It's just a term of art used for when you receive a percentage fee on the sale of real estate.

May 4 Tr. at 16:1-17:15 (DeAyala).

4. Next, the Court stated what the agreement to sell the Pitchfork Ranch is, and what the consideration for the 2.5% fee is.  See May 4 Tr. at 7-22 (Court). Tyler Group responded that the consideration for the 2.5% sales fee of the Pitchfork Ranch is to "develop additional revenues. He was asked to increase additional revenues on the ranch from oilfield surface activities, with a primary focus on fresh water sales."  May 4 Tr. at 19:6-21 (DeAyala).  Tyler Group also argued:

> The work he's supposed to be doing to increase the water sales is the same work he is doing that is the consideration for the fee of the sale of the ranch.  We call them two agreements, because they do come at two different times. But they're basically compensation to Tyler for the same work.

May 4 Tr. at 27:24-27:5 (DeAyala).  Tyler Group argued that his work resulted in the sale of Pitchfork to Concho Resources:

> Concho. . . realized, Oh, oh, we're not going to pay a quarter trespass fee, we've got to pay $2 a barrel. It's going to be our highest line item, one of our highest line items in drilling a well, going to make it very much more  expensive. We are better as owners than we are as water buyers. And that's what they shifted to do.

May 4 Tr, at 24 (DeAyala).

5. Next, Tyler Group agreed with the Court that its "position is that . . . the sale agreement was not dependent upon Tyler's improvement of the sale price."  May 4 Tr. at 28:6-15 (Court, DeAyala).

6. Madera responded and argued that there was no agreement for "future water sales," and, because "Madera and Pitchfork didn't benefit at all" when Concho Resources stopped buying water, Tyler was not entitled to any payment on sales that did not happen.  May 4 Tr., at 30:18-25 Hightower).  Madera argued that, although "Tyler was brought on to aid in various revenue-generating streams for the ranch, . . . not a single one of those ever fruitate into quote/unquote making money for the ranch."  May 31:3-7 (Hightower).  Madera argued that "finder's fee" means Madera will pay 2.5% if Tyler finds "[a]ny buyer that was willing  to pay over $100 million" and that Tyler accepted Madera's offer in the February 12, 2018 Email.  May 4 Tr. at 36:3-25

- 53 -

(Hightower).  Madera argued that, according to Tyler Group's timeline of events: "It says, 'On February 12, 2018, Bert offers Fred Tyler 2.5 percent on the sale if he brings the buyer.'  So there must have been some type of understanding between both parties there that Bert did offer that . . . ." May 4 Tr. at 37:8-13 (Hightower)(quoting Tyler's Timeline of Events at 1).  Madera argued that, if the Court finds that a contract exists between Tyler Group and Madera, it would be for 2.5% sales fee of Pitchfork Ranch, if Tyler Group finds a buyer willing to pay at least $100,000,000.00.  See May 4 Tr. at 38:22-29:17 (Hightower).  Madera argued that even if the Court concludes that the sales price is not part of the agreement, then Tyler Group does not satisfy the "finder's fee," because "Concho and the Maderas had been doing business already" before Madera hired Tyler Group.  May 4 Tr. 1-10 (Hightower).

7.  After Madera argued that there is not a meeting of the minds between Tyler Group and Madera, the Court stated:

> [T]here sure is a lot of activity by Mr. Tyler. . . . [I]f you look at his timeline, he's doing some work out there for there not to be a meeting of the minds.  People just don't act that way.  They don't go do a bunch of stuff for somebody else unless there is some expectation of compensation.

May 4 Tr. at 44:7-13 (Court).  Madera responded: "It's kind of like, akin to a car salesman, if you will. A car salesman, unfortunately, has to kiss a lot of frogs before they actually make a sale, because the nature of it is commission based."  May 4 Tr., at 44:14-20 (Hightower).

## CONCLUSIONS OF LAW

1.  The Court now will state its conclusions of law ("COLs"). The Court will begin by stating the applicable law.  It will then set out the law regarding issues relevant to its analysis. Last, the Court will then present that analysis.

## LAW REGARDING RULE 408 OF THE FEDERAL RULES OF EVIDENCE

2.  Rule 408 of the Federal Rules of Evidence reads as follows:

    **(a)**    **Prohibited Uses.** Evidence of the following is not admissible -- on behalf of any party -- either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:

        **(1)**    furnishing, promising, or offering -- or accepting, promising to accept, or offering to accept -- a valuable consideration in compromising or attempting to compromise the claim; and

        **(2)**    conduct or a statement made during compromise negotiations about the claim -- except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

    **(b)**    **Exceptions.** The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed. R. Evid. 408. Rule 408, "according to the Advisory Committee's notes, is to foster honest attempts to settle controverted claims without resorting to expensive and time consuming litigation." Bradbury v. Phillips Petroleum Co., 815 F.2d 1356, 1362-63 (10th Cir. 1987).

        In determining whether or not the disputed evidence should have been excluded under Rule 408, we must first determine whether the rule applies under the circumstances of this case. Rule 408 is limited in its application to evidence concerning the settlement or compromise of "a claim" when such evidence is offered to prove liability or validity of "*the* claim" (emphasis added) or its amount. Read literally, the rule does not appear to cover compromises and compromise offers that do not involve the dispute that is the subject of the suit, even if one of the parties to the suit was also a party to the compromise.

    . . . .

        In this case the settlement of the seven prior claims brought by landowners arguably involved claims that arose out of different events and transactions. Yet the stronger argument is that these claims are related inasmuch as they arose in the course of the same large scale uranium exploration project operated by Phillips, and because they are similar enough to the claim sued upon in this case to be relevant. These factors, combined with the strong policy interest in encouraging the settlement of disputes without resort to litigation, is sufficient to bring the evidence concerning the seven compromises and settlements under the umbrella of Rule 408.

Bradbury v. Phillips Petroleum Co., 815 F.2d at 1363.[31]

3.    Various United States Courts of Appeals have interpreted rule 408 to make inadmissible only statements that (i) are made in settlement negotiations, see, e.g., Morgan v. Baker Hughes Inc., 728 F. App'x 850, 857 (10th Cir. 2018)(unpublished)[32](affirming district court for excluding "statements" that were "plainly . . . 'the result of settlement negotiations'")(quoting Richards v. City of Topeka, 173 F.3d 1247, 1253 (10th Cir. 1999)); Mendelovitz v. Adolph Coors Co., 693 F.2d 570 (5th Cir. 1982); (ii) relate to issues involved in the proceedings, see, e.g., Lyondell Chem. Co. v. Occidental Chem. Corp., 608 F.3d 284, 299 (5th Cir. 2010)("[T]he offering of settlement evidence arising out of a shared factual nexus and bearing directly on present issues

_____

[31]

> [E]ven where the settlement relates to prior claims that arguably arose out of different events and transactions, where these claims are related inasmuch as they arose in the course of the same project operated by the defendant, and the claims sued upon are similar enough to be relevant, there is a sufficient basis for bringing the evidence concerning the compromises and settlements under the umbrella of Fed. R. Evid. 408.

Tracy Bateman, et al., Inadmissibility of Conduct or Statements During Compromise Negotiations, 12 Fed. Proc., L. Ed. § 33:233 (2021)(citing Bradbury v. Phillips Petroleum Co., 815 F.2d 1356 (10th Cir. 1987)).

[32]Morgan v. Baker Hughes Inc. is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Morgan v. Baker Hughes Inc. has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

of liability between many of the same parties falls within Rule 408's prohibition"); (iii) offer to compromise or settle any claim in the action being litigated, see, e.g., Trans Union Credit Information Co. v. Associated Credit Services, Inc., 805 F.2d 188, 192 (6th Cir. 1986); General Leaseways, Inc. v. National Truck Leasing Ass'n, 830 F.2d at 716.  "Fed. R. Evid. 408 does not prevent the same party who submitted the material in the course of settlement discussions from using the material later at trial, because Fed. R. Evid. 408 is designed to avoid one party using material against the party who submitted the material for settlement purposes."  Tracy Bateman, et al., Inadmissibility of Conduct or Statements During Compromise Negotiations, 12 Fed. Proc., L. Ed. § 33:233 (2021)(citing Hulter v. C.I.R., 83 T.C. 663 (1984)).  The 2006 amendment to rule 408 "excludes compromise evidence even when a party seeks to admit its own settlement offer or statements made in settlement negotiations."  Fed. R. Evid. 408 Advisory Committee Notes 2006 Amendment.

4.      Courts have regarded discussions between two parties as settlement negotiations if: (i) the parties met to talk about their interpretation of the disputed matter, with outside counsels' assistance, after the plaintiff filed an action, see Trans Union Credit Information Co. v. Associated Credit Services, Inc., 805 F.2d at 189-93; Olin Corp. v. Insurance Co. of North America, 603 F. Supp. 445 (S.D.N.Y. 1985), on reargument, 607 F. Supp. 1377 (S.D.N.Y. 1985); (ii) parties' counsel agreed that the discussions in the meeting would not be later used for any purpose, see Trans Union Credit Information Co. v. Associated Credit Services, Inc., 805 F.2d at 189-93; and (iii) parties' counsel conceded in a written communication between themselves that litigation was possible, see Olin Corp. v. Insurance Co. of North America, 603 F. Supp. at 445.  See also Tracy Bateman et al., Inadmissibility of Conduct or Statements During Compromise Negotiations -- How to determine what is compromise negotiation, 12 Fed. Proc., L. Ed. § 33:234 (2021).

5.     If "discussions ha[ve] not crystallized to the point of threatened litigation," communications between the parties are not considered compromise negotiations.  Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365, 1373 (10th Cir. 1977)(concluding that business communications were admissible, because there was not threat of litigation).   See, e.g., Scavetta v. King Soopers, Inc., No. 10-CV-02986-WJM-KLM, 2013 WL 2393070, at *2 n.2 (D. Colo. May 31, 2013)(Martinez, J.)(excluding a settlement agreement, because the plaintiff "threatened litigation in an e-mail dated December 16, 2009, reading in pertinent part: 'I will be seeking other legal remedies to my wrongful termination outside of the union.'")(quoting trial record); Arnold Oil Properties, L.L.C. v. Schlumberger Tech. Corp., No. CIV-08-1361-TDD, 2010 WL 3604094, at *3 (W.D. Okla. Sept. 9, 2010)(DeGiusti, J.)("[T]he fact that the parties met to discuss what happened and to resolve a problem does not mean they were engaged in compromise negotiations.  There is no suggestion that the discussions had crystallized to the point of threatened litigation . . . .").

> Where litigation has not been commenced or threatened, communications between parties are not considered compromise negotiations.  Thus, business communications between companies that have not reached that point, an admission in a conversation during an informal investigation, an effort to head off a criminal prosecution rather than resolve a civil claim, and a mere effort to buy time in which to pay an obligation, even though the validity of the obligation is later disputed have been considered admissible as outside Fed. R. Evid. 408.  Likewise, a bill that itemizes what the sender thinks the recipient owes, and demands payment, even under threat of legal action, is not an offer in settlement or a document in settlement negotiations excludable under Rule 408.

Tracy Bateman et al., Inadmissibility of Conduct or Statements During Compromise Negotiations -- How to determine what is compromise negotiation, 12 Fed. Proc., L. Ed. § 33:234 (2021)(footnotes omitted).

6.     Settlement evidence is not automatically admissible because a party offers it for "another purpose" under rule 408. Fed. R. Evid. 408 ("The court may admit this evidence for

another purpose . . . ."). See Bradbury v. Phillips Petroleum Co., 815 F.2d at 1363 ("Rule 408 does not exclude compromise evidence in all situations, but only where the evidence is offered to prove "liability for or invalidity of the claim or its amount." The rule does not require exclusion when the evidence is offered 'for another purpose . . . .'")(quoting Fed. R. Evid. 408); U.S. Aviation Underwriters, Inc. v. Olympia Wings, Inc., 896 F.2d 949, 956 (5th Cir. 1990)("The district court has broad discretion in determining whether to admit evidence of settlement for another purpose and we will not disturb that decision lightly."); Stephen A. Saltzburg, Michael M. Martin, & Daniel J. Capra, Federal Rules of Evidence Manual, Rule 408, at 603-04 (7th Ed. 1998). See Sec. & Exch. Comm'n v. Goldstone, 317 F.R.D. 147, 165 (D.N.M. 2016)(Browning, J.)(same).    Courts have admitted settlement evidence for these purposes under different circumstances.  In Belton v. Fibreboard Corp., 724 F.2d 500 (5th Cir. 1984), for example, the United States Court of Appeals for the Fifth Circuit approved a trial court's "admission of the evidence to prevent confusion of the jury."  724 F.2d at 505.  See Sterling Sav. Bank v. Citadel Dev. Co., 656 F. Supp. 2d 1248, 1256 (D. Or. 2009)(Haggerty, J.)("Courts have also used their discretion to admit evidence in other situations, such as to prevent confusion for the jury.").  Other courts have recognized that settlement evidence may be relevant to bias.  See Sec. & Exch. Comm'n v. Goldstone, No. CIV 12-0257 JB/LFG, 2016 WL 3854689, at *22 (D.N.M. June 3, 2016)(Browning, J.)(admitting evidence, because the defendants seek to "'prov[e] a witness's bias or prejudice,' which is a permissible purpose")(quoting Fed. R. Evid. 408(b)); S.E.C. v. Conaway, 698 F. Supp. 2d 771, 867 (E.D. Mich. 2010)(Pepe, M.J.)("In discounting certain of the McDonald testimony, the jury could also consider his potential bias because he had for years been a co-defendant and he settled with the SEC a month before trial because he 'just had enough.'"); Brocklesby v. United States, 767 F.2d 1288, 1292-94 (9th Cir. 1985)(admitting a defendant's

indemnity agreement with a third party to show: (i) that the defendant and a government defendant were not adverse; and (ii) to attack the defense witnesses' credibility); S.E.C. v. Retail Pro, Inc., No. 08-CIV-1620-WQH/RBB, 2011 WL 589828, at *6 (S.D. Cal. Feb. 10, 2011)(Hayes, J.)(noting that the parties could introduce evidence of consent decrees to rebut specific witnesses' testimony); Young v. U.S. Postal Serv., No. 86-CIV-9492 RLC, 1988 WL 126906, at *2 (S.D.N.Y. Nov. 23, 1988)(Carter, J.).

7.      "Settlement agreements, however, are inadmissible regardless of relevance if offered to establish liability for or the amount of a claim or if introduction thereof would result in undue prejudice to an opposing party." Trout v. Milton S. Hershey Med. Ctr., 572 F. Supp. 2d 591, 596 (M.D. Pa. 2008)(Conner, J.). The Court has excluded evidence of settlement agreements. In Leon v. Fedex Ground Package System, Inc., a deceased passenger's widow brought two wrongful death actions: one against FedEx Ground, and another against two other parties. See 163 F. Supp. 3d at 1069-71. The widow settled with the second group, and later moved to preclude FedEx Ground from admitting settlement evidence at trial under rule 408. See 163 F. Supp. 3d at 1054-55. FedEx Ground argued that the settlement evidence's absence would confuse the jury. See 163 F. Supp. 3d at 1069-71. The Court excluded the settlement evidence on the grounds that: (i) "[i]nforming jurors that [the other defendants] settled could cause them to unfairly decrease FedEx Ground's share of the liability"; (ii) the jury could "assume that this is an admission of guilt"; and (iii) jury instructions provided an alternative means of mitigating any jury confusion. 163 F. Supp. 3d at 1070. On a similar basis, in Sec. & Exch. Comm'n v. Goldstone, the Court concluded that the evidence of a settlement agreement's "unfair prejudice to the Defendants is greater than the potential danger of jury confusion." Sec. & Exch. Comm'n v. Goldstone, 317 F.R.D. 147, 165 (D.N.M. 2016)(Browning, J.)(citing Trout v. Milton S. Hershey Med. Ctr., 572 F.

Supp. 2d at 596, and <u>Leon v. Fedex Ground Package System, Inc.</u>, 163 F. Supp. 3d at 1068-71).

In <u>SFF-TIR, LLC v. Stephenson</u>, 250 F. Supp. 3d 856 (N.D. Okla. 2017)(Browning, J), the Court excluded some evidence of settlement negotiations, where, for instance, a "letter's plain language clearly establishes that the letter was an offer to compromise a claim for less than what the Plaintiffs held to be the fair market value for their shares," but excluded other evidence because the evidence was (i) not compromise offers between the plaintiffs and the defendants; and (ii) was unlikely to mislead or confuse the jury.  250 F. Supp. 3d at 1059-1060.

## LAW REGARDING NEW MEXICO ATTORNEY-CLIENT PRIVILEGE

8.      "The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out."  <u>Trammel v. United States</u>, 445 U.S. 40, 51 (1980).  The privilege's purpose is "to encourage clients to make full disclosure to their attorneys."  <u>Fisher v. United States</u>, 425 U.S. 391, 403 (1976).  Pursuant to rule 501 of the Federal Rules of Evidence, state law supplies the rules concerning attorney-client privilege in diversity cases:

> The common law -- as interpreted by United States courts in the light of reason and experience -- governs a claim of privilege unless any of the following provides otherwise:
>
> - the United States Constitution;
> - a federal statute; or
> - rules prescribed by the Supreme Court.
>
> But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.

Fed. R. Evid. 501.  <u>See</u> <u>Frontier Ref., Inc. v. Gorman-Rupp Co., Inc.</u>, 136 F.3d 695, 699 (10th Cir. 1998)("Rule 501 of the Federal Rules of Evidence provides that state law supplies the rule of decision on privilege in diversity cases.").

### 1.      New Mexico Attorney-Client Privilege.

9.      Under New Mexico law, the attorney-client privilege applies to "confidential communications made for the purpose of facilitating the rendition of professional legal services to the client." Anaya v. CBS Broad., Inc., 251 F.R.D. 645, 650 (D.N.M. 2007)(Browning, J.)(applying New Mexico state law regarding attorney-client privilege). See State ex rel. State Highway Comm'n v. Steinkraus, 1966-NMSC-134, ¶ 4, 76 N.M. 617, 620, 417 P.2d 431, 432 ("It is clear to us that the attorney-client privilege should only be applied to protect communications-not facts."); N.M.R.A § 11-503(B). Rule 11-503 of New Mexico Rules of Evidence codifies attorney-client privilege:

**A.**   **Definitions.**  For purposes of this rule,

  (1)     a "client" is a person, public officer, corporation, association, or other entity who consults with, seeks advice from, or retains the professional services of a lawyer or a lawyer's representative;

  (2)     a "lawyer" is a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation;

  (3)     a "representative of a lawyer" is one employed to assist the lawyer in providing professional legal services; and

  (4)     a communication is "confidential" if made privately and not intended for further disclosure except to other persons in furtherance of the purpose of the communication and includes the act of contacting or retaining a lawyer for the purpose of seeking professional legal services if not intended to be disclosed to third persons.

**B.**   **Scope of the privilege.** A client has a privilege to refuse to disclose, and to prevent any other person from disclosing, a confidential communication made for the purpose of facilitating or providing professional legal services to that client,

  (1)     between the client and the client's lawyer or representative;

  (2)     between the client's lawyer and the lawyer's representative;

(3)     between the client or client's lawyer and another lawyer representing another in a matter of common interest;

(4)     between representatives of the client or between the client and a representative of the client; or

(5)     between lawyers representing the client.

**C.**     **Who may claim the privilege.**  The privilege may be claimed by

(1)     the client;

(2)     the client's guardian or conservator;

(3)     the personal representative of a deceased client; or

(4)     the successor, trustee, or similar representative of a corporation, association, or other entity, whether or not in existence.

The lawyer of the client at the time of the communication may claim the privilege only on behalf of the client.  Authority to claim the privilege is presumed absent evidence to the contrary.

**D.**     **Exceptions.**  There is no privilege under this rule:

(1)     Furtherance of crime or fraud.  If the professional legal services were sought or obtained to enable or assist anyone in committing or planning to commit what the client knew or reasonably should have known to be a crime or fraud;

(2)     Claimants through same deceased client. For a communication relevant to an issue between parties who claim through the same deceased client, regardless of whether the claims are by testate or intestate succession or by inter vivos transaction;

(3)     Breach of duty by lawyer or client.  For a communication relevant to an issue of breach of duty either by the lawyer to the lawyer's client or by the client to the client's lawyer;

(4)     Document attested by lawyer.  For a communication relevant to an issue concerning an attested document to which the lawyer is an attesting witness; or

- 63 -

> (5)     Joint clients.  For a communication relevant to a matter of common interest between two or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between any of the clients.

N.M.R.A § 11-503.  Under rule 11-503, the elements of attorney-client privilege are: "'(1) a communication (2) made in confidence (3) between privileged persons (4) for the purpose of facilitating the attorney's rendition of professional legal services to the client.'"  Albuquerque J. v. Bd. of Educ. of Albuquerque Pub. Sch., 2019-NMCA-012, ¶ 19, 436 P.3d 1, 9 (quoting Santa Fe Pac. Gold Corp., 2007-NMCA-133, ¶ 14, 143 N.M. 215, 175 P.3d 309, and citing NMRA § 11-503(B)).[33]  The party asserting the privilege bears the burden to prove that all the privilege's elements exist.  Cf. United Nuclear Corp. v. Gen. Atomic Co., 1980-NMSC-094, ¶ 267, 96 N.M. 155, 217, 629 P.2d 231, 293 ("The bald assertion that production of the requested information would violate a privilege (provided by law) is not enough.  The party resisting discovery has the burden to clarify and explain its objections and to provide support therefor.  General objections without specific support may result in waiver of the objections.")(internal quotations omitted); NMRA § 1-026(B)(7)(a) (stating that when a party asserts a privilege as a basis for withholding information in discovery, "the party shall make the claim expressly and shall describe the nature of the . . . communications . . . not . . . disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege").

10.     New Mexico's approach to privileges is a special product of state-law jurisprudence and departs from rule 501 of the Federal Rules of Evidence, which expressly authorizes lower courts to continue developing and recognizing privileges.  See State ex rel. Attorney General v.

---

[33]The Court predicts that the New Mexico Supreme Court would agree with Albuquerque J. v. Bd. of Educ. of Albuquerque Pub. Sch., because the New Mexico Court of Appeals paraphrases rule 11-503(B).

First Judicial Dist. Court, 96 N.M. 254, 260, 629 P.2d 330, 336 (1981)("The fact that New Mexico did not follow the approach of Congress but instead limited the privileges available to those recognized by the Constitution, the Rules of Evidence, or other rules of this Court manifests the abrogation and inapplicability of the common law evidentiary privileges."); abrogated on other grounds by Republican Party of New Mexico v. New Mexico Tax'n & Revenue Dep't, 2012-NMSC-026, ¶ 42, 283 P.3d 853, 868 ("We disavow First Judicial to the extent that it could be read to support the adoption of the deliberative process privilege.").   In Ammerman v. Hubbard Broadcasting, Inc., 89 N.M. 307, 551 P.2d 1354 (1976), the Supreme Court of New Mexico held that rules of privilege, being evidentiary and thus procedural in nature, were constitutionally the domain of the judiciary.   See 89 N.M. at 310, 551 P.2d at 1357.   On that basis, the Supreme Court of New Mexico concluded that statutory privileges created by the legislature were unconstitutional. See 89 N.M. at 311, 551 P.2d at 1357.   New Mexico's approach to privilege, reflected in Rule 11-501, limiting privileges to those required by the state constitution and the rules promulgated by the Supreme Court embodies the principle that the Supreme Court of New Mexico, through its rule-making mechanism -- not the district courts scattered throughout the counties of New Mexico in their individual case-by-case work -- shall develop the privilege doctrine and jurisprudence for the state.

11.     In Public Service Company of New Mexico v. Lyons, the district court determined that the plaintiffs had implicitly waived their attorney-client privilege and work-product doctrine protection by affirmatively pleading fraudulent concealment, equitable tolling, and equitable estoppel in their complaint.   See 129 N.M. at 489, 10 P.3d at 168.   The New Mexico Court of Appeals reversed the district court, and found that "our courts must adhere closely to waiver as defined in Rule 11-511 and are not free to engage in ad hoc rule-making and waiver analysis as

requested by Defendants." 129 N.M. at 492, 10 P.3d at 171. The New Mexico Court of Appeals

rejected the approach of other courts, which allow the common law to shape privilege, and stated:

> In light of New Mexico's rule-bound law of privilege and the absence of Supreme
> Court case law to the contrary . . . we believe the issue of waiver should be governed
> by, and limited to, Rule 11-511 (waiver of privilege by voluntary disclosure), in the
> absence of any other provision specifically addressing the issue. Our rules reflect
> a careful, methodical, approach to the development of the rules governing
> privileges -- one that involves public participation and discourages ad hoc judicial
> intervention.

129 N.M. at 494, 10 P.3d at 173.

12. In <u>Anaya v. CBS Broadcasting, Inc.</u>, No. CIV-06-476, 2007 U.S. Dist. LEXIS

55164 (D.N.M. Apr. 30, 2007)(Browning, J.), the Court found:

> Despite the general tenor of <u>Public Service Company of New Mexico v. Lyons</u>, the
> Court does not believe that the case forecloses subject-matter waiver of the
> attorney-client privilege in the state of New Mexico; rather, based on multiple
> considerations, the Court believes that the New Mexico courts would endorse
> subject-matter waiver with regard to attorney-client privilege if confronted with the
> issue.

2007 U.S. Dist. LEXIS 55164, at **18-19. The Court considered that: (i) the parties did not cite,

nor did the Court locate, any federal or state appellate court which had refused to adopt

subject-matter waiver in the attorney-client privilege context when confronted with the issue; (ii)

the great weight of authority supported the doctrine of subject-matter waiver; (iii) New Mexico

courts had not barred application of the subject-matter waiver doctrine, and rule 11-511's use of

the term "matter" suggested that it did not foreclose subject-matter waiver; (iv) <u>Public Service</u>

<u>Company of New Mexico v. Lyons</u> dealt with the existence of "voluntary waiver," not the scope

of a voluntary waiver; and (v) rule 11-511's express language did not foreclose a subject-matter

scope of the waiver, as long as the waiver of the privilege is voluntary. See <u>Anaya v. CBS Broad.,</u>

<u>Inc.</u>, 2007 U.S. Dist. LEXIS 55164, at *19.

**2.      The Fiduciary Exception to the Attorney-Client Privilege.**

13.     Some courts have found a fiduciary exception to privilege.  See United States v. Mett, 178 F.3d 1058, 1062 (9th Cir. 1999)("The Ninth Circuit . . . has joined a number of other courts in recognizing a 'fiduciary exception' to the attorney-client privilege."); Washington-Baltimore, etc. v. Wash. Star Co., 543 F. Supp. 906, 909 (D.D.C. 1982)("[W]hen an attorney advises a fiduciary about a matter dealing with the administration of an employees' benefit plan, the attorney's client is not the fiduciary personally but, rather, the trust's beneficiaries."); Riggs Nat'l Bank v. Zimmer, 355 A.2d 709, 714 (Del. Ch. 1976)("The trustees here cannot subordinate the fiduciary obligations owed to the beneficiaries to their own private interests under the guise of attorney-client privilege.").  The fiduciary exception provides that a fiduciary, such as a trustee of a trust, is disabled from asserting the attorney-client privilege against beneficiaries on matters of trust administration.  See United States v. Mett, 178 F.3d at 1063 (citing Becher v. Long Is. Lighting Co. (In re Long Is. Lighting Co.), 129 F.3d 268, 272 (2d Cir. 1997)).

14.     Courts have based the fiduciary exception on two justifications.  The first justification is that the fiduciary is not the attorney's exclusive client, but acts as a proxy for the beneficiary.  See, e.g., United States v. Mett, 178 F.3d at 1063 ("[A]t least as to advice regarding plan administration, a trustee is not the real client and thus never enjoyed the privilege in the first place.")(internal quotation marks omitted)); Riggs Nat'l Bank v. Zimmer, 355 A.2d at 713 ("As a representative for the beneficiaries of the trust which he is administering, the trustee is not the real client in the sense that he is personally being served.").  "Under this justification, the fiduciary exception is but a logical extension of the client's control of the attorney-client privilege."  In re United States, 590 F.3d 1305, 1312 (Fed. Cir. 2009).  The second justification is that the fiduciary has a duty to disclose all information related to trust management to the beneficiary.  See, e.g., Becher v. Long Island Lighting Co. (In re Long Island Lighting Co.), 129 F.3d at 272 ("[An]

ERISA fiduciary must make available to the beneficiary, upon request, any communications with an attorney that are intended to assist in the administration of the plan."); Riggs Nat'l Bank v. Zimmer, 355 A.2d at 714 ("[T]rustees . . . cannot subordinate the fiduciary obligations owed to the beneficiaries to their own private interests under the guise of attorney-client privilege.").  Under this second justification, "the fiduciary exception can be understood as an instance of the attorney-client privilege giving way in the face of a competing legal principle," the duty to disclose.  United States v. Mett, 178 F.3d at 1063.

15.    In United States v. Mett, the United States Court of Appeals for the Ninth Circuit explained that the cases invoking the fiduciary exception to the attorney-client privilege demonstrate two ends of a spectrum:

> On the one hand, where an ERISA trustee seeks an attorney's advice on a matter of plan administration and where the advice clearly does not implicate the trustee in any personal capacity, the trustee cannot invoke the attorney-client privilege against the plan beneficiaries. On the other hand, where a plan fiduciary retains counsel in order to defend herself against the plan beneficiaries (or the government acting in their stead), the attorney-client privilege remains intact.

178 F.3d at 1064.  The courts that recognize a fiduciary privilege, however, have found that it does not extend to counsel retained for defense in a lawsuit.  See Wildbur v. ARCO Chem. Co., 974 F.2d 631, 645 (5th Cir. 1992)(finding that the fiduciary exception was not applicable to counsel retained for purpose of defending the lawsuit in question).  The Ninth Circuit has explained:

When an ERISA trustee seeks legal advice for his own protection, the legal fiction of "trustee as representative of the beneficiaries" is dispelled, notwithstanding the fact that the legal advice may relate to the trustee's administration of the trust.  Similarly, where a fiduciary seeks legal advice for her own protection, the core purposes of the attorney-client privilege are seriously implicated and should trump the beneficiaries' general right to inspect documents relating to plan administration.

United States v. Mett, 178 F.3d at 1065.

16.    Other courts have rejected the fiduciary exception to the attorney-client privilege.

See Wells Fargo Bank v. Superior Court, 22 Cal. 4th 201, 209, 990 P.2d 591, 596 (Cal. 2000) (rejecting the fiduciary exception under California law); Huie v. DeShazo, 922 S.W.2d 920, 924-25 (Tex. 1996)(rejecting the fiduciary exception under Texas law); Paskoski v. Johnson, 626 So. 2d 338, 339 (Fla. Ct. App. 4th 1993)(finding that the "trial court erred in determining that the trustee could not assert an attorney-client privilege or other privileges with respect to communications between the trustee and the trustee's lawyer and accountant in litigation between the trustee and a trust beneficiary."). See also J. Falk, The Fiduciary's Lawyer-Client Privilege: Does It Protect Communications from Discovery by a Beneficiary, 77 Fla. Bar J. 18, 20 (2003)(suggesting that the same arguments advanced in California and Texas -- "that permitting a fiduciary exception to the statutory privilege would improperly expand the role of the judiciary by engrafting a judicial exception onto the statutes . . . could be forcefully advanced under Florida law."). In Huie v. DeShazo, the issue was whether the attorney-client privilege protected communications between a trustee and his attorney relating to trust administration from discovery by a trust beneficiary. The Supreme Court of Texas held that, notwithstanding the trustee's fiduciary duty to the beneficiary, only the trustee, not the trust beneficiary, was the client of the trustee's attorney. The beneficiary therefore could not discover communications between the trustee and attorney otherwise protected under Texas Rule of Civil Evidence 503. See 922 S.W.2d at 921. In that case, the beneficiary argued that the trustee's fiduciary duty of disclosure overrode any attorney-client privilege that might otherwise apply, and included disclosure of any communications between the trustee and the trustee's attorney. See 922 S.W.2d at 923. The Supreme Court of Texas explained:

> The attorney-client privilege serves the same important purpose in the trustee-attorney relationship as it does in other attorney-client relationships. A trustee must be able to consult freely with his or her attorney to obtain the best possible legal guidance. Without the privilege, trustees might be inclined to forsake legal advice, thus adversely affecting the trust, as disappointed beneficiaries could later pore over the attorney-client communications in second-guessing the trustee's actions. Alternatively, trustees might feel compelled to blindly follow counsel's

advice, ignoring their own judgment and experience.  See In re Prudence-Bonds
Corp., 76 F. Supp. 643, 647 (E.D.N.Y. 1948), aff'd, 174 F.2d 288 (2d Cir.
1949)(concluding that, without the privilege, "the experience in management and
best judgment by [the trustee] is put aside . . . which, in the end may result in harm
to the [beneficiaries]").

Huie v. DeShazo, 922 S.W.2d at 924.   The Supreme Court of Texas rejected the fiduciary

exception, stating: "Rule 503 contains no exception applicable to fiduciaries and their attorneys.

If the special role of a fiduciary does justify such an exception, it should be instituted as an

amendment to Rule 503 through the rulemaking process."  922 S.W.2d at 924-25.  In Wells Fargo

Bank v. Superior Court, the beneficiaries of a private express trust sought to compel the trustee to

disclose its privileged communications with attorneys.  See 22 Cal. 4th at 204-05, 990 P.2d at 593.

The beneficiaries argued that Wells Fargo had to produce privileged communications to fulfill its

statutory and common-law duties as a trustee to report to the beneficiaries about the trust and its

administration.  See 22 Cal. 4th at 206, 990 P.2d at 594.  The Supreme Court of California rejected

the argument that Wells Fargo's duties as a trustee should take precedence over its privilege as the

client of an attorney, stating: "The privileges set out in the Evidence Code are legislative creations;

the courts of this state have no power to expand them or to recognize implied exceptions.  The

Boltwoods' argument is nothing more than a plea for an implied exception."  22 Cal. 4th at 206,

990 P.2d at 594 (citations omitted).  The Supreme Court of California distinguished its laws from

courts that have permitted a fiduciary exception:

In most of the other jurisdictions in which this question has arisen, courts have
given the trustee's reporting duties precedence over the attorney-client privilege.
See, e.g., Hoopes v. Carota, 531 N.Y.S.2d 407, 409 (1988), aff'd. 544 N.Y.S.2d
808 (1989); Riggs Nat. Bank of Washington, D.C. v. Zimmer, 355 A.2d 709,
712-714 (Del. Ch. 1976); United States v. Evans, 796 F.2d 264, 265-266 (9th Cir.
1986); Washington-Baltimore, etc. v. Washington Star Co., 543 F. Supp. 906,
908-909 (D.D.C. 1982).  But those courts consider themselves free, in a way we do
not, to create exceptions to the privilege.  New York's attorney-client privilege,
while statutory, is "not absolute."  Hoopes v. Carota, 531 N.Y.S.2d at 409.  Instead,

the courts of that state consider the privilege an "'obstacle' to the truth-finding process that may yield to a strong public policy requiring disclosure . . . ." 531 N.Y.S.2d at 409. The law in Delaware evolved at a time when that state recognized the attorney-client privilege solely as a matter of common law. As such, Delaware courts have considered the privilege to be "an exception to the usual rules requiring full disclosure" and have held that "its scope can be limited where circumstances so justify." Riggs Nat. Bank of Washington, D.C. v. Zimmer, 355 A.2d at 713.

Wells Fargo Bank v. Superior Court, 22 Cal. 4th at 208, 990 P.2d at 595. The Supreme Court of California noted that courts in other jurisdictions that follow a common-law system of privilege are free to craft exceptions, whereas California courts "do not enjoy the freedom to restrict California's statutory attorney-client privilege based on notions of policy or ad hoc justification." 22 Cal. 4th at 209, 990 P.2d at 596. The Supreme Court of California stressed that, under California law, the attorney-client privilege "applies not only to communications made in anticipation of litigation, but also to legal advice when no litigation is threatened." 22 Cal. 4th at 209, 990 P.2d at 596. The beneficiaries also argued that they should be considered clients of Wells Fargo's attorneys, and thus entitled to any privileged communications. The Supreme Court of California rejected this argument: "The attorney for the trustee of a trust is not, by virtue of this relationship, also the attorney for the beneficiaries of the trust. The attorney represents only the trustee." 22 Cal. 4th at 212, 990 P.2d at 598. The Supreme Court of California also rejected the beneficiaries' argument that they were entitled to inspect Wells Fargo's privileged communications with attorneys because the trust paid for the attorneys' advice, stating: "Payment of fees does not determine ownership of the attorney-client privilege. The privilege belongs to the holder, which in this context is the attorney's client." 22 Cal. 4th at 213, 990 P.2d at 598.

17.     New Mexico courts have not addressed whether a fiduciary exception could or

should apply under New Mexico's rule-based privilege laws.[34]   The Tenth Circuit has not addressed the fiduciary exception; however, district courts within the Tenth Circuit have had occasion to decide whether the exception applies under federal law.   In Harrington v. City of Albuquerque, No. CIV 01-0531, 2004 U.S. Dist. LEXIS 10153 (D.N.M. May 11, 2004)(Hansen, J.), the class action litigation dealt with the collection of "fair share" fees from non-members of the defendant union.   The plaintiffs took the deposition of the union's general counsel.   The general counsel appeared at the deposition, but, upon the advice of his counsel, refused to answer several questions related to the basis for, preparation of, and delay in issuing a revised "fair share" notice to nonmembers of the union as well as possible future notices.   The general counsel asserted the attorney-client privilege and work-product doctrine.[35]   The plaintiffs filed a motion to compel the deposition testimony, which the magistrate judge granted, and to which the union objected.   In ruling on the objections, the Honorable C. LeRoy Hansen, Senior United States District Judge for the United States District Court for the District of New Mexico, found that the plaintiffs were seeking information from the union's general counsel that pertained only to the union's fiduciary duty to issue a legally adequate fair share notice, and the general counsel's knowledge in this regard was derived before and was distinct from any activity designed either to protect the union from litigation or defend the union.   Judge Hansen found, therefore, that the union was obligated to issue a legally adequate notice to the non-members, and when it failed

---

[34]In Muse v. Muse, 145 N.M. 451, 200 P.3d 104 (Ct. App. 2008), the New Mexico Court of Appeals refused to consider the argument whether the attorney-client privilege should "be waived under a fiduciary exception-to-the-privilege theory" because it was raised for the first time on appeal.  See 145 N.M. at 464, 200 P.3d at 117.

[35] The court had federal question jurisdiction and thus applied the federal rules regarding privilege and not state rules, as it would in a diversity case.

to do so, to issue a corrected notice, and the union was at all times required to issue satisfactory notices in the future.  These responsibilities existed independent of the litigation, which did not alter the union's fiduciary obligations.  See 2004 U.S. Dist. LEXIS 10153, at *5.  Judge Hansen also found that the union's general counsel could not refuse to answer questions about the union's failure to meet its constitutionally required fiduciary responsibilities merely because the beneficiaries of that fiduciary relationship were forced to resort to litigation to enforce it.  See 2004 U.S. Dist. LEXIS 10153, at *6.  Judge Hansen stated: "As Judge Schneider correctly found, the timing of the litigation in no way impacts the existence of the fiduciary relationship or the requirements thereof.  The information the Plaintiffs seek is discoverable under the fiduciary exception to the attorney-client privilege."  2004 U.S. Dist. LEXIS 10153, at **6-7.

18.     In Society of Professional Engineering Employees in Aerospace v. Boeing Co., No. 05-1251, 2009 U.S. Dist. LEXIS 102345 (D. Kan. Nov. 3, 2009)(Humphreys, M.J.), the plaintiffs argued that the fiduciary exception applied and that ERISA beneficiaries were entitled to discover the legal advice that guided a plan administrator in interpreting their eligibility for benefits.  See 2009 U.S. Dist. LEXIS 102345, at *12.  Boeing countered that the fiduciary exception does not apply where the beneficiaries have already commenced litigation and the plan fiduciary retains counsel to defend itself against the beneficiaries.  The Honorable Karen M. Humphreys, United States Magistrate Judge for the United States District Court for the District of Kansas, held that the fiduciary exception did not negate the attorney-client privilege or work product doctrine, finding that, because the beneficiaries initiated a suit asserting claims directly against the defendant, "the legal fiction of the 'trustee as a representative of the beneficiaries' is dispelled." 2009 U.S. Dist. LEXIS 102345, at *15 (quoting United States v. Mett, 178 F.3d 1058, 1065 (9th Cir. 1999)).  Judge Humphreys found that the legal advice was sought because of the pending

litigation and claims of personal liability; thus, the attorney-client privilege remained intact. Soc'y of Prof'l Eng'g Employees in Aerospace v. Boeing Co., 2009 U.S. Dist. LEXIS 102345, at *15. In Laasmar v. Phelps Dodge Corp. Life, No. 06-0013, 2006 U.S. Dist. LEXIS 71028 (D. Colo. Sept. 29, 2006)(Watanabe, M.J.), another ERISA benefits case, the Honorable Michael J. Watanabe, United States Magistrate Judge for the United States District Court for the District of Colorado, rejected the plaintiffs' argument that, under the fiduciary exception to the attorney-client privilege, the court should have ordered the defendant to produce all documents exchanged between its employees, including counsel, relating to the benefits claim at issue in the case.  Judge Watanabe found "[t]hat the subject documents at issue relate to seeking of legal advice in response to threatened litigation by the Plaintiffs' lawyer and thus fall outside the 'fiduciary exception' to the attorney-client privilege."  2006 U.S. Dist. LEXIS 71028, at *6.  In In re Williams Cos. ERISA Litigation, No. 02-CV-159, 2004 U.S. Dist. LEXIS 30838 (N.D. Okla. Dec. 20, 2004)(Holmes, J.), the Honorable Sven E. Holmes, Chief United States District Judge for the United States District Court for the Northern District of Oklahoma, upheld the magistrate judge's decision to grant the defendant's motion for a protective order as to the first two paragraphs of an electronic-mail message and deny the motion as to the third paragraph of the electronic-mail message.  The magistrate judge found that the paragraph in question was a communication from an attorney to a fiduciary concerning the administration of the plan at issue and therefore fell under the fiduciary exception to the attorney-client privilege.  See 2004 U.S. Dist. LEXIS 30838, at *8.

## NEW MEXICO LAW REGARDING CONTRACT FORMATION

19.     In New Mexico, "[t]o prove the formation of a valid contract under New Mexico law, the party seeking enforcement generally must show that the contract is 'factually supported by an offer, an acceptance, consideration, and mutual assent.'"  Strausberg v. Laurel Healthcare

Providers, LLC, 2013-NMSC-032, ¶ 42, 304 P.3d 409, 419-20 (quoting Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 9, 121 N.M. 728, 918 P.2d 7).  See Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 7, 115 N.M. 665, 669, 857 P.2d 776, 780 (same).  See also NMRA CIV UJI 13-801 ("A contract is a legally enforceable promise [set of promises].  In order for a promise [set of promises] to be legally enforceable, there must be an offer, an acceptance, consideration, and mutual assent.").[36] "An implied contract may be found in written or oral representations, in the conduct of the parties, or in a combination of representations and conduct." Gormley v. Coca-Cola Enters., 2004-NMCA-021, ¶ 20, 135 N.M. 128, 85 P.3d 252, aff'd on other grounds, 2005-NMSC-003, 137 N.M. 192.[37] "An implied contract is created only where a[] [party] creates a reasonable expectation. The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon." Salazar v. City of Albuquerque, 776 F. Supp. 2d, 1217, 1250 (D.N.M. 2011)(Browning, J.)(quoting Hartbarger v. Frank Paxton Co., 115 N.M. 665, 672, 857 P.2d 776, 783 (1993)).

1.      **The Offer**.

20.      "'In the law of contracts an offer is a proposal setting forth the essential terms of the prospective transaction.'"  Baker v. Endeavor Servs., Inc., 2018-NMSC-035, ¶ 19, 428 P.3d 265, 270 (quoting Naranjo v. Paull, 1990-NMCA-111, ¶ 14, 111 N.M. 165, 169, 803 P.2d 254,

---

[36]The Court often looks to the New Mexico Civil Uniform Jury Instructions for guidance on New Mexico state law. See, e.g., Coffey v. United States, No. CIV 08–0588 JB/LFG, 906 F.Supp.2d 1114, 1186 n. 33, 2012 WL 5995622, at *60 n. 33 (D.N.M. Nov. 25, 2012)(Browning, J.)("The Supreme Court of New Mexico's adoption of uniform jury instructions proposed by standing committees of the Court establishes a presumption that the instructions are correct statements of law.")(citing State of New Mexico v. Wilson, 116 N.M. 793, 796, 867 P.2d 1175, 1178 (1994)).

[37]The Court predicts that the New Mexico Supreme Court would agree with this holding because its principle is embedded in the UJIs.  See NMRA CIV UJI 13-801.

258).

> An offer is a communication of a willingness to enter into a contract.   The communication must satisfy four conditions:
>
>> First, the communication must have included a proposal by [the offeror] showing [the offeror's] willingness to contract;
>>
>> Second, the material terms of that proposal must have been reasonably certain;
>>
>> Third, the terms must have been communicated to [offeree]; and
>>
>> Fourth, by the communication [the offeror] must have intended to give [offeree] the power to create a contract by accepting the terms.

NMRA CIV UJI Rule 13-805.  In addition, "[e]ven though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the proposed contract are reasonably certain."  Las Cruces Urban Renewal Agcy. v. El Paso Elec. Co., 1974-NMSC-004, ¶ 14, 86 N.M. 305, 523 P.2d 549; Restatement (Second) of Contracts § 32.[38] Further, "[a] manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent."  Associated Home & RV Sales, Inc. v. R. Vision, Inc., No. CIV.05 119, 2006 WL 4109674, at *5 (D.N.M. July 13, 2006)(Browning, J.)(quoting State v. Bankert, 117 N.M. 614, 620, 875 P.2d 370, 376 (1994)).

## 2.      **Acceptance of the Offer.**

21.      Acceptance must occur for an agreement to be binding. See Medina v. Sunstate Realty, Inc., 1995-NMSC-002, ¶ 16, 889 P.2d 171, 174.  "An acceptance must be clear, positive

---

[38]The Court predicts that the New Mexico Supreme Court would rely on Restatement (Second) of Contracts § 32(a), because the New Mexico Supreme Court consistently cites and uses Restatement (Second) of Contracts.  See, e.g., Romero v. Earl, 1991-NMSC-042, ¶ 6, 111 N.M. 789, 791, 810 P.2d 808, 810 (quoting the Restatement (Second) of Contracts §§ 71,79 for the definition of consideration).

and unambiguous." Tatsch v. Hamilton-Erickson Mfg. Co., 1966-NMSC-193, ¶ 10, 76 N.M. 729, 733, 418 P.2d 187, 189; Cornoyer v. AT&T Mobility Serv., LLC, No. CIV 15-0474, 2016 WL 6406853, at *11 (D.N.M. Oct. 5, 2016)(Browning, J.).  See Medina v. Sunstate Realty, Inc., 1995-NMSC-002, ¶ 8, 889 P.2d at 173.   "For there to be a contract, the offer must be accepted unconditionally and unqualifiedly by the offeree . . . to all terms."  Corr v. Braasch, 1981-NMSC-137, ¶ 5, 97 N.M. 279, 280, 639 P.2d 566, 567.  See Silva v. Noble, 1973-NMSC-106, ¶ 6, 85 N.M. 677, 678, 515 P.2d 1281, 1282 ("In order to constitute a binding contract, there must be an unconditional acceptance of the offer made.").  See also NMRA CIV UJI Rule 13-807 ("An acceptance is a statement or conduct made by one party to the other, showing that party's agreement to the terms of the other party's offer.").  Except for offers given for consideration, the offeror has the power to revoke the offer "at any time prior to an unconditional acceptance by the offeree."  Tatsch v. Hamilton-Erickson Mfg. Co., 1966-NMSC-193, ¶ 15, 76 N.M. at 734, 418 P.2d at 190.  Subject to certain exceptions, "the offeror must be notified of the acceptance."  Corr v. Braasch, 1981-NMSC-137, ¶ 5, 97 N.M. at 280, 639 P.2d at 567.

22.    A party's acceptance of a written offer may be express or implied by conduct.  See Medina v. Sunstate Realty, Inc., 1995-NMSC-002, ¶ 14, 889 P.2d at 174.  See also Cornoyer v. AT&T Mobility Serv., LLC, No. CIV 15-0474, 2016 WL 6406853, at *11 (D.N.M. Oct. 5, 2016)(Browning, J.).  Where the offer invites acceptance through performance, rather than in writing, the beginning of invited performance is an implied acceptance.  See Long v. Allen, 1995-NMCA-119, ¶ 6, 906 P.2d at 756.[39]  In DeArmond v. Halliburton Energy Serv., Inc., for example,

---

[39]The Court predicts the New Mexico Supreme Court would agree with the holding in Long v. Allen, because the principle is embedded in the UJIs.  See NMRA CIV UJI Rule 13-806.  See also Strata Prod. Co. v. Mercury Expl. Co., 1996-NMSC-016, ¶ 14, 121 N.M. 622, 627, 916 P.2d 822, 827 ("In a unilateral contract, the offeree accepts the offer by undertaking the requested

Halliburton Energy invited acceptance through performance by informing employees in a memorandum that "[y]our decision to . . . continue your current employment after January 1, 1998 means you have agreed to and are bound by the terms of this [arbitration] Program." 2003-NMCA-148, ¶ 9, 81 P.3d 573, 577.[40]

23.     A party's "notice of acceptance may be communicated in any reasonable way . . . unless [the] . . . offer required a particular manner of acceptance . . . ." NMRA, Rule 13-810.  See Silva v. Noble, 1973-NMSC-106, ¶ 6, 85 N.M. 677, 679, 515 P.2d 1281, 1283 ("'[M]anifestation [of acceptance] may be either written or oral or by actions and conduct or a combination thereof . . .'")(quoting R.J. Daum Const. Co. v. Child, 122 Utah 194, 200, 247 P.2d 817, 819 (1952)).

      a.     **Acceptance by Performance, Inaction, Or Silence.**

24.     "An oral or formal acceptance of an offer is not necessary.  The general rule is that an offer may be accepted by performance before a revocation." Keeth Gas Co. v. Jackson Creek Cattle Co., 1977-NMSC-087, ¶ 8, 91 N.M. 87, 90, 570 P.2d 918, 921.  "If [the offeror] invited acceptance of the offer through a return promise or through performance, and [the offeree] began the invited performance, such performance was an acceptance of the offer." NMRA CIV UJI 13-812.

> *Acceptance by performance.* Where the offer requires acceptance by performance and does not invite a return promise, as in the ordinary case of an offer of a reward, a contract can be created only by the offeree's performance.  See Comment b to § 32.  In such cases the act requested and performed as consideration for the offeror's promise ordinarily also constitutes acceptance; under § 45 the beginning of performance or the tender of part performance of what is requested

performance. Generally, the offeror is free to revoke or revise the offer before acceptance.").

[40]The Court predicts the New Mexico Supreme Court would agree with the holding in DeArmond v. Halliburton Energy Serv., Inc., because was cited favorably by the New Mexico Supreme Court in Flemma v. Halliburton Energy Servs., Inc., 2013-NMSC-022, ¶ 16, 303 P.3d 814, 820.

may both indicate assent and furnish consideration for an option contract.  In some other cases the offeree may choose to create a contract either by making a promise or by rendering or tendering performance; in most such cases the beginning of performance or a tender of part performance operates as a promise to render complete performance.  See §§ 32, 62.  Mere preparation to perform, however, is not acceptance, although in some cases preparation may make the offeror's promise binding under § 87(2).

Restatement (Second) of Contracts § 50(a) (italics in the original).[41]  Comment b to § 32 states:

> *a. Promise or performance*. In the ordinary commercial bargain a party expects to be bound only if the other party either renders the return performance or binds himself to do so either by express words or by part performance or other conduct.  Unless the language or the circumstances indicate that one party is to have an option, therefore, the usual offer invites an acceptance which either amounts to performance or constitutes a promise. The act of acceptance may be merely symbolic of assent and promise, or it may also be part or all of the performance bargained for.  See §§ 2, 4, 18, 19.  In either case notification of the offeror may be necessary.  See §§ 54, 56.
>
> The rule of this Section is a particular application of the rule stated in § 30(2).  The offeror is often indifferent as to whether acceptance takes the form of words of promise or acts of performance, and his words literally referring to one are often intended and understood to refer to either.  Where performance takes time, however, the beginning of performance may constitute a promise to complete it.  See § 62.
>
> *b. Offer limited to acceptance by performance only.* Language or circumstances sometimes make it clear that the offeree is not to bind himself in advance of performance.  His promise may be worthless to the offeror, or the circumstances may make it unreasonable for the offeror to expect a firm commitment from the offeree.  In such cases, the offer does not invite a promissory acceptance, and a promise is ineffective as an acceptance.  Examples are found in offers of reward or of prizes in a contest, made to a large number of people but to be accepted by only one.  See § 29.  Non-commercial arrangements among relatives and friends (see Comment a to § 19, Comment c to § 21) and offers which leave important terms to be fixed by the offeree in the course of performance (see §§ 33, 34) provide other examples.
>
> It is a separate question whether the offeree undertakes any responsibility

---

[41]The Court predicts that the New Mexico Supreme Court would rely on Restatement (Second) of Contracts § 32(a), because the New Mexico Supreme Court consistently cites and uses Restatement (Second) of Contracts.  See, e.g., Romero v. Earl, 1991-NMSC-042, ¶ 6, 111 N.M. 789, 791, 810 P.2d 808, 810 (quoting the Restatement (Second) of Contracts §§ 71,79 for the definition of consideration).

to complete performance once begun, or whether he takes any responsibility for the quality of the performance when completed.

Restatement (Second) of Contracts § 32.

25.     Although, silence or inaction ordinarily does not constitute acceptance of an offer, silence or inaction by the offeree can constitute acceptance in some circumstances:

The silence or inaction of [the offeree] constitutes acceptance only if:

[The offeree] accepted the benefit[s] of the offer, after a reasonable opportunity to reject the benefit[s], knowing that [the offeror] expected compensation in return;

[or]

[The offeror] stated or gave [the offeree] reason to understand that the offer could be accepted through silence or inaction and [offeree] intended to accept the offer through silence or inaction;

[or]

Where because of past dealings between the parties, it is reasonable that [the offeree] should have notified [the offeror] that [the offeree] did not intend to accept the offer.

NMRA CIV UJI 13-811.  See Garcia v. Middle Rio Grande Conservancy Dist., 1983-NMCA-047, ¶ 22, 99 N.M. 802, 807, 664 P.2d 1000, 1005 ("Silence is acceptance of a contract only when there is a duty to speak."), overruled on other grounds by Montoya v. AKAL Sec., Inc., 1992-NMSC-056, ¶ 22, 114 N.M. 354, 838 P.2d 971.  See also Restatement (Second) of Contracts § 69 (1981)(discussing the circumstances where silence constitutes acceptance).

### b.     A Counteroffer.

26.     Because an offeree must accept an offer unconditionally and unqualifiedly, a response to an offer with new terms becomes a new offer.  See Pickett v. Miller, 1966-NMSC-050, ¶ 9, 76 N.M. 105, 412 P.2d 400 ("It is not disputed that New Mexico enforces the general rule of contracts to the effect that an offer must be accepted unconditionally and unqualifiedly by

the offeree."); Restatement (Second) of Contracts, § 59 (1981)("A reply to an offer which purports

to accept it but is conditional on the offeror's assent to terms additional to or different from those

offered is not an acceptance but is a counter-offer.").  See also Polhamus v. Roberts, 1946-NMSC-

033, ¶ 18, 50 N.M. 236, 175 P.2d 196.  "If [the offeree] responded to an offer by conditioning

acceptance on new terms that added, varied or changed any term of the offer, the response was a

rejection of the original offer and operated as a new offer that could be accepted or rejected by [the

offeror]."  NMRA CIV UJI 13-808 ("If the new terms were reasonably implied by the original

offer, however, the response operated as an acceptance of the original offer despite the additional

or different terms.").  "If [the offeree's] response to an offer included additional or different terms

but did not condition acceptance on agreement to those terms, the response operated as an

acceptance of the original offer."  NMRA CIV UJI 13-808.

### 3.   Consideration.

27.

> Consideration adequate to support a promise is essential to enforcement of
> the contract and must be bargained for by the parties.  Knoebel v. Chief Pontiac, 61
> N.M. 53, 57, 294 P.2d 625, 627-28 (1956). Something is bargained for "if it is
> sought by the promisor in exchange for his promise and is given by the promisee in
> exchange for that promise."  Restatement (Second) of Contracts § 71 (1979); see
> also Restatement (Second) of Contracts § 79 (1979)(if the requirement of bargained
> for consideration is met, there is no further requirement of a benefit to the promisor
> or a detriment to the promisee).

Romero v. Earl, 1991-NMSC-042, ¶ 6, 111 N.M. 789, 791, 810 P.2d 808, 810.  See Heye v. Am.

Golf Corp., 2003-NMCA-138, ¶ 12, 134 N.M. 558, 80 P.3d 495 ("Consideration consists of a

promise to do something that a party is under no legal obligation to do or to forbear from doing

something he has a legal right to do.")(citing  Restatement (Second) of Contracts §§ 73, 74, at 179,

185 (1981))[42].   Consideration is

> any bargained-for benefit or advantage to [the promisor] which was a reason why [promisor] wanted to enter into the contract, or any loss or detriment to [the promise], which [the promisor] desired [the promise] to suffer or which was a reason for [the promisor] to enter into the contract. Consideration may consist of a return promise, an act, a forbearance, or the creation, modification, or destruction of a legal relation.

NMRA CIV UJI 13-814.  See Lukoski v. Sandia Indian Mgmt. Co., 1988-NMSC-002, ¶¶ 4-8, 106 N.M. 664, 666-667, 748 P.2d 507, 509-10 (concluding that if an employer issues a policy statement in a manual, encourages reliance on the policy, and then only selectively abides by it, the employer is making an illusory promise).

### 4.   Mutual Assent.

28.     "It is elementary in contract law that mutual assent must be expressed by the parties to the agreement. . . .  'When the minds of the parties have not met on any part or provision of a proposed contract, all of its portions are a nullity.'"  Trujillo v. Glen Falls Ins. Co., 1975-NMSC-046, ¶ 6, 88 N.M. 279, 280, 540 P.2d 209, 210 (quoting Lamonica v. Bosenberg, 1964-NMSC-024, ¶ 8, 73 N.M. 452, 455, 389 P.2d 216, 217).  Courts look to the "objective manifestations of the parties," not their subjective thoughts.  Trujillo v. Glen Falls Ins. Co., 1975-NMSC-046, ¶ 7, 88 N.M. at 281, 540 P.2d at 211.  See id. ("'The apparent mutual assent, essential to the formation of a contract, must be gathered from the language employed by them, or manifested by their words or acts, and it may be manifested wholly or partly by written or spoken words or by other acts or conduct.'")(quoting 17 C.J.S. Contracts s 32, at 640 (1963)).  In other words, mutual assent

---

[42]The Court predicts that the New Mexico Supreme Court would rely on Restatement (Second) of Contracts § 32(a), because the New Mexico Supreme Court consistently cites and uses Restatement (Second) of Contracts.  See, e.g., Romero v. Earl, 1991-NMSC-042, ¶ 6, 111 N.M. 789, 791, 810 P.2d 808, 810 (quoting the Restatement (Second) of Contracts §§ 71,79 for the definition of consideration).

requires a showing of agreement by the parties to the material terms of the contract. Mutual assent may be shown by the parties' written or spoken words, by their acts or failures to act, or some combination thereof. Ordinarily, when one party makes an offer, and the other party accepts the offer, there is mutual assent.

NMRA CIV UJI 13-816.

### <u>NEW MEXICO LAW REGARDING BREACH-OF-CONTRACT CLAIMS</u>

29.    A contract is a legally enforceable promise that must consist of an offer, an acceptance, consideration, and mutual assent.  <u>See</u> UJI 13-801 NMRA ("A contract is a legally enforceable promise . . . .  In order for a promise [set of promises] to be legally enforceable, there must be an offer, an acceptance, consideration, and mutual assent.").  A person may breach a contract by failing to perform a contractual obligation when the performance is required, unless that performance is otherwise excused.  <u>See</u> UJI 13-822 NMRA.  Incomplete performance is a breach of contract.  <u>See</u> <u>Cochrell v. Hiatt</u>, 1981-NMCA-125, ¶ 10, 638 P.2d 1101, 1103-04 (holding that, where the contract called for the roof to be restored to a "healthy" state and guaranteed the work for twenty-five years, because the roof leaked within the twenty-five-year period, the defendant's performance was incomplete, and the defendant was in breach of the contract).  Under New Mexico law, "[t]he elements of a breach-of-contract action are the existence of a contract, breach of the contract, causation, and damages."  <u>Abreu v. N.M. Children, Youth and Families Dep't</u>, 797 F. Supp. 2d at 1247.

> [A] complaint on breach of contract must allege: (1) the existence of a valid and binding contract; (2) the plaintiff's compliance with the contract and his performance of the obligations under it; (3) a general averment of the performance of any condition precedent; and (4) damages suffered as a result of defendant's breach.

<u>McCasland v. Prather</u>, 1978-NMCA-098, ¶ 7, 585 P.2d 336, 338 (citing Wright and Miller, Federal Practice and Procedure: Civil § 1235 (1969)).

30.     Applying these principles in Armijo v. N.M. Dep't of Transp., No. CIV. 08-0336 JB/ACT, 2009 WL 1329192 (D.N.M. Apr. 6, 2009)(Browning, J.), the Court found that a plaintiff's allegations failed to state a claim for breach of contract.  In support of the breach-of-contract claim, the plaintiff asserted that "the Department would follow state employment policies and procedure, and that the Department terminated him in breach of those policies without just cause."  2009 WL 1329192, at *7.  The Court noted that the plaintiff did not "indicate what contractual provisions or employment policies the Department breached," and did not say "to what his employment contract entitles him or of what the Department deprived him."  2009 WL 1329192, at *7.  The Court found that there was "not enough . . . to determine whether, if taken as true, the Complaint's allegations would support claims for breach of contract." 2009 WL 1329192, at *8.  On the other hand, the Court has previously determined that a pro se plaintiff sufficiently alleged that his counsel breached a contract for legal representation by alleging that his former counsel promised to represent the plaintiff at forfeiture proceedings, that the plaintiff paid the counsel, and that the counsel failed to represent the plaintiff.  See Archuleta v. City of Roswell, No. CIV 10-1224 JB/RHS, 2012 WL 4950324, at **16-17 (D.N.M. Sept. 30, 2012)(Browning, J.).

31.     "Additionally, in spite of the general bar on punitive damages for breach-of-contract cases, the Supreme Court of New Mexico has recognized that punitive damages may be recoverable under some circumstances for a breach of contract."  Anderson Living Trust v. ConocoPhillips Co., LLC, No. CIV 12-0040 JB/LFG, 2013 WL 3456913, at *42 (June 28, 2013)(Browning, J.).  As the Supreme Court of New Mexico stated in Romero v. Mervyn's, 1989-NMSC-081, 109 N.M. 249, 784 P.2d 992: "Our previous cases clearly establish that, in contract cases not involving insurance, punitive damages may be recovered for breach of contract when the defendant's conduct was malicious, fraudulent, oppressive, or committed recklessly with a wanton

- 84 -

disregard for the plaintiff's rights." 784 P.2d at 998. Punitive damages are not available when

they are "predicated solely on gross negligence. In addition to, or in lieu of, such negligence there

must be evidence of an evil motive or a culpable mental state." Paiz v. State Farm Fire & Cas.

Co., 1994-NMSC-079, ¶25, 118 N.M. 203, 211, 880 P.2d 300, 308 (internal quotation marks

omitted). The Supreme Court of New Mexico has defined "reckless disregard" sufficient for an

award of punitive damages as "when the defendant knows of potential harm to the interests of the

plaintiff but nonetheless utterly fails to exercise care to avoid the harm." Paiz v. State Farm Fire

& Cas. Co., 880 P.2d at 308 (citation and secondary quotations omitted). A defendant does not

act with reckless disregard to a plaintiff's rights merely by failing "to exercise even slight care,"

absent the requisite "culpable or evil state of mind." Paiz v. State Farm Fire & Cas. Co., 880 P.2d

at 308 (citation and secondary quotations omitted). The New Mexico Civil Jury Instructions define

the elements necessary for an award of punitive damages for a breach of contract as follows:

> If you find that _____ (*name of party making claim for punitive damages*)
> should recover compensation for damages, and if you further find that the conduct
> of _____ (*name of party whose conduct gives rise to a claim for punitive
> damages*) was [malicious], [reckless], [wanton], [oppressive], or [fraudulent], then
> you may award punitive damages.

NMRA CIV UJI 13-861.

## NEW MEXICO LAW REGARDING CONTRACT INTERPRETATION

32.    In contract cases, "the role of the court is to give effect to the intention of the

contracting parties." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 22, 925 P.2d at 1184. "The

primary objective in construing a contract is not to label it with specific definitions or to look at

form above substance, but to ascertain and enforce the intent of the parties as shown by the contents

of the instrument." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 22, 925 P.2d at 1184 (citing

Shaeffer v. Kelton, 1980-NMSC-117, 619 P.2d 1226, 1229). "The parol evidence rule 'bars

admission of evidence extrinsic to the contract to contradict and perhaps even supplement the writing.'" Memorial Med. Ctr., Inc. v. Tatsch Const., Inc., 2000-NMSC-030, ¶ 16, 12 P.3d at 431 (citation omitted).   On the other hand, New Mexico has "adopted the contextual approach to contract interpretation, in recognition of the difficulty of ascribing meaning and content to terms and expressions in the absence of contextual understanding."   Mark V, Inc. v. Mellekas, 1993-NMSC-001, 845 P.2d 1232, 1235 (citation and internal quotation marks omitted).  See Pedroza v. Lomas Auto Mall, Inc., No. CIV 07-0594 JB/RHS, 2013 WL 4446770, at *18 (D.N.M. Aug. 2, 2013)(Browning, J.).

33.      "The question whether an agreement contains an ambiguity is a matter of law." Hartnett v. Papa John's Pizza USA, Inc., 912 F. Supp. 2d 1066, 1092 (D.N.M. 2012)(Browning, J.).  See Mark V., Inc. v. Mellekas, 845 P.2d at 1235 (citing Levenson v. Mobley, 1987-NMSC-102, 744 P.2d 174, 176).  When the "evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law."  Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 114 N.M. at 781, 845 P.2d at 1235.  A contract "is not rendered ambiguous merely because a term is not defined; rather, the term must be interpreted in its usual, ordinary, and popular sense . . . and may be ascertained from a dictionary."  Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 8, 127 P.3d at 1111 (internal quotation marks omitted)(applying principle to insurance policy).   "A contract is deemed ambiguous only if it is reasonably and fairly susceptible of different constructions.  The mere fact that the parties are in disagreement on the construction to be given does not necessarily establish ambiguity."  Vickers v. N. Am. Land Dev., Inc., 1980-NMSC-021, ¶ 9, 607 P.2d 603, 606 (citation omitted).

34.      "An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity."  Mark V, Inc. v. Mellekas, 845 P.2d at 1235 (citation omitted).  If the court

finds that the contract is "reasonably and fairly susceptible of different constructions, an ambiguity exists."  Mark V, Inc. v. Mellekas, 845 P.2d at 1235 (citing Vickers v. North Am. Land Dev., Inc., 94 N.M. at 68, 607 P.2d at 606 (1980)).

> [I]n determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance. . . .   It is important to bear in mind that the meaning the court seeks to determine is the meaning one party (or both parties, as the circumstances may require) attached to a particular term or expression at the time the parties agreed to those provisions.
>
> . . . .
>
> It may be that the evidence presented is so clear that no reasonable person would determine the issue before the court in any way but one.  In that case, to the extent the court decides the issue, the question then may be described as one of law.

C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 17, 817 P.2d 238, 242-44 (affirming the trial court because it "considered all evidence adduced in response to the motion for summary judgment, including collateral or extrinsic evidence of the circumstances surrounding the execution of the lease amendment, and quite properly found no ambiguity")(citations and footnote omitted).  In addition, in determining whether an ambiguity exists,

> [a] court may employ the many rules of contract interpretation that do not depend on evidence extrinsic to the contract.  See, e.g., Smith v. Tinley, 100 N.M. 663, 665, 674 P.2d 1123, 1125 (1984) (reasonable interpretation of contract is favored); Schultz & Lindsay Constr. Co. v. State, 83 N.M. 534, 536, 494 P.2d 612, 614 (1972) (uncertainties construed strictly against drafter); Id. at 535, 494 P.2d at 613 (each part of contract is to be given significance according to its place in the contract so as to give effect to the intentions of the parties).

C.R. Anthony Co. v. Loretto Mall Partners, 817 P.2d at 244 n.5.  Once the Court finds that an ambiguity exists, the resolution of that ambiguity becomes a question of fact.  See Mark V, Inc. v. Mellekas, 845 P.2d at 1235.  To decide the meaning of any ambiguous terms, "the fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances

surrounding the agreement, as well as oral evidence of the parties' intent."  Mark V, Inc. v. Mellekas, 845 P.2d at 1236.  "[I]f the court finds ambiguity, the jury (or court as the fact finder in the absence of a jury) resolves the ambiguity as an issue of ultimate fact before deciding breach and damages."  C.R. Anthony Co. v. Loretto Mall Partners, 817 P.2d at 241.

### NEW MEXICO LAW REGARDING THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

35.    "Whether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement."  Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12, 111 N.M. 57, 60, 801 P.2d 639, 642.  "'Broadly stated, that covenant requires that neither party do anything which will deprive the other of the benefits of the agreement.'"  Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12, 801 P.2d at 642 (quoting Romero v. Mervyn's, 1989-NMSC-081, ¶ 32, 109 N.M. 249, 257, 784 P.2d 992, 1000). "The breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party."  Sanders v. FedEx Ground Package Sys., 2008-NMSC-040, ¶ 7, 114 N.M. 449, 188 P.2d 1200 (secondary quotations omitted).  The Supreme Court of New Mexico has expressed reluctance, however, to use the covenant of good faith and fair dealing "under circumstances where . . . it may be argued that from the covenant there is to be implied in fact a term or condition necessary to effect the purpose of a contract."  Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12 801 P.2d at 642.

> "Generally, in the absence of an express provision on the subject, a contract contains an implied covenant of good faith and fair dealing between the parties. Under the implied covenant of good faith and fair dealing, courts can award damages against a party to a contract whose actions undercut another party's rights or benefits under the contract.  Our Supreme Court has nevertheless refused to apply this implied covenant to override an express at-will termination provision in an integrated, written contract."

Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co, 407 F.3d 1091, 1114-15 (10th Cir. 2005)(quoting Kropinak v. ARA Health Servs., Inc., 2001-NMCA-081, ¶¶ 3-4,  33 P.3d 679)(secondary citations omitted).

36.    New Mexico has recognized that a cause of action for breach of the covenant of good faith and fair dealing sounds in contract.  See Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶17,  872 P.2d 852, 857.  The Supreme Court of New Mexico has also explained that tort recovery for breach of the covenant of good faith and fair dealing is permissible only where a special relationship exists, such as between an insurer and its insured.  See Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 857.  The "relationship of insurer and insured is inherently unbalanced; the adhesive nature of insurance contracts places the insurer in a superior bargaining position."  Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 857 (quoting Egan v. Mutual of Omaha Ins. Co., 24 Cal. 3d 809, 820 620 P.3d 141, 146 (Cal. 1979)).  Similarly, the Court of Appeals of New Mexico has held that "[t]he claim of breach of good faith and fair dealing sounds in contract, at least when no 'special relationship' such as that between an insured and insurer exists."  Heimann v. Kinder-Morgan CO2 Co., 2006-NMCA-127, ¶ 18, 144 P.3d 111.

37.    The Supreme Court of New Mexico has indicated that "the duty to not act in bad faith or deal unfairly," which an implied covenant of good faith and fear dealing within a contract imposes, "becomes part of the contract and the remedy for its breach is on the contract itself." Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 857 (discussing an Arizona case and distinguishing this measure of damages from tort damages that are available for breach of this covenant in the insurance context).  In the insurance context, however, a plaintiff

can recover tort damages for breach of this implied covenant.   See Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 857.

38.     The Supreme Court of New Mexico notes that it does "not recognize a cause of action for breach of an implied covenant of good faith and fair dealing in an at-will employment relationship."  Melnick v. State Farm Mut. Auto. Ins. Co., 1989-NMSC-012, ¶ 13, 749 P.2d 1105, 1109.  This limitation is because "there is no contract of employment upon which the law can impose the stated duty to exercise good faith and fair dealing."  Sanchez v. The New Mexican, 1987-NMSC-059, ¶ 13, 738 P.2d 1321, 1324 (emphasis in original).

## NEW MEXICO LAW REGARDING UNJUST ENRICHMENT

39.     "'To prevail in unjust enrichment, 'one must show that: (1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust.'"  City of Rio Rancho v. Amrep Sw. Inc., 2011-NMSC-037, ¶ 54, 260 P.3d 414, 428 ((quoting Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 129 N.M. 200, 3 P.3d 695, 698 (Armijo, J.)[43]).  A person who has been unjustly enriched at the expense of another is required to make restitution to the other."   Restatement (First) of Restitution § 1 (1937).[44]  Equitable claims are typically unavailable if there is an adequate remedy at law.  See

---

[43]The Honorable M. Christina Armijo served on the Court of Appeals of New Mexico from 1996 to 2001.  In 2001, she was then appointed as a United States District Judge for the United States District Court for the District of New Mexico.

[44]The Supreme Court of New Mexico has relied upon the Restatement First of Restitution when analyzing unjust enrichment claims.  See, e.g., Sunwest Bank of Albuquerque, N.A. v. Colucci, 1994-NMSC-027, ¶ 12, 117 N.M. 373, 376, 872 P.2d 346, 349; Hydro Conduit Corp. v. Kemble, 1990-NMSC-061, ¶ 8, 110 N.M. 173, 175, 793 P.2d 855, 857.  See also United States ex rel. Sunworks Division of Sun Collector Corp. v. Insurance Co. of North Am., 695 F.2d 455, 458 (10th Cir. 1982)(discussing the Restatement of Restitution § 1 when analyzing an unjust enrichment claim under New Mexico law).  The Supreme Court of New Mexico last cited the Restatement of Restitution in 2003.  See Chase Manhattan Bank v. Candelaria, 2004-NMSC-017,

Gen. Tel. Co. of the Sw. v. State Tax Comm'n, 1962-NMSC-005, ¶ 18, 367 P.2d 711, 715; Sims

v. Sims, 1996-NMSC-078, ¶ 28, P.2d 153, 159 ("[E]quity will not act if there is a complete and

adequate remedy at law.")(quoting S.P.C.S., Inc. v. Lockheed Shipbuilding & Constr. Co., 631

P.2d 999, 1001 (Wash. App. 1981))).  Additionally, the "'hornbook rule [is] that quasi-contractual

remedies . . . are not to be created when an enforceable express contract regulates the relations of

---

¶ 10, 135 N.M. 527, 530, 90 P.3d 985, 988.  The Restatement Third of Restitution was published
in 2011, and the Supreme Court of New Mexico has not relied directly on it.  Justice Antonin
Scalia writes, regarding the Restatement Third of Restitution:

> I write separately to note that modern Restatements -- such as the Restatement
> (Third) of Restitution and Unjust Enrichment (2010), which both opinions address
> in their discussions of the disgorgement remedy -- are of questionable value, and
> must be used with caution.  The object of the original Restatements was "to present
> an orderly statement of the general common law."  Restatement of Conflict of
> Laws, Introduction, p. viii (1934).  Over time, the Restatements' authors have
> abandoned the mission of describing the law, and have chosen instead to set forth
> their aspirations for what the law ought to be.  Keyes, The Restatement (Second):
> Its Misleading Quality and a Proposal for Its Amelioration, 13 Pepp. L. Rev. 23,
> 24-25 (1985).  Section 39 of the Third Restatement of Restitution and Unjust
> Enrichment is illustrative; as Justice THOMAS notes, post, at 1068 (opinion
> concurring in part and dissenting in part), it constitutes a "'novel extension'" of the
> law that finds little if any support in case law.  Restatement sections such as that
> should be given no weight whatever as to the current state of the law, and no more
> weight regarding what the law ought to be than the recommendations of any
> respected lawyer or scholar.  And it cannot safely be assumed, without further
> inquiry, that a Restatement provision describes rather than revises current law."

Kansas v. Nebraska, 574 U.S. 445, 475-76 (2015)(Scalia, J., concurring in part and dissenting in
part).  In Montana v. United States, 440 U.S. 147, Chief Justice William Rehnquist notes that the
Supreme Court's "references to law review articles and drafts or finally adopted versions of the
Restatement of Judgments are not intended to bind the Court to the views expressed therein on
issues not presented by the facts of this case."  440 U.S. at 164 (Rehnquist, J., concurring).  The
Court, therefore, relies upon the Restatement First of Restitution in analyzing the unjust
enrichment claims in the present case, because the Supreme Court of New Mexico has referenced
solely the Restatement First of Restitution, and because of the concerns Justice Scalia expresses
that the Restatement Third of Restitution "constitutes a 'novel extension' of the law that finds little
support if any in case law."  Kansas v. Nebraska, 574 U.S. at 476-76 (2015)(Scalia, J., concurring
in part and dissenting in part)(quoting Thomas, J., concurring in part and dissenting in part).

the parties with respect to the disputed issue.'" Elliott Indus. Ltd. P'ship v. BP America Production

Co., 407 F.3d 1091, 1117 (10th Cir. 2005)("Elliott Indus.")(quoting Member Servs. Life Ins. v.

Am. Nat'l Bank & Tr. Co. of Sapulpa, 130 F.3d 950, 957 (10th Cir. 1997)).[45]  In Elliott Indus., for

example, the Tenth Circuit held that the plaintiffs' leases with ConocoPhillips that defined

ConocoPhillips' royalty obligations precluded the plaintiffs' claims that ConocoPhillips' royalty

payment practices unjustly enriched it at the plaintiffs' expense.  See 407 F.3d at 1117.  The

plaintiffs contended that the leases did not preclude their unjust-enrichment claim, because they

did not contain an express contractual provision covering ConocoPhillips' deduction of a thirty-

nine percent processing fee from the plaintiffs' royalty payments.  See 407 F.3d at 1117.  The

Tenth Circuit reasoned, however, that, although "the contracts may not delineate any specific

deductions," the leases "control how royalties are to be paid." 407 F.3d at 1117.  The Tenth Circuit

concluded, therefore, that the district court properly granted ConocoPhillips summary judgment

on the plaintiffs' unjust-enrichment claim, because "the claim for underpayment of royalties is

grounded in the parties' contractual relationships." 407 F.3d at 1117.  See Anderson Living Tr. v.

ConocoPhillips Co., LLC, 952 F. Supp. at 1033.

## **ANALYSIS**

40.    First, the Court denies the Motion, because it is not settlement communications and

---

[45]As the Tenth Circuit has explained, "when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue."  Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003).  The Court has critiqued the Elliott Indus. decision in the past, though on a different legal issue, and concluded that the Supreme Court of New Mexico would follow a different path.  See Anderson Living Tr. v. WPX Energy Prod., LLC, 312 F.R.D. 620, 625-630 (D.N.M. 2015)(Browning, J.) The Court reiterates that interpretation here, though not on the issue quoted above.

Madera waived any confidential attorney-client privilege, since he took no steps to rectify the inadvertent disclosure.  Second, the Court awards Tyler Group no damages under the water sales agreement, because  Madera and Pitchfork Cattle paid Tyler Group for the one water sale that Tyler negotiated, and Madera did not act in bad faith.  Third, the Court concludes that Madera and Tyler had a contract for 2.5% of Pitchfork Ranch's sale to compensate Tyler for the work he did improving Pitchfork Ranch's water sales and therefore attracting potential buyers, because the record reflects that Madera made an offer on February 12, 2018; (ii) Tyler accepted through performance; (iii) there was consideration; and (iv) the parties objectively manifested mutual assent.  See Strausberg v. Laurel Healthcare Providers, LLC, 2013-NMSC-032, ¶ 42, 304 P.3d at 419-20 (concluding that a contract is "'factually supported by an offer, an acceptance, consideration, and mutual assent.'")(quoting Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 9, 121 N.M. 728, 918 P.2d 7).  The Court concludes, therefore, that Madera has breached the contract, because Madera and Pitchfork Cattle has not paid Tyler Group anything when Madera sold Pitchfork Ranch to Quail Ranch LLC, a Concho Resources subsidiary, for $81,600,000.00.  Accordingly, the Court awards Tyler Group $2,040,000.00 in damages, which is 2.5% of the $81,600,000.00 sales price of Pitchfork Ranch.

**I.     THE FEBRUARY 12, 2018, EMAIL IS ADMISSIBLE, BECAUSE IT IS NOT SETTLEMENT COMMUNICATIONS AND MADERA WAIVED CONFIDENTIAL ATTORNEY-CLIENT PRIVILEGE, BECAUSE IT IS NOT <u>PRIVILEGED ATTORNEY-CLIENT COMMUNICATION.</u>**

41.     Madera and Pitchfork Cattle argue that the Court should exclude the February 12, 2018, Email, for three reasons.  First, they argue that the February 12, 2018 Email is inadmissible evidence of settlement negotiations under rule 408 of the Federal Rules of Evidence.  See Motion Memo at 1-3.  Second, they that argue the February 12, 2018 Email creates the risk of jury

confusion and prejudice under rule 403.  See Motion Memo at 1-3.  Third, they argue that the

February 12, 2018 Email is privileged attorney-client communications.  See Motion Memo at 1-3.

The Court concludes that the February 12, 2018, Email: (i) is not evidence of settlement negations,

because it was an offer to pay Tyler a sales fee for the sale of Pitchfork Ranch, and no litigation

regarding the agreement had yet taken place; (ii) there is no risk of jury confusion; and (iii) email

is not privileged attorney-client communications.

        42.    Rule 408 of the Federal Rules of Evidence prohibits evidence of settlement

negotiations in the following circumstances:

> **(c)**    **Prohibited Uses.**  Evidence of the following is not admissible -- on behalf of any party -- either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>
> > **(1)**    furnishing, promising, or offering -- or accepting, promising to accept, or offering to accept -- a valuable consideration in compromising or attempting to compromise the claim; and
> >
> > **(2)**    conduct or a statement made during compromise negotiations about the claim -- except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.
>
> **(d)**    **Exceptions.** The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed. R. Evid. 408.  Madera and Pitchfork Cattle contends that the February 12, 2018, Email is

evidence of settlement negotiations, because "Madera instructed his attorney at the time to make

an offer to the Tyler Group regarding payment."  Motion Memo at 3.  An offer to enter into a

contract, however, is not a settlement negotiation, because communications between the parties

that "ha[ve] not crystallized to the point of threatened litigation" are not considered settlement

negotiations.  Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365, 1373 (10th Cir. 1977)(concluding that business communications were admissible, because there was not threat of litigation).  See, e.g., Scavetta v. King Soopers, Inc., No. 10-CV-02986-WJM-KLM, 2013 WL 2393070, at *2 n.2 (D. Colo. May 31, 2013)(Martinez, J.)(excluding a settlement agreement, because the plaintiff "threatened litigation in an e-mail dated December 16, 2009, reading in pertinent part: 'I will be seeking other legal remedies to my wrongful termination outside of the union.'")(quoting trial record); Arnold Oil Properties, L.L.C. v. Schlumberger Tech. Corp., No. CIV-08-1361-TDD, 2010 WL 3604094, at *3 (W.D. Okla. Sept. 9, 2010)(DeGiusti, J.)("[T]he fact that the parties met to discuss what happened and to resolve a problem does not mean they were engaged in compromise negotiations.  There is no suggestion that the discussions had crystallized to the point of threatened litigation . . . .").  Because Madera and Pitchfork do not point to anything in the record to indicate there was any threat of litigation regarding a disputed claim on February 12, 2018, rule 408 does not bar the February 12, 2018, Email.  See Motion Memo at 1-3; Fed. R. Evid. 408(a).

43.    Next, Madera and Pitchfork Cattle argue that the admission of the email correspondence creates the risk of jury confusion and prejudice under rule 403.  See Motion Memo at 3.  Madera and Pitchfork Cattle contend:

> There is a significant risk that the jury will confuse the purpose for which Tyler Group Partners, LLC purports to offer the negotiations at trail and will construe the negotiations as some sort of concession by Bert Madera and Pitchfork Cattle Company, LLC that monies are due to the Tyler Group, a result which would be unfairly prejudice to Bert Madera and Pitchfork Cattle Company, LLC. Accordingly, Rule 403 bars admission of the negotiations.

Motion Memo at 3 (citing Equal Employment Opportunity Commission v. Gear Petroleum, Inc., 948 F.2d 1542, 1546 (10th Cir. 1991); Southwest Nurseries, LLC v. Florists Mut. Ins., Inc., 266

F. Supp. 2d at 1258-59; and 2 Weinstein's Federal Evidence §408.08 ("The almost inevitable impact of the disclosure of [settlement evidence] is that the jury will consider the offer or agreement as evidence of a concession of liability.")).  The Court concludes that rule 403 does not bar the February 12, 2018, Email, because Madera and Pitchfork Cattle's rule 403 argument merely repackages the settlement disclosure concerns that rule 408 covers, which the Court already has addressed, and they do not explain what other prejudice they would suffer from disclosure.  See Motion Memo at 3 ("Rule 403 bars admission of the negotiations").  In addition, the Court concludes that the February 12, 2018 Email would not confuse a jury, because it is an offer and nothing in the record suggests it is a settlement negotiation, because neither Madera nor Tyler had yet threatened any litigation, and they were not attempting to settle a disputed claim.  Moreover, on March 17, 2021, the parties stipulated to a bench trial rather than a jury trial, see Stipulated Order Agreeing to a Non-Jury Trial, filed March 17, 2020 (Doc. 111), so there is little chance this February 12, 2018 Email would confuse the Court, given that the Court has already had to consider the February 12, 2018 Email for 408 Purposes before considering it for 403 purposes.  See Coffey v. United States, No. CIV 08-0588, 2012 WL 1698289, at *3 (Browning, J.)("The concerns of rule 403 apply differently in a bench trial where a jury has no role in the decision-making process.  Specifically, the Tenth Circuit has stated that: "Other circuits have held, and we agree, that excluding evidence in a bench trial under 'Rule 403's weighing of probative value against prejudice [is] improper.'" (quoting United States v. Kienlen, 349 F.App'x 349, 351 (10th Cir. 2009)(unpublished)[46](quoting Gulf States Utils. Co. v. Ecodyne Corp., 635 F.2d 517, 519 (5th Cir.

---

[46]United States v. Kienlen is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

1981))).

44.    Last, Madera and Pitchfork Cattle argue the February 12, 2018, Email is not admissible, because it is privileged attorney-client material that was inadvertently disclosed.  <u>See</u> Motion Memo at 4.  Pursuant to rule 501 of the Federal Rules of Evidence, state law supplies the rules concerning attorney-client privilege in diversity cases.  <u>See</u> Fed. R. Evid. 501.   Under New Mexico law, the attorney-client privilege applies to "confidential communications made for the purpose of facilitating the rendition of professional legal services to the client."  <u>Anaya v. CBS Broad., Inc.</u>, 251 F.R.D. 645, 650 (D.N.M. 2007)(Browning, J.)(applying New Mexico state law regarding attorney-client privilege).  <u>See</u> <u>State ex rel. State Highway Comm'n v. Steinkraus</u>, 1966-NMSC-134, ¶ 4, 76 N.M. 617, 620, 417 P.2d 431, 432 ("It is clear to us that the attorney-client privilege should only be applied to protect communications -- not facts."); N.M.R.A § 11-503(B). Rule 11-503 of New Mexico Rules of Evidence codifies attorney-client privilege: "A client has a privilege to refuse to disclose, and to prevent any other person from disclosing, a confidential communication made for the purpose of facilitating or providing professional legal services to that client . . .  between the client and the client's lawyer or representative . . . ."  N.M.R.A § 11-503. Under rule 11-503, the elements of attorney-client privilege are: "'(1) a communication (2) made

_____

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that <u>United States v. Kienlen</u> has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

in confidence (3) between privileged persons (4) for the purpose of facilitating the attorney's rendition of professional legal services to the client.'" Albuquerque J. v. Bd. of Educ. of Albuquerque Pub. Sch., 2019-NMCA-012, ¶ 19, 436 P.3d 1, 9 (quoting Santa Fe Pac. Gold Corp., 2007-NMCA-133, ¶ 14, 143 N.M. 215, 175 P.3d 309, and citing NMRA § 11-503(B)).[47]

45.     Madera sent the February 12, 2018, Email to Tyler's email, but addressed Morgan Banks, his lawyer's legal secretary: "Morgan: Let's offer Tyler Group 2.5% finders fee on the sale of Pitchfork." Feb. 12, 2018 Email at 2. The February 12, 2018 Email, therefore, satisfies elements one, three, and four of N.M.R.A § 11-503: it was a communication made between a client and his lawyer's representative for the purposes of legal services. See NMRA § 11-503; Albuquerque J. v. Bd. of Educ. of Albuquerque Pub. Sch., 2019-NMCA-012, ¶ 19, 436 P.3d 1, 9 (concluding that, under rule 11-503, the elements of attorney-client privilege are: "(1) a communication (2) made in confidence (3) between privileged persons (4) for the purpose of facilitating the attorney's rendition of professional legal services to the client."). The parties dispute whether the email was made in confidence: Tyler Group argues that Madera "intentiona[lly]" emailed Tyler. Response at 7. When a party inadvertently discloses otherwise protected material, the Court should consider five factors to determine whether the document has lost its privilege:

> (1) The reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production; (2) the number of inadvertent disclosures; (3) the extent of the disclosure; (4) any delay and measures taken to rectify the disclosures; (5) whether the overriding interests of justice would be served by relieving a party of its error.

---

[47]The Court predicts that the New Mexico Supreme Court would agree with Albuquerque J. v. Bd. of Educ. of Albuquerque Pub. Sch., because the New Mexico Court of Appeals paraphrases rule 11-503(B).

Hartman v. El Paso Nat. Gas Co., 1988-NMSC-080, ¶ 36, 107 N.M. 679, 687, 763 P.2d 1144, 1152.  The February 12, 2018 Email was not made in confidence because Madera sent the email both to his attorney and to Tyler.  Despite finding that the disclosure was inadvertent, the Court concludes that Madera did not take any precautions to prevent the disclosure, and did not take any steps to rectify the disclosure.  Madera did not have a substantial number of inadvertent disclosures, but the Court concludes that the overriding interests of justice are not served by relieving Madera of his error.  Consequently, the February 12, 2018 Email is not protected by attorney client privilege.

II.   **MADERA AND PITCHFORK CATTLE DO NOT OWE TYLER GROUP ANY DAMAGES UNDER THE ORAL WATER SALES AGREEMENT, BECAUSE MADERA AND PITCHFORK CATTLE PAID TYLER GROUP FOR THE ONE WATER SALE TYLER NEGOTIATED, AND MADERA DID NOT ACT IN BAD FAITH.**

46.     Tyler Group seeks $900,000.00 in damages under the water sales agreement, because Madera and Pitchfork Cattle stopped selling water to Concho Resources.  See Tyler Group FOFs at 9 (no paragraph numbering).   Tyler Group argues that there is no dispute that Madera and Tyler had an agreement where Madera and Pitchfork Cattle would pay Tyler Group five percent of all water sales Tyler negotiated, and that Madera and Pitchfork Cattle "prevented Tyler from receiving fees of at least $900,000 from January to August 2018."  Tyler Group FOFs at 9-10 (no paragraph numbering).   Tyler Group contends that, "but for" Madera's and Pitchfork Cattle's actions, "Concho would have continued making monthly water purchases from Defendants of at least $2 million per month until the Ranch sold on August 29, 2018," and that Madera's "interference" with the water sales therefore violated the duty of good faith and fair dealing.  Tyler Group FOFs at 10 (no paragraph numbering).

47.     Here, the parties do not dispute that Madera and Tyler had an oral contract where

Tyler was to receive five percent of all water sales that Tyler negotiated, and the record reflects that this contract existed.  See May 3 Tr. at 40:12-24 (DeAyala, Madera); id. 92:21-93:25 (DeAyala, Madera); id. at 101:2-8 (DeAyala, Madera)(DeAyala: "[Y]our deal was to pay him five percent of water sales."  Madera: "I agree there."); id. at 262:14-19 (DeAyala, Montgomery); Tyler Group FOFs at 4 (no paragraph numbering); Madera FOFs ¶¶ 23-24, at 3-4.  Developing Pitchfork Cattle's water business was meant to provide Madera and Pitchfork Cattle with a "long term income stream."  May 3 Tr. at 126:14-17 (DeAyala, Tyler); Tyler Group's FOFs at 3 (no paragraph numbering).  While Tyler was working for Madera, Tyler negotiated only one water sale of $1,350,000.00 between Concho Resources and Pitchfork Cattle, which was Pitchfork Cattle's single "largest" water sale "by far."   May 3 Tr. at 40:2-8 (DeAyala, Madera).  See May 3 Tr. at 39:20-40:8 (DeAyala, Madera); id. at 130:1-131:13 (DeAyala, Tyler); id. at 225:6-8 (Coker); 2017 Water Sale Emails at 1; Water Sales Check at 1.  The Maderas paid Tyler $67,500.00 for negotiating the water sale between Concho Resources and Pitchfork Cattle, which is five percent of $1,350,000.00.  See May 3 Tr. at 40:12-51:15 (DeAyala, Madera); id. at 130:1-131:13 (DeAyala, Tyler); Summary of Pitchfork Cattle Company, LLC Transactions at Merrill Lynch Bank of America Corporation at 1.  The November, 2017, water sale was the only water sale that Tyler negotiated for Pitchfork Cattle.  See May 3 Tr. at 40:25-41:18 (DeAyala, Madera); Tyler Group FOFs at 5-6 (no paragraph numbering); Madera FOFs ¶ 34, at 3-4.

48.    Tyler expected that Concho Resources would keep buying water from Pitchfork Cattle, and argues that the Madera's decision to cut off Concho Resources prevented him from receiving his rightful payout from these continued water sales.  See Tyler Group FOFs at 9-10 (no paragraph numbering).   "Whether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement."  Watson Truck & Supply Co.

v. Males, 1990-NMSC-105, ¶ 12, 111 N.M. 57, 60, 801 P.2d 639, 642.  Accord Sanders v. FedEx

Ground Package Sys., Inc., 2008-NMSC-040, ¶ 7, 144 N.M. 449, 452, 188 P.3d 1200, 1203.

"Broadly stated, that covenant requires that neither party do anything which will deprive the other

of the benefits of the agreement."  Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12,

111 N.M. 57, 60, 801 P.2d at 642 (quoting Romero v. Mervyn's, 1989-NMSC-081, ¶ 32, 109 N.M.

249, 257, 784 P.2d 992, 1000).   "Absent any honest pursuit of interests to which a party to a

contract is entitled, i.e., absent cause or excuse, his or her intentional use of the contract to the

detriment of another party is wrongful, constitutes bad faith, and clearly is a breach of the covenant

of good faith and fair dealing."  Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12,

111 N.M. 57, 60 801 P.2d at 642.  "The breach of this covenant requires a showing of bad faith or

that one party wrongfully and intentionally used the contract to the detriment of the other party."

Sanders v. FedEx Ground Package Sys., 2008-NMSC-040, ¶ 7, 114 N.M. 449, 188 P.2d 1200

(quoting Cont'l Potash, Inc. v. Freeport-McMoran, Inc., 1993-NMSC-039, ¶ 64, 115 N.M. 690,

706, 858 P.2d 66, 82).   "'The implied covenant is aimed at making effective the agreement's

promises.  Thus, it is breached only when a party seeks to prevent the contract's performance or

to withhold its benefits from the other party.'"  Sanders v. FedEx Ground Package Sys., Inc., 2008-

NMSC-040, ¶ 8, 144 N.M. at 452, 188 P.3d at 1203 (quoting Azar v. Prudential Ins. Co. of Am.,

2003-NMCA-062, ¶ 51, 133 N.M. 669, 68 P.3d 909).

        49.     Tyler Group does not allege that Madera and Pitchfork Cattle acted in bad faith to

deprive him of the benefit of his contract; he argues only that, "but for" the Maderas' decision to

stop the water sales to Concho Resources, Tyler Group lost out on potential income from the water

sales agreement.  Tyler Group FOFs at 9-10 (no paragraph numbering).  Here, Concho Resources

did not have an agreement with Madera and Pitchfork Cattle to drill a certain number wells per

year or buy a certain amount of water per month' under the SUCA.   See May 3 Tr. at 88:1-14 (Hightower, Madera); SUCA at 1.   Concho Resources was free to purchase as much water as it wanted as long as it purchased the water from Pitchfork Cattle for $2.00 per barrel.   See SUCA at 1.   Although the Maderas shut off the water supply to Concho Resources and prevented Concho Resources from accessing Pitchfork Ranch in January 2018, Tyler Group does not contend that the Maderas did so in bad faith to deprive Tyler Group from the benefit of their water sales agreement, and nothing in the record suggests that the Maderas acted in bad faith.   See Pretrial Order ¶ 5, at 9 (listing stipulated facts); Tyler Group FOFs at 7 (no paragraph numbering); Madera FOFs ¶ 24, at 3-4; May 3 Tr. at 50:19-51:7 (DeAyala, Madera); id. at 237:5-16 (DeAyala, Coker). Instead, the record shows that the Maderas shut off the water supply to Concho Resources over a billing dispute.   See Voicemail (not dated)(admitted at Trial on May 3, 2021, as Tyler Group's Exhibit 27)(Madera's voicemail to Concho Resources threatening to shut off the water to Concho Resources if Concho Resources did not pay a disputed amount of money owed); Concho Resources TRO ¶ 11, at 2 (alleging that on "January 12, 2018, [Pitchfork Cattle] called COG and threat[en]ed to lock COG out of the land, denying it access to the frac pond and water, and physically turned off the pumps at the frac pond, thereby preventing the delivery of the water to COG's nearby Project").   Not only is the record devoid of evidence if bad faith, the Maderas had no incentive to deprive Tyler Group from the benefit of the water sales agreement by shutting off the water to Concho Resources, because (a) they would all lose out on a "great" business opportunity under the SUCA, May 3 Tr. at 128:23-129:8 (Tyler); id. at 72:4-11 (DeAyala, Madera)(testifying that Madera's and Tyler's relationship was "supposed to be a long-term income stream where [Madera] would win big, and Tyler would win small"), and (b) the Maderas appreciated Tyler Group's water sales efforts, see Appreciation Letter at 1.   Accordingly, Madera's decision to shut off Concho

Resources was not done in bad faith, because Madera did not seek to withhold from Tyler Group a benefit from the water sales agreement.  See Sanders v. FedEx Ground Package Sys., Inc., 2008-NMSC-040, ¶ 8, 144 N.M. at 452, 188 P.3d at 1203 ("'The implied covenant. . . is breached only when a party seeks to prevent the contract's performance or to withhold its benefits from the other party.'")(quoting Azar v. Prudential Ins. Co. of Am., 2003-NMCA-062, ¶ 51, 133 N.M. 669, 68 P.3d 909).  Although Madera's actions meant that Tyler Group would not be paid under their water sales agreement, that was not Madera's intention.  See Voicemail; Concho Resources TRO ¶ 11, at 2.  While the parties do not say expressly, the Court infers that the shut off was meant to give Madera, Pitchfork Cattle, and Tyler more leverage over Concho Resources, and that effect was successful.  If that is the case, Tyler eventually benefited from the hard ball.

50.     In addition, Tyler Group's argument is only a "but for" argument: i.e., but for Madera's decision to shut off water to Concho Resources, Tyler Group would have made more money from the water sales agreement.  Tyler Group FOFs at 9-10 (no paragraph numbering).  Although causation is necessary, it is not sufficient to establish a violation of the duty of good faith and fair dealing.  See Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12, 111 N.M. at 60, 801 P.2d at 642.  Even here, Tyler Group's argument flounders, because Tyler Group's assessment of damages is purely speculative: Concho Resources was under no obligation to buy more water and was not obliged to build more wells under the SUCA or any other agreement.  See May 3 Tr. at 88:1-14 (Hightower, Madera)(testifying that Concho Resources did not have an agreement with Pitchfork Cattle to drill a certain number wells per year).  "Damages based on surmise, conjecture or speculation cannot be sustained.  Damages must be proved with reasonable certainty."  Mascarenas v. Jaramillo, 1991-NMSC-014, ¶ 22, 111 N.M. 410, 415, 806 P.2d 59, 64.  See First Nat. Bank in Albuquerque v. Sanchez, 1991-NMSC-065, ¶ 18, 112 N.M. 317, 323, 815

P.2d 613, 619 (same).   Tyler Group's estimation of damages is based only on Tyler's expectation

of potential future water sales, which, even without Madera's interference were not guaranteed.

See Tyler Group FOFs at 6 (no paragraph numbering); May 3 Tr. at 143:11-24 (DeAyala, Tyler).

Further, even if the Court were to conclude that some water sales likely were to occur before

Madera fired Tyler Group, the Court would be speculating as to the amount of water Concho

Resources would purchase based on only one historical water sale.   Accordingly, Tyler Group has

not met his burden to establish damages.   See Mascarenas v. Jaramillo, 1991-NMSC-014, ¶ 22,

111 N.M. at 415, 806 P.2d at 64; First Nat. Bank in Albuquerque v. Sanchez, 1991-NMSC-065, ¶

18, 112 N.M. at 323, 815 P.2d at 619.

51.     Tyler Group is not entitled to any damages under the water sales agreement,

because, although based on past practices and discussions with Concho Resources, Tyler expected

that Concho Resources would purchase more water under the SUCA in 2018, Tyler Group did not

negotiate any further water sales, and Madera and Pitchfork Cattle did not act in bad faith to

deprive him on the agreement's benefits.   See May 3 Tr. at 40:12-24 (DeAyala, Madera); id. 92:21-

93:25 (DeAyala, Madera); id. at 101:2-8 (DeAyala, Madera); id. at 262:14-19 (DeAyala,

Montgomery); Tyler Group FOFs at 4 (no paragraph numbering); Madera FOFs ¶¶ 23-24, at 3-4.

## III.   TYLER GROUP IS ENTITLED TO $2,040,000.00, BECAUSE MADERA AND TYLER FORMED AN ORAL CONTRACT FOR 2.5% OF PITCHFORK RANCH'S SALE.

52.     The parties dispute whether they formed a contract for 2.5% of Pitchfork Ranch's

sale, and, if they did, what the agreement's terms are.   See Tyler Group FOFs at 7-11 (no paragraph

numbering); Madera FOFs ¶¶ 22-59, at 3-8.   In New Mexico, "[t]o prove the formation of a valid

contract under New Mexico law, the party seeking enforcement generally must show that the

contract is 'factually supported by an offer, an acceptance, consideration, and mutual assent.'"

Strausberg v. Laurel Healthcare Providers, LLC, 2013-NMSC-032, ¶ 42, 304 P.3d 409, 419-20 (quoting Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 9, 121 N.M. 728, 918 P.2d 7).  See Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 7, 115 N.M. 665, 669, 857 P.2d 776, 780 (same).  See also NMRA CIV UJI 13-801.  "An implied contract may be found in written or oral representations, in the conduct of the parties, or in a combination of representations and conduct."  Gormley v. Coca-Cola Enters., 2004-NMCA-021, ¶ 20, 135 N.M. 128, 85 P.3d 252, aff'd on other grounds, 2005-NMSC-003, 137 N.M. 192.  The Court concludes that Madera and Tyler engaged in a series of negotiations in January and February, 2018, and reached an agreement for 2.5% of Pitchfork Ranch's sale to compensate Tyler for the work he did improving Pitchfork Ranch's water sales and therefore attracting potential buyers.[48]

### A.    MADERA OFFERED TYLER 2.5% OF PITCHFORK RANCH'S SALE.

53.    "'In the law of contracts an offer is a proposal setting forth the essential terms of the prospective transaction.'"  Baker v. Endeavor Servs., Inc., 2018-NMSC-035, ¶ 19, 428 P.3d 265, 270 (quoting Naranjo v. Paull, 1990-NMCA-111, ¶ 14, 111 N.M. 165, 169, 803 P.2d 254, 258).

> An offer is a communication of a willingness to enter into a contract.  The communication must satisfy four conditions:
>
> > First, the communication must have included a proposal by [the offeror] showing _____'s (name of offeror) willingness to contract;
> >
> > Second, the material terms of that proposal must have been reasonably certain;

---

[48]Although both parties list the elements of contract formation generally, the parties do not cite any case law explaining the definition of each element, do not analyze each element with citations to case law and the record, and cite non-New Mexico cases to support their arguments. See Tyler Group FOFs at 10-14; Madera FOFs ¶¶ 39-59, at 8-0.

Third, the terms must have been communicated to [offeree]; and

Fourth, by the communication [the offeror] must have intended to give [offeree] the power to create a contract by accepting the terms.

NMRA CIV UJI Rule 13-805.  In addition, "[e]ven though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the proposed contract are reasonably certain."  Las Cruces Urban Renewal Agcy. v. El Paso Elec. Co., 1974-NMSC-004, ¶ 14, 86 N.M. 305, 523 P.2d 549.  See Restatement (Second) of Contracts § 32.

54.     Here, Madera and Tyler engaged in a series of negotiations in January and February, 2018.  Negotiations between the parties began in January, 2018, when Tyler heard that Madera had fired Coker and Ozark Royalty, Tyler thought that he was now "exposed," and called Madera.  May 3 Tr. at 116:17-117:1 (DeAyala, Tyler); Tr. at 164:3-8 (Tyler).  See Tyler Group FOFs at 7 (no paragraph numbering). During that conversation, Madera told Tyler that Tyler "deserved a fee" and that Madera "would take care of it."  May 3 Tr. at 116:3-6 (Tyler); Tyler Group FOFs at 7 (no paragraph numbering). Following that conversation, through his attorney Mr. Newell, Madera offered Tyler "a one time finders fee payment of one percent for any ranch purchaser you bring to Mr. Madera who is willing to pay in excess of $100,000,000 for the ranch." Newell Letter at 1.  On February 8, 2018, Tyler rejected this offer and counter offered in an email: "[I]n this case I would accept nothing less than 3% gross of ANY accepted sale price I bring forth." Feb. 2018 Email Chain at 1.

55.     Tyler's February 8, 2018, counteroffer, became the new offer.  See Pickett v. Miller, 1966-NMSC-050, ¶ 9, 76 N.M. 105, 412 P.2d 400 ("It is not disputed that New Mexico enforces the general rule of contracts to the effect that an offer must be accepted unconditionally and unqualifiedly by the offeree."); Restatement (Second) of Contracts, § 59 (1981) ("A reply to an

offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer."); Polhamus v. Roberts, 1946-NMSC-033, ¶ 18, 50 N.M. 236, 175 P.2d 196.   See also May 3 Tr. at 64:9-12 (Madera)(testifying that, on February 8, 2018, when Madera read Tyler's February 8 Email asking for "nothing less than three percent gross," Madera, "[i]n [his] mind, . . . then cancelled Mr. Tyler and Tyler Group from the sale, from any of this . . . because he turned it down, my offer").

56.     On February 8, 2018, after Tyler sent the February 8, 2018, Email, with his counteroffer, Tyler called Madera and left a voicemail. See May 3 Tr. at 119:11-120:24 (DeAyala, Madera); Tyler Group FOFs at 7 (no paragraph numbering); Madera FOFs ¶ 27, at 4. On February 8, 2018, after Tyler left the voicemail, Madera returned Tyler's call, and they discussed an agreement.[49]   See May 3 Tr. at 119:11-120:16 (DeAyala, Tyler)(describing the sequence of events); Tyler Group FOFs at 7-8 (no paragraph numbering). See also May 3 Tr. at 120:17-25 (Tyler); id. at 66:17-23 (Madera)(stating that "I would not" dispute that he and Tyler had a conversation on between February 8 and 12, 2018, about Tyler's fee).   After this telephone conversation, on February 12, 2018, Madera sent Tyler an email addressed to Morgan Banks: "Morgan: Let's offer Tyler Group 2.5% finders fee on the sale of Pitchfork." Feb. 12, 2018 Chain at 2.

---

[49]Tyler Group argues that, "[d]uring the call, Tyler and Defendants agreed that Defendants would pay Tyler 2.5% of the sales price of the Ranch," Tyler Group FOFs at 8 (no paragraph numbering); as the Court discusses, however, Madera counter offered on February 12, 2018, which became the operative offer. See Feb. 12, 2018 Email at 2. Tyler argues that the February 12, 2018, Email offer "confirm[ed]" and "memorialized" their telephone conversation; however, the Court concludes that the February 12, 2018, Email did not memorialize an offer, because it expressly states: "Let's offer Tyler . . . ," referring to an action to be taken in the future, and does not record what had occurred during the February 8, 2018, telephone conversation. Feb. 2018 Email Chain at 2.

57.     Madera's February 12, 2018 Email was a counteroffer, and became the controlling offer to Tyler, because it was a "communication of a willingness to enter into a contract."  NMRA CIV UJI Rule 13-805.  See Baker v. Endeavor Servs., Inc., 2018-NMSC-035, ¶ 19, 428 P.3d at 270.  See also See Pickett v. Miller, 1966-NMSC-050, ¶ 9, 76 N.M. 105, 412 P.2d 400; Restatement (Second) of Contracts, § 59 (1981); Polhamus v. Roberts, 1946-NMSC-033, ¶ 18, 50 N.M. 236, 175 P.2d 196.   First, Madera's February 12, 2018, Email expressed a "willingness to contract," NMRA CIV UJI Rule 13-805, because it states: "let's offer Tyler . . . ," Feb. 8, 2018 Email at 2, and reflects Madera and Tyler's recent telephone conversation with the same terms, see May 3 Tr. at 122:7-14 (DeAyala, Tyler); id. at 124:14-16 (DeAyala, Tyler)(DeAyala: "Did this email memorialize that conversation?"  Tyler: "It did.").[50]

58.     Second, the terms of the contract are "reasonably certain" based on Madera's and Tyler's ongoing discussion, because: (i) the offer does not include a minimum sales price, which had dropped out after Tyler's February 8, 2018, counteroffer, see Feb. 8, 2018 Email at 1;[51] (ii) it

---

[50]Although Madera inadvertently sent Tyler the email, because Madera did not indicate to Tyler that the February 12, 2018 email had been sent by accident and because it reflects their conversation from February 8, 2018, the Court concludes that expressed a "willingness to contract."  NMRA CIV UJI Rule 13-805.

[51]Madera's and Tyler's agreement that Madera will pay Tyler 2.5% of Pitchfork Ranch's gross sales price does not depend on the amount for which Madera will sell Pitchfork Ranch.  See Feb. 12, 2018 Email at 2; Tyler's Timeline of Events at 1; May 3 Tr. at 64:24-65:11 (Madera); id. at 122:7-14 (DeAyala, Tyler); id. at 124:14-16 (DeAyala, Tyler); id. at 151:8-25 (Hightower, Tyler); id. at 153:6-8 (Hightower, Tyler); id. at 68:10-20 (DeAyala, Madera); Tyler Group FOFs at 7-8 (no paragraph numbering); Madera FOFs ¶¶ 27, 29, at 4. Madera argues that, if there is an agreement between the parties, it includes the term that Madera will pay Tyler Group only if Pitchfork Ranch sells for more than $100,000,000.00.  See May 4 Tr. at 39:11-14 (Hightower). Although the $100,000,000.00 term is part of Madera's offer on February 6, 2018, see Newell Letter at 1, that term dropped out when Tyler Group counter offered, see Feb. 8, 2018 Email at 1 ("I would accept nothing less than 3% gross of ANY accepted sale price I bring forth."), and Madera made his final offer on February 12, 2018, without a reference to a sales price, see February 12, 2018 Email at 2 ("Let's offer Tyler Group 2.5% finder's fee on the sale of Pitchfork.").  See

includes a term for 2.5% of Pitchfork Ranch's sales price; and (iii) the phrase "finder's fee" refers to Tyler's ongoing work to improve Pitchfork Ranch's water sales and therefore make Pitchfork Ranch more attractive for protentional buyers, not to Tyler finding a buyer for Pitchfork Ranch, which he was not hired to do, Pretrial Order ¶ 2, at 8 (listing as a stipulated fact that Tyler was not "hired nor tasked with . . . introducing prospective buyers to the Maderas"); May 3 Tr. at 153:4-19 (Hightower, Tyler).[52]

59.     Third, Madera "communicated" the offer's terms to Tyler when Madera emailed Tyler.  NMRA CIV UJI Rule 13-805.  Although the February 12, 2018, Email was addressed to Banks, and not Tyler, once Tyler received the offer, Madera made no efforts to tell Tyler that he had not meant to send Tyler the offer.  See May 3 Tr. at 64:24-65:11 (Madera)(agreeing that he did not "do anything prior to 2020 to say, oops, I didn't mean to send it, give it back, anything like that . . ."); id. at 65:1-20 (Madera)(agreeing that Madera did not send a "follow-up email That said, oh, you weren't supposed to receive that, Fred . . .").  Fourth, the offer gave Tyler to power accept

---

also NMRA CIV UJI 13-808 ("If [the offeree] responded to an offer by conditioning acceptance on new terms that added, varied or changed any term of the offer, the response was a rejection of the original offer and operated as a new offer that could be accepted or rejected by [the offeror].").

[52]Although Madera argues that the Court should interpret "finder' fee" literally, the Court agrees with Tyler Group's interpretation of the term finder's fee, because it reflects the stipulated facts in the Pretrial Order and reflects the trial testimony.  Compare May 4 Tr. at 35-39:17 (Court, Hightower), with May 4 Tr. at 16:1-17:15 (DeAyala).  In its FOF ¶¶ 130-132, at 34-36, supra, the Court concludes that, although Tyler and Madera used the phrase "finder's fee" throughout their negotiations, Tyler was not "hired nor tasked with . . . introducing prospective buyers to the Maderas."  Pretrial Order ¶ 2, at 8 (listing stipulated facts).  Madera and Tyler use the phrase "finder's fee" to refer to Tyler's efforts to improve Pitchfork Ranch's water operations and therefore make Pitchfork Ranch more attractive for protentional buyers.  See May 3 Tr. at 116:11-16 (Tyler)("My function was just to do business-development-type services and create a balance sheet, create water sales, create these business lines and business streams for the Ranch as revenue streams and then also look at other businesses that we could . . . do."); id. at 151:18-152:2 (Hightower, Tyler)("I was attracting the buyer . . . ."); id. at 153:4-19 (Hightower, Tyler); May 4 Tr. at 15:20-17:15 (Court, DeAyala).

the terms.  See NMRA CIV UJI Rule 13-805.  Accordingly, Madera's February 12, 2018, Email

was an offer to Tyler to enter into an agreement.  See Baker v. Endeavor Servs., Inc., 2018-NMSC-

035, ¶ 19, 428 P.3d at 270; NMRA CIV UJI Rule 13-805.

### B.   TYLER ACCEPTS MADERA'S OFFER THROUGH PERFORMANCE.

60.   Acceptance must occur for an agreement to be binding.  See Medina v. Sunstate

Realty, Inc., 1995-NMSC-002, ¶ 16, 889 P.2d 171, 174.  "An acceptance must be clear, positive

and unambiguous."  Tatsch v. Hamilton-Erickson Mfg. Co., 1966-NMSC-193, ¶ 10, 76 N.M. 729,

733, 418 P.2d 187, 189.  See Medina v. Sunstate Realty, Inc., 1995-NMSC-002, ¶ 8, 889 P.2d at

173.  "For there to be a contract, the offer must be accepted unconditionally and unqualifiedly by

the offeree . . . to all terms."  Corr v. Braasch, 1981-NMSC-137, ¶ 5, 97 N.M. 279, 280, 639 P.2d

566, 567.  See Silva v. Noble, 1973-NMSC-106, ¶ 6, 85 N.M. 677, 678, 515 P.2d 1281, 1282 ("In

order to constitute a binding contract, there must be an unconditional acceptance of the offer

made.").  See also NMRA CIV UJI Rule 13-807 ("An acceptance is a statement or conduct made

by one party to the other, showing that party's agreement to the terms of the other party's offer.").

Except for offers given for consideration, the offeror has the power to revoke the offer "at any time

prior to an unconditional acceptance by the offeree."  Tatsch v. Hamilton-Erickson Mfg. Co., 1966-

NMSC-193, ¶ 15, 76 N.M. at 734, 418 P.2d at 190.  Subject to certain exceptions, "the offeror

must be notified of the acceptance."  Corr v. Braasch, 1981-NMSC-137, ¶ 5, 97 N.M. at 280, 639

P.2d at 567.

61.   A party's acceptance of a written offer may be express or implied by conduct.  See

Medina v. Sunstate Realty, Inc., 1995-NMSC-002, ¶ 14, 119 N.M. at 139, 889 P.2d at 174;

Cornoyer v. AT&T Mobility Serv., LLC, No. CIV 15-0474, 2016 WL 6406853, at *11 (D.N.M.

Oct. 5, 2016)(Browning, J.).  Where the offer invites acceptance through performance, rather than

in writing, the beginning of invited performance is an implied acceptance.  See Long v. Allen,

1995-NMCA-119, ¶ 6, 906 P.2d at 756.[53]  In DeArmond v. Halliburton Energy Serv., Inc., for

example, Halliburton Energy invited acceptance through performance by informing employees in

a memorandum that "[y]our decision to . . . continue your current employment after January 1,

1998 means you have agreed to and are bound by the terms of this [arbitration] Program."  2003-

NMCA-148, ¶ 9, 134 N.M. 630, 634, 81 P.3d 573, 577.  A party's "notice of acceptance may be

communicated in any reasonable way . . . unless [the] . . . offer required a particular manner of

acceptance . . . ."  NMRA, Rule 13-810.  See Silva v. Noble, 1973-NMSC-106, ¶ 6, 85 N.M. 677,

679, 515 P.2d 1281, 1283 ("'[M]anifestation [of acceptance] may be either written or oral or by

actions and conduct or a combination thereof . . .'")(quoting R.J. Daum Const. Co. v. Child, 122

Utah 194, 200, 247 P.2d 817, 819 (1952)).

62.     Here, Tyler never called Madera, sent Madera an email, or sent Madera a letter

rejecting, accepting, or counter offering Madera's offer in the February 12, 2018, Email.  See May

3 Tr. at 68:10-20 (DeAyala, Madera).[54]  "An oral or formal acceptance of an offer is not

---

[53]The Court predicts the New Mexico Supreme Court would agree with the holding in Long v. Allen, because the principle is embedded in the UJIs.  See NMRA CIV UJI Rule 13-806.  See also Strata Prod. Co. v. Mercury Expl. Co., 1996-NMSC-016, ¶ 14, 121 N.M. 622, 627, 916 P.2d 822, 827 ("In a unilateral contract, the offeree accepts the offer by undertaking the requested performance. Generally, the offeror is free to revoke or revise the offer before acceptance.").

[54]Madera testified at the trial that he did not receive any communication from Tyler about the offer in the February 12, 2018, Email:

DeAyala:     And you'll agree with me that after this email was sent by you that there is no writing, no email, letter, smoke signal, or anything else from Mr. Tyler disagreeing with it?

Madera:      Nor is there any email or letter or phone conversation where he accepted it.

necessary," however.  Keeth Gas Co. v. Jackson Creek Cattle Co., 1977-NMSC-087, ¶ 8, 91 N.M. 87, 90, 570 P.2d 918, 921.  "The general rule is that an offer may be accepted by performance before a revocation."  Keeth Gas Co. v. Jackson Creek Cattle Co., 1977-NMSC-087, ¶ 8, 91 N.M. at 90, 570 P.2d at 921.  "If [the offeror] invited acceptance of the offer through a return promise or through performance, and [the offeree] began the invited performance, such performance was an acceptance of the offer."  NMRA CIV UJI 13-812.  Here, Madera's offer in the February 12, 2018, Email could be accepted by Tyler's performance, it did not require Tyler to formally accept: i.e., Tyler could accept by working to improve Pitchfork Ranch's water sales to attract potential buyers:

> In the ordinary commercial bargain a party expects to be bound only if the other party either renders the return performance or binds himself to do so either by express words or by part performance or other conduct.  Unless the language or the circumstances indicate that one party is to have an option, therefore, the usual offer invites an acceptance which either amounts to performance or constitutes a promise.  The act of acceptance may be merely symbolic of assent and promise, or it may also be part or all of the performance bargained for.

Restatement (Second) of Contracts § 32(a).[55]  See Feb. 12, 2018 Email at 2.  Accordingly, the Court concludes that Tyler accepted Madera's offer by continuing to work for Madera and Pitchfork Cattle until Madera fired Tyler later that summer.  See Medina v. Sunstate Realty, Inc.,

---

DeAyala:      Afterwards?

Madera:       During or after, either way.

May 3 Tr. at 68:10-20 (DeAyala, Madera).

[55]The Court predicts that the New Mexico Supreme Court would rely on Restatement (Second) of Contracts § 32(a), because the New Mexico Supreme Court consistently cites and uses Restatement (Second) of Contracts.  See, e.g., Romero v. Earl, 1991-NMSC-042, ¶ 6, 111 N.M. 789, 791, 810 P.2d 808, 810 (citing the Restatement (Second) of Contracts §§ 71,79 for the definition of consideration).

1995-NMSC-002, ¶ 14, 889 P.2d at 174 (concluding that a party's acceptance of a written offer

may be implied by conduct).

> ### C.   THERE WAS CONSIDERATION, BECAUSE MADERA PROMISED TO PAY TYLER 2.5% FINDER'S FEE ON THE SALE OF PITCHFORK RANCH AND TYLER PROMISED TO CONTINUE TO WORK TO IMPROVE PITCHFORK RANCH'S WATER SALES BUSINESS TO ATTRACT POTENTIAL BUYERS AND TO IMPROVE THE RANCH'S VALUE.

63.

Turning to consideration,

> [c]onsideration adequate to support a promise is essential to enforcement of the contract and must be bargained for by the parties.  Knoebel v. Chief Pontiac, 61 N.M. 53, 57, 294 P.2d 625, 627-28 (1956). Something is bargained for "if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise."  Restatement (Second) of Contracts § 71 (1979); see also Restatement (Second) of Contracts § 79 (1979) (if the requirement of bargained for consideration is met, there is no further requirement of a benefit to the promisor or a detriment to the promisee).

Romero v. Earl, 1991-NMSC-042, ¶ 6, 111 N.M. 789, 791, 810 P.2d 808, 810.  See Heye v. Am.

Golf Corp., 2003-NMCA-138, ¶ 12, 134 N.M. 558, 80 P.3d 495 ("Consideration consists of a

promise to do something that a party is under no legal obligation to do or to forbear from doing

something he has a legal right to do.")(citing  Restatement (Second) of Contracts §§ 73, 74, at 179,

185 (1981)).[56]  In other words, consideration is

> any bargained-for benefit or advantage to [the promisor] which was a reason why [promisor] wanted to enter into the contract, or any loss or detriment to [the promise], which [the promisor] desired [the promise] to suffer or which was a reason for [the promisor] to enter into the contract.  Consideration may consist of a return promise, an act, a forbearance, or the creation, modification, or destruction

---

[56]The Court predicts that the New Mexico Supreme Court would rely on Restatement (Second) of Contracts § 32(a), because the New Mexico Supreme Court consistently cites and uses Restatement (Second) of Contracts.  See, e.g., Romero v. Earl, 1991-NMSC-042, ¶ 6, 111 N.M. 789, 791, 810 P.2d 808, 810 (quoting the Restatement (Second) of Contracts §§ 71,79 for the definition of consideration).

of a legal relation.

NMRA CIV UJI 13-814.  See Lukoski v. Sandia Indian Mgmt. Co., 1988-NMSC-002, ¶¶ 4-8, 106

N.M. 664, 666-667, 748 P.2d 507, 509-10 (concluding that, if an employer issues a policy

statement in a manual, encourages reliance on the policy, and then only selectively abides by it,

the employer is making an illusory promise).

      64.    The Court concludes that there is consideration, because: (i) Madera promised to

pay Tyler "2.5% finders fee on the sale of Pitchfork" Ranch, Feb. 12, 2018 Email at 2; and

(ii) Tyler, in return, promised to continue[57] to work to improve Pitchfork Ranch's water sales

business to attract potential buyers and improve the value of the ranch.  See Feb. 2018 Email Chain

at 2; May 3 Tr. at 66:17-23 (Madera); id. at 116:17-122:14 (DeAyala, Tyler); id. at 120:17-25

(Tyler); id. at 123:15-126:20 (DeAyala, Tyler); id. at 153:6-8 (Hightower, Tyler); id. at 116:11-16

(Tyler)("My function was just to do business-development-type services and create a balance

sheet, create water sales, create these business lines and business streams for the Ranch as revenue

streams and then also look at other businesses that we could . . . do."); id. at 151:18-152:2

(Hightower, Tyler)("I was attracting the buyer . . . ."); Tyler Group's FOFs at 7 (no paragraph

numbering).

      **D.**    **MADERA AND TYLER OBJECTIVELY MANIFESTED MUTUAL ASSENT.**

---

[57]To the extent that Madera's offer was for work Tyler already had performed, such consideration still can be valid consideration.  See Restatement (Second) of Contracts § 86 (1981) ("A promise made in recognition of a benefit previously received by the promisor from the promisee is binding to the extent necessary to prevent injustice.").  Regardless, Madera's offer was premised on Tyler's continued and hence future work.   The Court predicts that the New Mexico Supreme Court would rely on Restatement (Second) of Contracts § 86, because the New Mexico Supreme Court consistently cites and uses Restatement (Second) of Contracts.  See, e.g., Romero v. Earl, 1991-NMSC-042, ¶ 6, 111 N.M. 789, 791, 810 P.2d 808, 810 (citing the Restatement (Second) of Contracts §§ 71,79 for the definition of consideration).

65.     "It is elementary in contract law that mutual assent must be expressed by the parties to the agreement. . . .  'When the minds of the parties have not met on any part or provision of a proposed contract, all of its portions are a nullity.'"  Trujillo v. Glen Falls Ins. Co., 1975-NMSC-046, ¶ 6, 88 N.M. 279, 280, 540 P.2d 209, 210 (quoting Lamonica v. Bosenberg, 1964-NMSC-024, ¶ 8, 73 N.M. 452, 455, 389 P.2d 216, 217).  Courts look to the "objective manifestations of the parties," and not to their subjective thoughts.  Trujillo v. Glen Falls Ins. Co., 1975-NMSC-046, ¶ 7, 88 N.M. at 281, 540 P.2d at 211.  See id. ("'The apparent mutual assent, essential to the formation of a contract, must be gathered from the language employed by them, or manifested by their words or acts, and it may be manifested wholly or partly by written or spoken words or by other acts or conduct.'")(quoting 17 C.J.S. Contracts s 32, at 640 (1963)).  In other words, mutual assent

> requires a showing of agreement by the parties to the material terms of the contract. Mutual assent may be shown by the parties' written or spoken words, by their acts or failures to act, or some combination thereof.  Ordinarily, when one party makes an offer, and the other party accepts the offer, there is mutual assent.

NMRA CIV UJI 13-816.

66.     Here, Tyler's and Madera's actions reflect mutual assent, because Tyler continued work to improve Pitchfork Ranch's income streams, and Madera fired Tyler in July, 2018, so that he would not have to pay Tyler anything.   See May 3 Tr. at 74:22-75:18 (DeAyala, Madera).[58]

---

[58]At the trial, Madera testified:

DeAyala:   Okay.  Let's go to your deposition . . . [w]here you say: . . .

          [A:]     "I terminated his employment.

          . . . .

Because Madera testified that, he fired Tyler so that he would not have to pay Tyler anything under their agreement, the Court concludes that Madera understood that there was mutual assent to enter into a contract.[59]  See Trujillo v. Glen Falls Ins. Co., 1975-NMSC-046, ¶ 7, 88 N.M. at 281, 540 P.2d at 211.  In addition, at trial, Madera testified that if he had sold Pitchfork Ranch for over $100,000,000.00, he would have paid Tyler 2.5% of the sale's fee; this testimony also shows that Madera understood that he had an agreement with Tyler.  See May 3 Tr. at 75:19-76:11 (DeAyala, Madera).  Although Madera testified that he would have paid Tyler under their agreement if he had sold Pitchfork Ranch for over $100,000,000.00, see May 3 Tr. at 75:19-76:11 (DeAyala, Madera), the Court already has concluded that this term was not part of the agreement, because Tyler's February 8, 2018, counteroffer conditioned his offer on not having any minimum sales

> [Q:]   So you made sure to fire him before you'd ever have to pay him anything?
>
> [A:]   Oh, yeah, definitely."
>
> Does that refresh your memory?
>
> Madera:   Yes, sir.
>
> DeAyala:   Is that testimony true?
>
> Madera:   Yes, sir.

May 3 Tr. at 74:4-75:16 (DeAyala, Tyler)(quoting Deposition Testimony of Bert Madera).

[59]Although "[m]ost offers are revocable," the power of revocation lasts only until the offeree has accepted the offer. Restatement (Second) of Contracts § 42(a) (1981). See id. § 42(c) ("Once the offeree has exercised his power to create a contract by accepting the offer, a purported revocation is ineffective as such."). Accordingly, although Madera fired Tyler, he fired Tyler after Tyler already had accepted by commencing performance and the revocation is "ineffective." Restatement (Second) of Contracts § 42(c) (1981). The Court predicts that the New Mexico Supreme Court would rely on Restatement (Second) of Contracts § 42, because the New Mexico Supreme Court consistently cites and uses Restatement (Second) of Contracts. See, e.g., Romero v. Earl, 1991-NMSC-042, ¶ 6, 111 N.M. 789, 791, 810 P.2d 808, 810 (citing the Restatement (Second) of Contracts §§ 71,79 for the definition of consideration).

price, and Madera's February 12, 2018, offer did not include a minimum sales price.  See Analysis § III(A), supra.  In addition, Madera testified that he fired Tyler so that he would not have to pay Tyler under their agreement, see May 3 Tr. at 74:22-75:18 (DeAyala, Madera), contradicting his statement; the Court concludes that Madera's reference to the $100,000,000.00 is self-serving testimony.

67.     Accordingly, the Court concludes that Madera and Tyler had a contract for 2.5% of Pitchfork Ranch's sale to compensate Tyler for the work he did improving Pitchfork Ranch's water sales and therefore attracting potential buyers, because the record reflects that Madera made an offer on February 12, 2018; (ii) Tyler accepted through performance; (iii) there is consideration; and (iv) the parties objectively manifested mutual assent.  See Strausberg v. Laurel Healthcare Providers, LLC, 2013-NMSC-032, ¶ 42, 304 P.3d at 419-20 (concluding that a contract is "'factually supported by an offer, an acceptance, consideration, and mutual assent.'")(quoting Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 9, 121 N.M. 728, 918 P.2d 7).  See Gormley v. Coca-Cola Enters., 2004-NMCA-021, ¶ 20, 135 N.M. 128, 85 P.3d 252 ("An implied contract may be found in written or oral representations, in the conduct of the parties, or in a combination of representations and conduct."), aff'd on other grounds, 2005-NMSC-003, 137 N.M. 192.  See also NMRA CIV UJI 13-801.  The Court concludes that Madera breached the contract, because Madera and Pitchfork Cattle did not pay Tyler Group anything when Madera sold Pitchfork Ranch to Quail Ranch LLC, a Concho Resources subsidiary, for $81,600,000.00. See Letter Agreement at 1 (listing the terms of the sale between Quail Ranch LLC, the purchaser, and the Maderas and Pitchfork Cattle, the sellers); Pretrial Order ¶ 6 at 8; May 3 Tr. at 31:12-16 (DeAyala, Madera); Tyler Group FOFs at 9 (no paragraph numbering); Madera FOFs ¶ 31, at 5; Pretrial order ¶ 7 at 8 (listing as an stipulated fact: "The Maderas did not pay Tyler any fee resulting

from the sale of the Ranch."); Tyler Group FOFs at 9 (no paragraph numbering); May 3 Tr. at

141:3-143:9 (Coker).  See also Cochrell v. Hiatt, 1981-NMCA-125, 638 P.2d 1101, 1103-04;[60]

NMRA CIV UJI 13-801, 13-822.

   **IT IS ORDERED** that: (i) the Defendant's Motion In Limine to Bar Reference of

Settlement Negotiations, Attorney Client-Communication and Dismissal of Parties, filed

November 30, 2020 (Doc. 80), is denied; and (ii) judgment is granted in Tyler Group Partners,

LLC's favor against the Defendants in the amount of $2,040,000.00.

                              _____
                              UNITED STATES DISTRICT JUDGE

*Counsel:*

Emilio DeAyala
Buck Keenan, LLP
Houston, Texas

--and--

Joseph M. Zebas
Zebas Law Firm, LLC
Hobbs, New Mexico

   *Attorneys for the Plaintiff*

Clayton S. Hightower
Sanders, Bruin, Coll & Worley, P.A.
Roswell, New Mexico

   *Attorneys for the Defendants*

---

   [60]The Court predicts that the New Mexico Supreme Court would agree with this holding because its principle is embedded in the UJIs.  See NMRA CIV UJI 13-801.